## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| **Plaintiff,** | |
| v. | |
| KEVIN B. MERRILL; JAY B. LEDFORD; CAMERON R. JEZIERSKI; GLOBAL CREDIT RECOVERY, LLC; DELMARVA CAPITAL, LLC; RHINO CAPITAL HOLDINGS, LLC; RHINO CAPITAL GROUP, LLC; DEVILLE ASSET MANAGEMENT LTD; AND RIVERWALK FINANCIAL CORPORATION, | Case No. RDB-18-2844 |
| | AMENDED COMPLAINT |
| | JURY TRIAL DEMANDED |
| **Defendants,** | |
| and | |
| AMANDA MERRILL AND LALAINE LEDFORD, | |
| **Relief Defendants.** | |

Plaintiff, Securities and Exchange Commission (the "Commission"), alleges as follows:

### NATURE OF THE ACTION

1.      This matter involves an offering fraud by Defendants Kevin B. Merrill

("Merrill"), Jay B. Ledford ("Ledford"), and Cameron Jezierski ("Jezierski") that raised more

than $345 million from over 230 investors to purportedly purchase consumer debt portfolios.

From at least 2013 to present, Defendants operated this Ponzi-like scheme that involved, among

other things, securities offerings rife with misrepresentations, fake debt, forged signatures,

fabricated wire transfers, the movement of millions of dollars into personal accounts, and an

elaborate scheme wherein Defendants offered and sold investments in the same (and often fictitious) debt and/or debt portfolios, to multiple victims.

2.      Of the $345 million raised, more than $90 million was invested by over 200 individual investors; approximately $52 million by family offices; and nearly $203 million by feeder funds, largely made up of groups of individuals.  These investors included small business owners, restauranteurs, construction contractors, retirees, doctors, lawyers, accountants, bankers, talent agents, current and former professional athletes, and financial advisors.

3.      Touting their purported expertise in collecting on and reselling consumer debt, Merrill and Ledford, through a web of entities they owned and/or controlled, including Defendants Global Credit Recovery, LLC; Delmarva Capital, LLC; Rhino Capital Holdings, LLC; Rhino Capital Group, LLC; DeVille Asset Management LTD; and Riverwalk Financial Corporation (collectively, "Entity Defendants"), offered and sold securities to investors with the promise of significant profits.  Defendants used these and a total of approximately 30 interrelated corporate entities and over 55 bank accounts to move investor money, deceive investors, and continue their Ponzi-like scheme that has survived only with the influx of greater and greater sums of cash.

4.      Instead of using investors' money as promised, Defendants stole a vast portion of the money raised and used almost all that remained to make Ponzi-like payments to earlier investors so that the scheme could continue.  Defendants Merrill and Ledford took millions to maintain a lavish lifestyle.  Ledford misappropriated at least $40 million, including transferring at least $17 million to personal bank accounts and purchasing items including a $368,000 Ferrari, a $330,000 seven-carat diamond ring, and a $168,000 23-carat diamond bracelet, while transferring $13 million to casinos.  Merrill misappropriated at least $45 million, including by

transferring over $7 million to his personal bank accounts, spending $10.2 million on at least 25 high-end automobiles (including a 2008 Bugatti Veyron, a 2014 Pagani Huayra Diablo, a 2014 Ferrari F12 Berlinetta, a 2017 Rolls Royce Dawn, and multiple other models made by Ferrari and Lamborghini), $5.5 million toward the purchase of a house in Naples, Florida, over $2 million for home renovations, $500,000 for an interest in a Gulfstream 200 private jet, a $100,000 club membership in Naples, $350,000 on a boat, and transferring approximately $1 million to casinos.  Merrill and Ledford further misappropriated investor funds by transferring to their respective wives, Amanda Merrill and Lalaine Ledford, investor money and other assets purchased using the misappropriated money, including real estate and luxury goods.

5.     Defendants made payments to investors of approximately $197 million, most of which consisted of money received from investors, to deceive investors into believing that their money had been invested as promised and that they were reaping profits from those investments. As a result, many unsuspecting investors were victimized repeatedly and referred other prospective investors to Defendants.  Merrill and Ledford continued to seek additional money from investors until the filing of the SEC's complaint and their arrests by the criminal authorities.

6.     By engaging in the conduct described in this Amended Complaint, Defendants violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R § 240.10b-5(a), (c); and Defendants Merrill and Ledford and the Entity Defendants violated, and unless enjoined will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).  Relief Defendants Amanda Merrill and

Lalaine Ledford have been unjustly enriched, as they have received proceeds of the fraud to which they have no legitimate claim.

## JURISDICTION AND VENUE

7.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act, 15 U.S.C. § 77t(b) and 77t(d), and Sections 21(d) and (e) of the Exchange Act, 15 U.S.C. § 78u(d) and 78u(e), to enjoin acts, transactions, practices, and courses of business, and to obtain disgorgement, prejudgment interest, civil penalties, and such other and further relief as the Court may deem just and appropriate.

8.     The Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act, 15 U.S.C. §§ 77t and 77v, and Sections 21 and 27 of the Exchange Act, 15 U.S.C. §§ 78u and 78aa.

9.     Venue lies in this judicial district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a).  Among other things, certain of the acts, practices, and courses of business constituting the violations of the federal securities laws alleged herein occurred within this district, including that Defendants made misrepresentations and engaged in deceptive conduct affecting investors residing within this district.  In addition, Defendant Merrill resides and transacts business through Defendants Global Credit Recovery, LLC; Delmarva Capital, LLC; Rhino Capital Holdings, LLC; and Rhino Capital Group, LLC in the District of Maryland.  Defendants Ledford, DeVille Asset Management LTD, and Riverwalk Financial Corporation transmitted false documents into the District of Maryland for distribution by Defendant Merrill.  Relief Defendant Amanda Merrill received ill-gotten funds obtained as a result of Defendants' fraudulent scheme operated within the District of Maryland and other assets purchased with such ill-gotten funds.  Relief Defendant

Lalaine Ledford received ill-gotten funds obtained as a result of Defendants' fraudulent scheme operated within the District of Maryland and other assets purchased with such ill-gotten funds.

## DEFENDANTS

10.     Kevin B. Merrill, 53, lives in Towson, located in Baltimore County, Maryland. Merrill previously was in the business of buying, selling, and collecting on consumer debt. Merrill owns and/or controls, among other entities, Defendants Global Credit Recovery, LLC; Delmarva Capital, LLC; Rhino Capital Holdings, LLC; and Rhino Capital Group, LLC; as well as GCR CBL CP I, LLC; GCR CBL CP II, LLC ("GCR CBL II"); GCR CBL CP III, LLC; GCR CBL CP IV, LLC("GCR CBL IV"); GCR Mercer Holdings, LLC; GCR HCP Holdings 1, LLC ("GCR HCP"); and K.B. Merrill Associates ("KB Merrill").

11.     Jay B. Ledford, 54, lives in Westlake, Texas and Las Vegas, Nevada.  Ledford, through his entities, has, on occasion, bought, sold, and collected on consumer debt and also operated a credit repair business and an accounting firm.  Ledford owns and/or controls, among other entities, Defendants DeVille Asset Management LTD and Riverwalk Financial Corporation; as well as Financial Reclamation Group LLC ("FRG"); Halo Credit Solutions LLC ("Halo"); JBL Holdings LLC ("JBL Holdings"); Jay B. Ledford, P.C. ("JBL PC"); the Joseph Finance Company ("JFC"); Leddy Bear LTD ("Leddy Bear"); Ledford & Associates, PLLC ("Ledford & Associates"); King Fischer LTD d/b/a LP Investments LTD ("LP"); NLEX, Inc. ("NLEX"); Receivables Portfolio Interchange, Inc. ("RPI"); Riverwalk Capital Investments, Inc. ("RW Capital"); Riverwalk Credit Solutions, Inc. ("RW Credit"); Riverwalk Debt Solutions, Inc. ("RW Debt"); Riverwalk Fixed Asset Group LLC ("RW Fixed"); SCUSA Financial, Inc. ("SCUSA"), and Vaquero Asset Management ("Vaquero").  Ledford is a certified public accountant registered in Texas.

12.     Cameron R. Jezierski, 27, of Fort Worth, Texas, is an employee of Defendants DeVille Asset Management LTD and/or Riverwalk Financial Corporation.  Jezierski operated the Ledford-controlled entities SCUSA and NLEX, and owns and/or controls CRJ Holdings LLC ("CRJ Holdings").

13.     Global Credit Recovery, LLC ("GCR") is a Maryland limited liability company with its principal place of business in Towson, Maryland.  GCR is the entity through which Merrill primarily operates, and GCR sold purported investments in consumer debt portfolios.  Merrill owns, controls, and is the managing member of GCR.

14.     Delmarva Capital, LLC ("Delmarva") is a Delaware limited liability company with its principal place of business in Towson, Maryland.  Merrill owns, controls, and is the CEO/managing member of Delmarva, and Delmarva sold purported investments in consumer debt portfolios.

15.     Rhino Capital Holdings, LLC ("Rhino Capital") is a Montana limited liability company with its principal place of business in Towson, Maryland.  Rhino Capital is owned and controlled by Merrill, and Rhino Capital received money from investors in connection with purported investments in consumer debt portfolios.

16.     Rhino Capital Group, LLC ("Rhino Group") is a Delaware limited liability company with its principal place of business in Towson, Maryland.  Merrill owns and controls Rhino Group, and Rhino Group sold purported investments in consumer debt portfolios.  In his communications with investors, Merrill portrayed Rhino Group and Rhino Capital (collectively, "Rhino") as a single entity and treated the two interchangeably.

17.     DeVille Asset Management LTD ("DeVille") is a Texas limited partnership. DeVille's principal place of business is in Colleyville, Texas.  JBL Holdings, an entity owned

and/or controlled by Ledford, is DeVille's general partner.  DeVille is controlled by Ledford, who holds himself out as DeVille's CEO, and DeVille sold purported investments in consumer debt portfolios.

18.     Riverwalk Financial Corporation ("RW Financial") is a Delaware corporation with its principal place of business in Colleyville, Texas.  RW Financial is the entity through which Ledford primarily operated.  RW Financial received money from investors and is controlled by Ledford, who is the CEO.

## RELIEF DEFENDANTS

19.     Amanda Merrill, 29, lives in Towson, Maryland.  Mrs. Merrill married Merrill in December 2015.  Mrs. Merrill is a florist and wedding planner.  Mrs. Merrill previously worked as an assistant to Mr. Merrill in connection with his purported debt portfolio business.

20.     Lalaine Ledford, 35, lives in Las Vegas, Nevada.  Mrs. Ledford married Ledford in December 2017.  Mrs. Ledford previously worked as an assistant to Mr. Ledford in connection with his purported debt portfolio business.

## OTHER ENTITIES

21.     Centurion Capital Corporation ("Centurion") is a Texas corporation with its principal place of business in Colleyville, Texas.  Centurion is owned by SBL Holdings, LLC, which is controlled by a Ledford family member.  Centurion sold purported investments in consumer debt portfolios at the direction of Ledford.

22.     GCR CBL CP I, LLC ("GCR CBL I") is a Delaware limited liability company with its principal place of business in Towson, Maryland.  GCR CBL I is controlled by Merrill, and GCR CBL I sold investments to investors in connection with the purported purchase of debt portfolios for investment purposes.

23.     GCR CBL CP III, LLC ("GCR CBL III") is a Delaware limited liability company with its principal place of business in Towson, Maryland.  GCR CBL III is controlled by Merrill, and GCR CBL III sold investments to investors in connection with the purported purchase of debt portfolios for investment purposes.

24.     GCR Mercer Holdings, LLC ("GCR Mercer") is a Delaware limited liability company with its principal place of business in Towson, Maryland.  GCR Mercer is owned and/or controlled by Merrill, and GCR Mercer sold investments to investors in connection with the purported purchase of debt portfolios for investment purposes.

## FACTS

**I.      MERRILL, LEDFORD, AND ENTITY DEFENDANTS FRAUDULENTLY OFFERED AND SOLD INVESTMENTS RELATING TO PORTFOLIOS OF CONSUMER DEBT**

### A.      Structure of Defendants' Operations

25.     Since at least 2013, Merrill and Ledford have worked together to offer and sell purported investments in consumer debt portfolios.  During this time, on occasion, they purchased, serviced, and sold a limited amount of actual consumer debt.  These activities were dwarfed by the fraudulent scheme described herein.  Indeed, they often used the actual debt information as part of their scheme to deceive and defraud investors.

26.     Consumer debt of the type relevant to this matter—generally auto debt, credit card debt, and student loan debt—is often sold in portfolios comprised of groups of thousands of individual debtors' accounts.  The portfolios are typically denominated by the principal, or face, value amount—the amount of outstanding debt collectively owed by the individual debtors comprising the portfolio.  Thus, a portfolio containing $100 million of outstanding debt owed by the individual debtors would be referred to as a "$100 million" portfolio.

27.     Typically, debt portfolios are sold for a fraction of the face value.  Thus, a $100 million portfolio might be acquired for a few million dollars. The price could depend on numerous factors, including the issuer, type of debt, age of the accounts, whether the debt is secured, or the location of the debtors.

28.     Debt portfolios are often documented in electronic spreadsheets or database files containing thousands of entries with relevant information for each individual debt, including, for example, the identity of debtor and contact information, the type of debt, the amount owed, and the date the debt was acquired.

29.     Merrill and Ledford maintained separate entities, and divided duties relating to the purported business.  The two used this network of entities to give an air of legitimacy to their scheme.

30.     Merrill and Ledford solicited and received money from individual investors, as well as investment funds and special purpose vehicles organized by investors, to make investments related to these purported debt portfolios.  While Merrill and Ledford worked separately at times, they often both worked on the same investments, and relied on each other for documentation, support, introductions to investors, and raising sufficient funds to keep the fraudulent scheme ongoing.

31.     Ledford maintained a network of at least 20 entities, including his own CPA firm, but generally handled the operational aspects of the business through two entities, DeVille and RW Financial, which took in investor money and participated in some limited, actual debt acquisition, resale, and collections activity.  These entities employed individuals to evaluate debt portfolios for purchase, as well as persons who operated debt collection telephone banks, handled human resources, payroll, and other operational duties.

32.     Merrill operated without much staff and tended to focus on raising money for the scheme, operating mainly through GCR and/or Delmarva.  While Ledford often interacted with investors, he tended to rely on Merrill to find new investors.  Merrill generally negotiated the framework for investments, with Ledford's approval.

33.     Merrill often communicated with investors, including in the emails described herein, through his GCR email address.  Ledford often communicated with investors, including in the emails described herein, through his RW Financial email address.

34.     As a general matter, Ledford, assisted by Jezierski, created the fraudulent documentation and paperwork required to maintain the scheme, including due diligence documents that purportedly summarized the investments.  These usually took the form of asset purchase overviews, summarizing the debt portfolio and its expected returns, and spreadsheets with projected recoveries.  Ledford also created, in the name of various entities controlled by Defendants, documents including purchase agreements, collection reports, and profits projections containing many material misrepresentations.  Ledford also oversaw wire transfer remittances of purported collection amounts, much of which actually constituted Ponzi-like payments.

**B.      Structure of the Securities Offered and Sold by Defendants**

35.     In perpetrating their fraud, Merrill, Ledford, and Entity Defendants used four basic structures for the investments in debt portfolios they offered and sold:  (1) "Investor Agreements," mainly sold to individual investors; (2) "Agreements Concerning Acquisition of Portfolios," or similarly structured agreements; (3) investments structured as credit facilities or promissory notes; and (4) unit interests in limited liability companies.

36.     Typically, GCR or Delmarva was the counterparty on Investor Agreements, which Merrill signed as "Managing Member" or "Member" of the entity.  They typically represented that, upon an investment of money, GCR or Delmarva would "partake in the

business of buying, selling, and recovering" on debt portfolios for the investor.  Multiple investors purportedly could own an interest in the same portfolio, and investors were led to believe that their "money rides along side" Merrill's and other investors' money.

37.     Merrill referred to these investments as being part of a "fund" or a "pool of dollars" from which purchases of debt portfolios would be made.  While returns could be fixed or variable based on purported portfolio sales and/or collections amounts, the Investor Agreements made clear that investors would not "be involved in any day to day or long term decision making" for GCR or Delmarva, and GCR or Delmarva would "use its best reasonable efforts to produce a profit" for the investor.  The Merrill entity's compensation was generally tied to investor returns, providing a stated percentage for purported collection costs and/or allowing that the Merrill entity would share in profits above a specified percentage or hurdle.

38.     Other investors entered into Agreements Concerning Acquisition of Portfolios. Under the terms of these investment contracts, investors contributed money toward the purported purchase of all or a portion of a debt portfolio, with the remainder to be funded by other investors or Defendants.  An entity controlled by Ledford or Merrill—usually GCR, Rhino, or DeVille—was the counterparty on these contracts.  The agreements provided that the Merrill or Ledford entity would hold title to the portfolio in trust for the investors and would attempt to recover money for investors by selling the portfolio or collecting on the underlying debt, as set forth in the specific agreement.

39.     These agreements required the Merrill or Ledford entity to "use [its] best reasonable efforts to produce a profit" for investors, and stated that investors would not be "involved in any day to day or long term decision making" for the entity.  Returns were typically variable, and depended on purported collections (net a fee paid to the entity based on purported

gross collections) or resale results.  Many of these agreements provided that the Defendant counterparty was entitled to an additional percentage of profits after a specified threshold.

40.     A few investment funds structured their investments as credit facilities with promissory notes.  GCR, Delmarva, a Merrill entity, and a Ledford entity were counterparties under these agreements and Merrill and Ledford signed on behalf of their respective entities as CEO.  Under this structure, investors provided money for the purported purchase of either all or a portion of debt portfolios, which Merrill and Ledford represented they would either collect on or resell.  Although structured slightly different in each case, the documentation typically stated that investors would receive a fixed return, ranging from 12-15%, and split the remaining profits with the Merrill and Ledford entities.

41.     Investors extending credit, in the form of cash infusions to Defendants' businesses (in truth, the ongoing fraud) were motivated primarily by profit.  Indeed, when soliciting investment and thereafter, Merrill and Ledford repeatedly discussed with investors how much money they had made and would make by investing.

42.     Finally, certain investors invested through special purpose vehicles, structured as limited liability companies.  Merrill entered into these agreements himself, or on behalf of the various entities he managed and controlled.  Merrill represented that these entities would acquire debt portfolios that DeVille would collect on.

43.     These investments were structured such that a special purpose vehicle ("SPV") was owned 50% by GCR or Merrill and 50% by the investors.  Investors typically paid into the SPV half the price of a debt portfolio in exchange for 5,000 Class B units of the SPV.  Merrill or GCR, depending on the SPV, owned 5,000 Class A units of the SPV.  As Class B holders, investors were entitled to receive a 14% return on contributed capital and, after an equal

distribution to GCR as Class A holders, pro rata distribution of profits between investors and GCR.

44.     Again, the SPVs' operating agreements typically gave Merrill "full and exclusive discretion" to "manage and control" the SPVs and stated that Merrill would, with certain limited exceptions, "make all decisions affecting the business and assets" of the SPVs.

45.     Regardless of how the transaction was structured, investors provided Defendants with money in connection with their investments.

46.     Merrill, Ledford, and the Entity Defendants then pooled this money with that of other investors, commingling investors' money in common bank accounts and using such pooled funds to repay previous investors in a Ponzi-like fashion.

47.     Merrill, Ledford, and the Entity Defendants typically structured these fraudulent investments such that the fictitious profits from collections on or resale of debt portfolios were to be split between the investor and the Entity Defendant that was the counterparty to the investment contract.  For example, certain investors who entered into investment contracts with Defendant GCR were promised a fixed rate of return up to a specified percentage, with profits above that percentage either retained by GCR or shared between the investors and GCR.

48.     Investors expected—based on Merrill's, Ledford's, and the Entity Defendants' representations, in Merrill's and Ledford's email communications with investors, and in agreements in which Entity Defendants were counterparties—that their profits would be derived solely from Merrill's, Ledford's, and the Entity Defendants' efforts.

49.      Investors played no role in Defendants' day-to-day operations.  Rather, investors relied on Merrill and Ledford to select debt portfolios and apply their supposed expertise to collect on or resell them in order to make a profit.

C.     **Defendants Made Material Misrepresentations and Omissions and Engaged in Deceptive Conduct**

1.     **Overall Structure of the Fraudulent Scheme**

50.     To induce investment, Merrill, and GCR by and through Merrill, often provided potential investors with a presentation or similar documentation describing GCR as being in the business of buying and selling consumer debt portfolios, representing that GCR used "proprietary quantitative analytical tools" to evaluate prospective portfolio purchases, and after acquiring debt portfolios, repackaged them for collection and resale "as quickly as possible to maximize profit."  All of these statements describing GCR's business operations were false because, since at least 2014, GCR has not been in the business of buying and selling consumer debt.

51.     The presentations also advertised projections as to how investors' money would be spent and returned, including offering to some investors 100% of net collections up to 25% of the principal investment annually, with profits over 25% split 50/50 with GCR up to 40% annually, and profits 41% and over split 80/20 between GCR and the investor.  These representations were false because investors often were repaid, if at all, with their own or other investors' money, and not with collections from the debt portfolios in which they thought they had invested.

52.     To induce more sophisticated investors to invest, Merrill provided background "due diligence" documents created by Ledford and/or Jezierski that provided a purported assessment of the portfolio they proposed to purchase and explained why it would be a good investment.  These "due diligence" documents misrepresented that the investor's money would be used to purchase a specific portfolio at an advertised price, when in reality, it was used to enrich Defendants, and to pay existing investors.

53.     In offering and selling investments in debt portfolios, Merrill and Ledford made

the following misrepresentations, among others:

      a.   False statements during the "due diligence" phase, including at least one

          occasion in which Ledford created and Merrill supplied to investors falsified

          tax documents that purported to show that GCR was profitable;

      b.   False statements that Merrill, Ledford, or their affiliates had purchased a debt

          portfolio when they had not;

      c.   False statements inflating the price paid for a particular debt portfolio;

      d.   "Double selling" overlapping interests in the same debt portfolio; and

      e.   Misrepresentations that payments to investors came from money collected

          from debt portfolios, when, in reality, such money was typically provided by

          another investor.

54.     To make it seem as though they genuinely purchased a debt portfolio as promised,

Merrill and Ledford fabricated and distributed to investors fake purchase and sale agreements,

some of which included the forged signature of an actual executive of a debt issuer, and fake

wire transfer and confirmation documents.

55.     Once an investor sent money for investment, Merrill and Ledford wired it

throughout their web of Entity Defendants and other affiliates, typically using the money to

repay investors and to enrich themselves.

56.     After an investment was made, Merrill and Ledford, with Jezierski's assistance,

frequently provided investors with collection reports that purported to show, compared to

projections, amounts collected each month on the debt for each portfolio.  These reports were

false.  In some instances, Merrill and Ledford also falsely reported on the timing and profit associated with the purported (but in reality fictitious) resale of a debt portfolio.

57.     Ledford and Jezierski fabricated debt portfolios that they used to stand in the place of the actual, unpurchased portfolios.  To do this, they combined portions of previously purchased (and, at times, already collected on) debtor accounts to manufacture a portfolio with approximately the same amount of underlying debt as the portfolio from which investors expected their profits.

58.     Ledford and Jezierski created reports that were sent to investors that purported to show projected collections on a specific debt portfolio, where that portfolio did not exist.

59.     After claiming to have purchased a debt portfolio, Ledford and Jezierski fabricated collections reports that presented false collections activity.  An Entity Defendant then sent or caused to be sent the represented amount to the investor, often minus a fee for Merrill's and Ledford's supposed efforts.

60.     Of course, because this was a fraud, these payments consisted of other investors' money and, in some cases, the investor's own money, i.e., money that investors sent to Entity Defendants was sometimes funneled back to the same investor as purported profits on an earlier investment.

61.     Each Entity Defendant made Ponzi-like payments to investors, failing to disclose that the payments were funded from investor contributions—not profits from the consumer debt portfolios.

62.     This distribution of fake collection reports and corresponding payments of purported profits was designed to deceive investors into thinking their investments were legitimate.

63.     Merrill, Ledford, and Jezierski each knew, or were reckless in not knowing, that his activities were deceptive and part of the fraudulent scheme.

64.     Defendants used Debtmaster, a debt collection software program, to manage their limited, actual debt portfolios, tracking collections activity on, and remittances owed investors related to, those portfolios.

65.     In late 2017, Jezierski recommended to Ledford that they set up a parallel Debtmaster program to manage the purported debt portfolios underlying Defendants' fraudulent scheme, suggesting they "[c]ould even set it up under a random company name just to be clean." Ledford replied, "That's an excellent idea!"

66.     Jezierski later confirmed to Ledford that he had set up the new program under the company name "DVAM."  Jezierski asked Ledford to provide any data he wanted entered into the new program, including any payments that needed to be posted, and "then we can use this system of record going forward as a parallel to the DeVille system."

67.     Ledford agreed that they would fund the costs of the system through DeVille. Jezierski thereafter emailed Ledford, suggesting that they "setup DVAM, LLC (whatever we want to call it) to manage these transactions and deposits . . . we can deposit a sum and then schedule out the remits each month" so that "[t]hen we never tie anything back to our general/main accounts."

68.     Ledford asked, "Is there anyone else aware of this project?"  Jezierski replied, "Nope."

**2.   Examples of Fraud Perpetrated on Specific Investors**

**a.   Individual A**

69.     Since 2015, Merrill and Ledford have raised funds from more than 200 individuals.  One individual investor's ("Individual A") experience is illustrative of Defendants' deception of individual investors.

70.     Merrill was introduced to Individual A by an existing investor, Individual B.

71.     Individual B is himself a victim of the fraudulent scheme.  He invested approximately $3 million and has continued to "reinvest" what he has been told are his "profits," and is now owed approximately $5 million.  However, none of this money has been invested as represented by Defendants.

72.     Individual A executed an Investor Agreement stating, among other things, that GCR would purchase debt portfolios for Individual A, which would be managed at the sole discretion of GCR and its management, and GCR would use best efforts to produce a profit for Individual A.  The agreement contained a signature line for Merrill as the Managing Member of GCR.

73.     Individual A initially invested $500,000 by wiring money to Delmarva.  Merrill provided Individual A with a document that reflected that Merrill had used Individual A's money to invest in two specific debt portfolios.  But Merrill knew that was false.  The money was not used to purchase debt portfolios.  Instead, Merrill, through Delmarva, used over $400,000 of Individual A's money to make payments to previous investors, and used over $60,000 to pay credit card debt and to make payments to Merrill's relatives.

74.     A few weeks later, Merrill asked Individual A if he was interested in investing in two additional debt portfolios.  Individual A agreed to invest another $500,000, and wired the money to Delmarva.

75.     Again, the money was not used to purchase any debt portfolios.  Instead, Delmarva, by and through Merrill, wired $400,000 to a luxury sports car dealership for the initial payment on a 2014 Pagani Huayra Diablo (a $2 million sports car acquired by Merrill), made payments to existing investors totaling $54,000, and paid approximately $20,000 in credit card debt.

76.     This cycle repeated, with Individual A again investing hundreds of thousands of dollars based on false representations of profits, and Merrill, and Delmarva by and through Merrill, again using Individual A's money to repay investors and for personal use, including spending tens of thousands of dollars of Individual A's money on cars, jewelry, and $100,000 on a private fitness club membership near Merrill's Naples, Florida home.

77.     In total, Defendants have obtained $1.8 million from Individual A.  Individual A's investments were procured through material misrepresentations and omissions and deceptive conduct.  Defendants obtained more than $90 million from all individual investors based on conduct similar to that described herein.

### b.     The Dallas Group

78.     Since late 2017, Merrill and Ledford, aided by Jezierski, defrauded an investment adviser and associated funds located in Dallas, Texas (the "Dallas Group") of approximately $30 million.  The Dallas Group invested through a credit facility/note structure.

79.     The Dallas Group requested heightened levels of diligence and access.  Therefore, Merrill and Ledford needed to use additional means of deception—creating fake debt portfolios for purchase, creating fake companies to imitate real companies, forging documents, and creating fake collection reports.

80.     In December 2017, Merrill emailed the Dallas Group regarding investing in a $316 million auto loan debt portfolio being sold by Santander Consumer USA Inc.

("Santander").  Ledford drafted an email to Merrill stating that Santander had contacted Merrill and Ledford directly and offered to sell the portfolio for a specific purchase price if they agreed to close in under two weeks.  Merrill and Ledford knew all of this was false.  Merrill copied and pasted the text of Ledford's email to his associate, who then used it to pitch to the Dallas Group.

81.     In reality, Santander was publicly marketing this debt portfolio through a debt broker.  When the Dallas Group noticed this and inquired, Merrill emailed Ledford, asking "What do I say[?]"  In the meantime, one of Merrill's associates replied to the Dallas Group, stating that Merrill's company was in the final bid group.  Merrill forwarded this reply to Ledford with the message "Dodged bullet."

82.     The next day, Merrill emailed the Dallas Group and represented that his group was awarded the bid to purchase the debt portfolio from Santander.  This was false and misleading.  Santander did not sell the $316 million portfolio to anyone, let alone Defendants, nor did it sell any portfolio to Merrill or GCR during this time frame.

83.     In the course of negotiating the Dallas Group's investment, Merrill created a new special purpose vehicle, GCR Mercer.  Merrill controlled GCR Mercer, but the Dallas Group had the right to inspect GCR Mercer's records, potentially allowing the Dallas Group to trace the flow of their money that was supposed to be used in the first instance to purchase a debt portfolio directly from Santander.

84.     Therefore, to aid their deception, Ledford and Jezierski created a new entity and bank account designed to mimic the real Santander.  Because of its full name, "Santander Consumer USA," Santander is often referred to in the industry as "SCUSA."

85.     On or about December 20, 2017, Ledford and Jezierski formed a new entity, "SCUSA Financial, Inc.," a Texas corporation with Jezierski serving as the sole director and

President.  This "Fake SCUSA" then opened a bank account at the same bank where the real

Santander has accounts.  Jezierski is the sole signatory on the Fake SCUSA account.

86.     Ledford prepared a forged purchase and sale agreement bearing the signature of

Santander's CFO, as well as a notary's signature.  No one from Santander signed an agreement

to sell the $316 million file (nor was it notarized).  Instead, the signatures had been copied and

pasted from a previous Santander agreement.  Merrill countersigned the forged agreement and

sent it on to the Dallas Group.

87.     The forged purchase agreement also contained wire instructions as to where GCR

Mercer should send the money to complete the purchase.  The agreement made it appear as

though GCR Mercer would wire the money to the real Santander, however, the instructions

actually directed the transfer to Fake SCUSA's account, maintained by Jezierski.

88.     After Merrill wired his portion of the purported co-investment, $1,579,585.48,

into GCR Mercer's account, the Dallas Group wired approximately $14 million to GCR Mercer

to fund its portion of the investment.

89.     The Dallas Group's money was not used to purchase a $316 million portfolio

from Santander.  Instead, the next day, consistent with the wire instructions in the fake

agreement, Merrill-controlled GCR Mercer wired the money to the account of Fake SCUSA—

creating the wire trail necessary to make it appear that a genuine transaction had occurred.

90.     The same day that Dallas Group's money arrived in the Fake SCUSA bank

account, Ledford emailed wiring instructions to Jezierski for disbursing funds out of the account.

Fake SCUSA wired nearly $8 million to Defendant DeVille, over $5 million to Defendant RW

Financial, and over $2.5 million to Joseph Finance Company (all Ledford entities).  Ledford used

a portion of the money transferred to DeVille to kickback $50,000 to CRJ Holdings, Jezierski's

entity, and to return $1,579,585.48 to Delmarva—the precise amount Merrill purportedly had "co-invested" with the Dallas Group to purchase the Santander debt portfolio.

91.     Joseph Finance Company sent the entire $2.5 million it received to Ledford's personal bank account.  Defendants used the remaining money wired to DeVille and RW Financial, together with other investors' money, to pay existing investors, to make transfers to personal accounts, or for Ledford's personal use.

92.     As part of their investment agreement, Merrill, GCR as servicer, and DeVille, as subservicer, agreed to provide to the Dallas Group reports detailing collections made from individual debtors from the $316 million Santander debt portfolio.  To sidestep the impossibility of providing the Dallas Group with collection reports from a debt portfolio Defendants had never purchased, Ledford directed the creation of a fabricated debt portfolio.

93.     Ledford asked a RW Financial employee to use four other Santander files to create a debt portfolio with approximately the same number of accounts and principal balance as the portfolio in which the Dallas Group purportedly had invested.  Jezierski assisted by making sure that certain older accounts were swapped out for newer accounts to avoid revealing that the portfolio had been cobbled together from old debt files.

94.     Beginning in February 2018, Jezierski provided Ledford trust reports for the Dallas Group's investments that purported to show collection activity based on the fabricated debt portfolio they had created.  The collection activity reflected in the reports also appears to have been fabricated, as no $316 million debt file was actually acquired.  Jezierski provided these reports to a Merrill associate, who forwarded them to the Dallas Group.  GCR Mercer, using money it obtained from DeVille, paid the Dallas Group the amounts listed in the reports as a way to further mask the fraud and continue the relationship.

95.     Over the next several months, the Dallas Group invested almost $15 million in three more deals.  While Ledford did purchase some smaller debt files, none of the Defendants ever purchased anything close to what Merrill told the Dallas Group, using documents and information provided by Ledford, that GCR Mercer had acquired for its investments, and never for the purchase prices that Merrill represented.

96.     For each repeated investment by the Dallas Group, Defendants' pattern of fraudulent conduct was similar, including using forged agreements memorializing nonexistent purchases from debt issuers, creating a new entity to mimic a genuine entity, cobbling together fabricated debt portfolios, and largely misappropriating the Dallas Group's money to pay existing investors and to fund purchases of luxury cars, a boat, and a vacation home in Florida.

97.     In connection with the creation of a new entity, NLEX, to mimic National Loan Exchange, Inc., an established debt broker with the industry-known acronym NLEX, Jezierski suggested to Ledford:  "As we open these companies I had an idea.  Can I rent a virtual space that handles mail, phone number, etc. that we can use as the incorporation address on all of these companies?  It will be cleaner, and we can use it to kind of divert away from ourselves."

98.     After Ledford agreed that Jezierski's suggestion was a "good idea," Jezierski later reported to Ledford that the task was done and that he had opened the virtual space under one of his (Jezierski's) company's names.

99.     The Dallas Group has invested at least $30 million, and has received back only approximately $4.6 million, principally sourced from other investors' money.  The Dallas Group's investments were procured through material misrepresentations and omissions and deceptive conduct.

c.      **The Boulder Group**

100.    Since 2014, Merrill and Ledford have defrauded a group of individuals,
investment funds, and entities based in Boulder, Colorado (collectively, the "Boulder Group") of
approximately $116 million by misrepresenting, among other things, the nature of the
investments being made, the use of the invested money, and the source of supposed profits
returned to it.

101.    Boulder first invested primarily through investment contracts with GCR, which
Merrill signed as managing member of GCR.  Later, the Boulder Group entered into investment
contracts with DeVille, which Ledford signed as CEO of DeVille.

102.    The entities within the Boulder Group often co-invested in the same portfolios of
debt, and GCR, DeVille, and Centurion provided separate agreements for each entity,
documenting their acquisitions of a percentage of the overall portfolio.

103.    In Investor Agreements that the Boulder Group entered into with GCR, GCR
promised to "partake in the business of buying, selling, and recovering consumer debt portfolios"
and agreed it would "identify and purchase such portfolios for Investor."  According to the
agreement, the debt portfolios "shall be managed at the sole discretion of [GCR] and its
management," which would "use its best reasonable efforts to produce a profit for the Investor."

104.    Similarly, in an Agreement Concerning Acquisition of Portfolios, which the
Boulder Group later entered into with DeVille, DeVille agreed to take title to any debt portfolios
acquired, hold them in trust for the investors, and use its "best efforts to sell the Portfolio to
unrelated, unaffiliated third parties within 90 days from the execution of this Agreement."
Multiple Boulder Group investors invested in these debt portfolios, each taking a specified
percentage interest in the portfolio.  In this agreement, DeVille acknowledged that it had a
"fiduciary obligation to obtain the best price for the Portfolio" and to "use its best reasonable

efforts to produce a profit" for the Boulder Group.  The agreement further provided that the Boulder Group would not "be involved in any day to day or long term decision making" of DeVille.

105.    In early interactions with the Boulder Group, Ledford fabricated documents for Merrill to respond to the Boulder Group's due diligence requests.  The Boulder Group requested a CPA letter, averring that Merrill's income taxes had been filed properly, and a copy of GCR's Schedule C, the form used by a sole proprietorship or single-member LLC to report its profits or losses to the IRS.

106.    Merrill suggested that Ledford "use your girl" to write the CPA letter because a letter coming from Ledford, himself a CPA, might create a "snag."  Ledford thereafter emailed to Merrill a letter purportedly written by a female employee of Ledford's accounting firm ("CPA Employee") to attest that Merrill timely filed his income tax returns and had no outstanding tax issues.

107.    Merrill emailed to Ledford GCR's Schedule C, showing an almost $200,000 loss for GCR in 2012, with the message that the form "needs much love and adjusting. ;)"  Ledford thereafter sent to Merrill an altered Schedule C, showing GCR made a profit of approximately $100,000 in 2012.  Merrill responded, "Not sure how you did but looks good to me."  Ledford replied, "As mentioned, not sure how we support the details.  Hopefully, they will not try to contact [CPA Employee] or need further information."

108.    Merrill sent, or directed the sending of, the fabricated CPA Letter and fake Schedule C to the Boulder Group.

109.    Merrill and Ledford have made numerous other misrepresentations to the Boulder Group, including misrepresenting how its money was being used, the price at which certain debt

portfolios were being acquired, and failing to disclose that certain portfolios were acquired from related entities.

110.    For example, on September 16, 2015, Ledford emailed Merrill about a purported $17.5 million Credit Union file with a purchase price of approximately $1.2 million, proposing to buy and resell it within 60-90 days, and offered to split the purchase price three ways among Merrill, Ledford, and the Boulder Group.  Merrill forwarded this message to the Boulder Group.

111.    Ledford provided to the Boulder Group a copy of the purported purchase agreement whereby DeVille, Ledford's company, acquired the $17.5 million Credit Union file, from Vaquero, another entity that Ledford controlled.  At the time, Vaquero did not even exist. It was not until a few weeks later that Ledford created it as a shell entity under his control. Neither Ledford nor Merrill told the Boulder Group that Vaquero was a related entity that Ledford would be creating.

112.    Ledford provided the two different Boulder Group investors and Delmarva, Merrill's company, with Agreements Concerning Acquisition of Portfolios, pursuant to which each investor would contribute approximately $300,000 to the purchase price of the $17.5 million Credit Union debt portfolio in exchange for a 25% stake in the profits upon the portfolio's resale.  DeVille agreed to take title to the file and use its best efforts to resell it to make a profit for all investors, including the Boulder Group investors.

113.    The Boulder Group thereafter sent two wires to DeVille, approximately $300,000 each, to go towards the purchase price of the $17.5 million Credit Union debt portfolio.  Neither Merrill, Delmarva, nor any other of Merrill's entities made a similar wire or deposit.  Moreover, DeVille did not pay Vaquero the $1.2 million purchase price as represented to the Boulder Group.

114.    Instead, DeVille sent about half of the approximately $600,000 it had obtained from the Boulder Group to Ledford's personal account, and used nearly all of the remainder to pay existing investors.

115.    Similarly, in early 2016, Ledford offered to the Boulder Group investments in two debt files that he purportedly planned to acquire from third parties, for approximately $2.8 million and approximately $1.5 million, and then resell.

116.    Instead of acquiring any portfolios from third parties, Ledford directed the fabrication of two debt portfolios from debt files DeVille already owned.  Ledford sent the Boulder Group spreadsheets containing the accounts for the two purportedly newly purchased debt portfolios, stating that "both files look great" and that he was "very confident we can get the sales prices I projected in the write-ups."

117.    The Boulder Group thereafter transferred $900,000 to DeVille.  DeVille did not use the money to purchase any debt portfolios.  Instead, it wired approximately half to Ledford's personal account.  DeVille then used the remainder to pay existing investors, including nearly $100,000 to the Boulder Group, using the Group's own funds to pay purported profits from its prior investments.

118.    In February 2017, Ledford suggested to the Boulder Group that it invest through Centurion, a new company purportedly run by Ledford's family member.  In reality, Ledford controlled Centurion for purposes of its interactions with the Boulder Group.

119.    The Boulder Group has purchased a number of investments from Centurion.  In each case, the information regarding the investment came from Ledford.  Similarly, money used to pay the Boulder Group's purported profits from its investments with Centurion came principally from other investors, including the prior investments made by the Boulder Group.

120.    In total, the Boulder Group has invested approximately $116 million with Merrill and Ledford and their affiliated entities.  Of that amount, approximately $92.8 million has been repaid to the Boulder Group in the form of purported profits or redemptions that almost entirely consisted of Ponzi-like payments of monies invested by the Boulder Group or other investors. The Boulder Group's investments were procured through material misrepresentations and omissions and deceptive conduct.

### d.    The New Jersey Group

121.    Starting in 2017, Merrill and Ledford obtained nearly $6.1 million over the course of three investments made by an investment partnership based in New Jersey (the "New Jersey Group").

122.    As part of Merrill's efforts to convince the New Jersey Group to invest with GCR, in March 2017, a Merrill associate, with Merrill copied, emailed to the New Jersey Group monthly collection reports that Ledford had created, which falsely stated that DeVille had collected more than $1.2 million from a portion of its portfolios in February 2017.

123.    In November 2017, Merrill solicited the New Jersey Group's investment in connection with the purported acquisition of a $63 million Chrysler debt portfolio, with a purported purchase price of approximately $3.7 million. This portfolio was also fraudulently marketed to the Chicago Group, as discussed below.

124.    In reality, DeVille acquired a $60.7 million Chrysler portfolio for just over $1 million.  Merrill thus misrepresented to the New Jersey Group the face value and price of the debt portfolio, as well as failing to disclose that collections from the same portfolio were the basis for another investor's investment.

125.    The New Jersey Group entered into an investment contract with Rhino Group, and Merrill signed as sole member of Rhino Group.  The New Jersey Group agreed to contribute

$2.5 million to acquire the purported debt portfolio, and Rhino Group agreed to contribute approximately $1.2 million.  Pursuant to the agreement, Rhino Group would retain title to the file and "attempt to recover funds in the portfolio . . . and … use its best reasonable efforts to produce a profit for" the New Jersey Group.  The New Jersey Group would be paid a 10% return on its investment and, after Rhino Group was paid a 10% return for its purported investment, split pro-rata with Rhino Group any additional profits.  The agreement made clear that the New Jersey Investors would not "be involved in any day to day or long-term decision making" for Rhino Group.

126.    On November 29, 2017, Merrill emailed the New Jersey Group a purported contract between Santander (which issued and sold Chrysler auto loans) and Rhino Group for the sale of the purported $63 million Chrysler debt portfolio.  Merrill knew this was false and that this agreement was fabricated, as Santander did not sell Rhino Group any debt files between June 2015 and May 2018.

127.    Attached to the same email, Merrill provided to the New Jersey Group a document purporting to be a "Full Detail Wire Activity Report" for Rhino Group's supposed PNC bank account ending -4776.  The document stated that, on November 29, 2017, Rhino Group wired approximately $3.7 million to Santander's bank account to pay for the $63 million Chrysler debt portfolio.  This document also was fabricated, as there is no Rhino Group PNC bank account ending in -4776.  Moreover, no other Merrill (or Ledford) controlled entity wired $3.7 million to Santander in this amount on that day.

128.    On November 30, 2017, the New Jersey Group wired $2.5 million to Rhino Capital.  Aside from the approximately $1 million DeVille paid Santander for the actual debt portfolio, Ledford and Merrill together misappropriated the remainder for their personal benefit

and to repay other investors through Rhino, GCR, Delmarva, DeVille, RW Financial, and Ledford's accounting firm, Ledford & Associates.

129.    Merrill and Ledford employed similar fraudulent tactics in connection with at least two additional investments made by the New Jersey Group.

130.    In total, Defendants obtained approximately $6.1 million from the New Jersey Group, while making payments back to the New Jersey Group of approximately $1.7 million, principally sourced from the New Jersey Group's and other investors' money.  The New Jersey Group's investments were procured through material misrepresentations and omissions and deceptive conduct.

>    **e.    The Chicago Group**

131.    Starting in August 2017, Merrill and Ledford obtained approximately $17.9 million from a group of investors from Chicago (the "Chicago Group").  The Chicago Group invested with Defendants through special purpose vehicles Defendants created and controlled.

132.    To induce investment, Merrill provided the Chicago Group with false collection reports similar to those he had provided the New Jersey Group, described above.

133.    In August 2017, DeVille purchased a debt portfolio from Santander, with a face value of approximately $170 million, for about $2.8 million.

134.    On August 11, 2017, Merrill emailed the Chicago Group regarding investment in a debt portfolio (the "$170M Debt File") being sold by Santander.  Merrill, forwarding documents he received from Ledford—altered only to reference GCR instead of DeVille— represented to the Chicago Group that the $170M Debt File had a total face value of $170,458,705.08 and a purchase price of a little over $10 million.

135.    Defendants did not disclose to the Chicago Group the debt portfolio's actual purchase price of approximately $2.8 million.

136.     The Chicago Group invested with Defendants through SPVs.  Merrill created a

number of SPVs, including GCR CBL I and GCR CBL III, each an SPV with Merrill as the

manager.  Merrill's duties as manager included managing the purchase of and collections on any

acquired debt portfolios, as well as remitting money to the Chicago Group.  GCR is the

managing member of GCR CBL I, and Merrill is the managing member of GCR CBL III.  The

SPVs created as investment vehicles for the Chicago Group were managed exclusively by

Merrill.

137.     For its August 2017 investment, the Chicago Group paid approximately $5

million to GCR CBL I and owned 5,000 of its Class B shares.  GCR owned 5,000 Class A shares

and purported to acquire the $170M Debt File for approximately $10 million.  Per the investment

agreement, as the holder of Class B units, the Chicago Group was to receive all net returns—

after collection expenses, pursuant to a service agreement entered into between the SPVs and

DeVille—until a 14% return on contributed capital had been met.  Thereafter, all incremental

returns were to be paid to GCR equal to the amount distributed to the Chicago Group and, once

that occurred, all remaining returns were to be divided pro rata.

138.     On August 17, 2017, Ledford emailed Merrill, attaching what he represented was

a signed purchase and sale agreement between GCR and Santander for the purchase of the

$170M Debt File.  Merrill later sent this agreement to the Chicago Group, though he knew the

agreement was a fabrication.   The agreement was false because Santander did not sell any debt

portfolios to GCR between 2016 and May 2018.

139.     On August 24, 2017, Ledford emailed Merrill regarding the $170M Debt File and

informed him that he (Ledford) was "working on the wire sheet now."  About 40 minutes later,

Ledford sent Merrill an email with the subject line "wire confirmation," attached to which was a

Microsoft Word document named "Treasury Management Client Support Notification 08232017." Ledford authored this document. The document contains a purported confirmation of an approximately $10 million debit from a GCR bank account and a corresponding credit to Santander's bank account. This document was false because no such transaction occurred and both Merrill and Ledford knew it.

140.    On August 25, 2017, the Chicago Group wired approximately $5 million to GCR CBL I's bank account.

141.    A few days later, Merrill transferred most of the approximately $5 million obtained from the Chicago Group to a GCR bank account. He then wired $3.2 million to DeVille.

142.    Merrill used the $1.8 million retained by GCR to purchase exotic cars, including a $950,000 2008 Bugatti Veyron, and a share of an airplane.

143.    Of the $3.2 million of the Chicago Group's money that was wired to DeVille, Ledford transferred $2.9 million to an RW Financial bank account, on which he drew a $2.5 million cashier's check, payable to himself. Ledford then wired the remaining funds in the RW Financial account to JBL Holdings, which funds were then transferred to his personal accounts, including an account held by Ledford's trust, or used for other personal expenditures.

144.    Similarly, in November 2017, Merrill and Ledford obtained an additional approximately $1.8 million from the Chicago Group in connection with Rhino Group's purported acquisition of a purported $63 million Chrysler debt portfolio, the same portfolio in which the New Jersey Group invested. To document this fake purchase, Merrill provided to the Chicago Group a fabricated wire confirmation and purchase agreement between Santander and Rhino.

145.     On November 30, 2017, the Chicago Group wired approximately $1.8 million to Rhino's bank account.  Along with the $2.5 million from that Rhino received from the New Jersey Group for its investment in the same purported $63 million Chrysler debt portfolio, Rhino transferred approximately $3.8 million to GCR, leaving approximately $500,000 in Rhino's account, which was used by Merrill to purchase a $100,000 cashier's check made out to himself and an approximately $375,000 cashier's check made out to a luxury automobile dealer.

146.     As for the money transferred to GCR, Merrill sent money to the mortgagee on his residence; repaid existing investors; transferred money to DeVille and to Delmarva, the latter of which was then spent at a boutique jewelry store.

147.     Of the money that Merrill transferred to DeVille, Ledford transferred money to his accounting firm, Ledford & Associates, his personal bank accounts, and to RW Financial, which used the money to repay investors.

148.     Merrill and Ledford employed similar fraudulent tactics in connection with at least one additional investment made by the Chicago Group in early 2018.

149.     In total, Defendants obtained approximately $17.9 million from the Chicago Group, while making payments back of approximately $6.5 million, principally using the Chicago Group's own and other investors' money.  The Chicago Group's investments were procured through material misrepresentations and omissions and deceptive conduct.

**f.     The Bethesda Group**

150.     Starting in March 2016, Defendants obtained at least $16.2 million from an entity, based in Bethesda, Maryland, that was formed to pool the funds of individuals seeking to invest with Merrill and his companies (the "Bethesda Group").  The Bethesda Group invested through a credit facility/note structure, repeatedly sending money to Defendants in connection with their purported acquisition of debt portfolios.

151.    On March 6, 2016, Merrill emailed the Bethesda Group documents he had received from Ledford that described two purported debt portfolios: a $19.9 million Alta Colleges debt portfolio (the "$19.9M Debt File") and a $17 million Lincoln Tech debt portfolio (the "$17M Debt File").  These documents represented that GCR would purchase both portfolios directly from the issuer.  Merrill and Ledford knew this was not true.

152.    Merrill also sent the Bethesda Group a purchase agreement between GCR and Receivables Portfolio Interchange, Inc. ("RPI"), purportedly documenting GCR's purchase of the $19.9M Debt File from RPI.  Defendants knew, and did not disclose to the Bethesda Group, that RPI was an affiliated entity, owned and/or controlled by Ledford.

153.    Ledford used RPI to pretend to sell debt to Merrill-controlled entities and defraud investors.  Merrill knew that RPI did not actually acquire or own debt portfolios.

154.    On March 10, 2016, the Bethesda Group transferred $2 million to Delmarva to fund the purchase of the $19.9M Debt File.  None of this $2 million was used to purchase the $19.9M Debt File.

155.    On March 21, 2016, the Bethesda Group wired another $1 million to Delmarva to fund the purchase of the $17M Debt File.  Delmarva wired the money, plus what remained of the Bethesda Group's initial $2 million investment, to RPI, per the agreement, purportedly for purchase of the $17M Debt File.

156.    Merrill sent the Bethesda Group an email containing an image of a wire confirmation showing that Delmarva had sent RPI the money.  However, the same day, RPI wired a little over a $1 million back to Delmarva, leaving a balance of $250,000 at RPI.

157.    Merrill used the money returned to Delmarva to repay other investors and on personal expenses.  As to the money retained by RPI, approximately $225,000 was transferred to

entities under the control of Ledford, and $25,000 to his personal bank account.  None of the $1 million invested by the Bethesda Group was used to purchase the $17M Debt File by RPI, DeVille, or any other Ledford or Merrill controlled entity.

158.    Merrill represented to the Bethesda Group that it was the lone external beneficiary of returns to be generated from the $19.9M Debt File and $17M Debt File.  In fact, Ledford and Merrill sold the promise of returns to be generated from accounts underlying the $19.9M Debt File and the $17M Debt File each to at least three other groups of investors.

159.    In August 2016, the Bethesda Group informed Merrill that it would have approximately $930,000 available from investors for the purchase of a debt portfolio. Merrill then emailed Ledford that he "need[ed] another deal for $900k for [Bethesda Group] funds."

160.    Ledford responded by providing Merrill with a portfolio of credit card debt that already the subject of collections for the benefit of another party.

161.    On August 23, 2016, the Bethesda Group transferred $919,000 to Delmarva. Delmarva did not purchase any debt portfolios with the Bethesda Group's money.  Instead, Merrill spent these funds as follows:  $37,500 at a watch and jewelry boutique; nearly $50,000 on private air travel; more than $460,000 on exotic cars, including a 2014 Ferrari F12 Berlinetta; $100,000 to a Las Vegas casino; and the balance to pay commissions, credit card debt, and other investors.

162.    Merrill and Ledford employed similar fraudulent tactics in connection with several additional investments made by the Bethesda Group.  Merrill also "double sold" the same interests in at least seven deals to both the Bethesda Group and another investor.

163.    In total, the Bethesda Group has invested approximately $16.2 million, and has been paid back approximately $6.4 million, principally using the Bethesda Group's and other

investors' money.  The Bethesda Group's investments were procured through material misrepresentations and omissions and deceptive conduct.

### g.   The Virginia Group

164.   Since at least early 2015, three Northern Virginia-based entities controlled by members of a Virginia-based family (collectively, the "Virginia Group") invested a total of approximately $52.8 million with Merrill and Ledford and their companies.

165.   The Virginia Group invested through purchase and sale agreements, purporting to acquire debt portfolios from DeVille, and servicing agreements, whereby DeVille agreed to service the debt they purportedly acquired and remit the collections, less a fee, to the Virginia Group.

166.   The Executive Investment Manager at one of the Virginia Group's affiliated companies managed the Virginia Group's investments with Merrill and Ledford.  The entities within the Virginia Group often co-invested in the same portfolios of debt and were provided separate agreements for each entity documenting its acquisition of a discrete portion of the overall portfolio.

167.   Merrill represented that he was investing alongside the Virginia Group in at least one debt portfolio when he did not do so.  Ledford, through DeVille and RW Financial, misrepresented the source and content, or existence of, debt portfolios offered as investments to the Virginia Group, and in other instances inflated their purported purchase prices.

168.   For example, on February 24, 2017, Ledford, using his RW Financial email address, emailed the Virginia Group regarding a proposed investment in a portfolio of Chrysler auto debt with a principal value of approximately $150 million, which DeVille would acquire for approximately $9.23 million.   The Virginia Group agreed to fund half of the purported purchase

price and on March 3 and 6, 2017, wired a total of $4.58 million to DeVille.  DeVille, by and

through Ledford, did not use this money to purchase the debt portfolio as they had promised.

169.    In fact, Santander, which issues and sells Chrysler's auto loans, did not sell

anyone a portfolio with a principal value of $150 million in all of 2017.  Neither Merrill's nor

Ledford's entities paid $9.23 million to anyone during the same timeframe.

170.    Similarly, in June 2017, Ledford, using his RW Financial email address, emailed

the Virginia Group regarding "an excellent opportunity" to purchase a $125 million auto loan

portfolio direct from Santander, for a purchase price of $7.1 million.  Ledford provided to the

Virginia Group an asset purchase overview, reflecting the purported portfolio's principal value

of $125,714,285.57 (the "$125M Debt File").

171.    The Virginia Group agreed to invest and, on June 7, 2017, wired a total of $3.3

million to DeVille.  DeVille did not use this money to purchase any debt portfolios.

172.    Santander did not sell to Defendants or anyone else a portfolio with a principal

value of approximately $125 million at any time in 2017.

173.    In fact, Ledford had an RW Financial employee create the $125M Debt File on

May 30, 2017, using accounts from a debt portfolio that DeVille had previously purchased from

Santander.  Ledford instructed this employee:  "Please pull a random file ~$125,714,286 from

the $355M Santander file we purchased."

174.    Merrill and Ledford employed similar fraudulent tactics in connection with

several additional investments made by the Virginia Group, including offering and selling the

Virginia Group the same interests in debt portfolios that were also sold to other investors.

175.    For example, in August 2017, Ledford offered to the Virginia Group an opportunity to invest in the $170M Debt File offered and sold as an investment to the Boulder Group and the Chicago Group, discussed *supra*.

176.    DeVille provided to the Virginia Group trust reports detailing the purported monthly collections on the debt portfolios in which the Virginia Group had invested.  Rather than making payments to the Virginia Group from collections as the trust reports reflected, in many instances Merrill, through Delmarva, funded the remittances Ledford paid to the Virginia Group.

177.    For example, on March 11, 2015, Ledford emailed to the Virginia Group the trust reports for February's collections, which showed that DeVille owed a remittance of $73,958.75.  That day, Merrill wired $73,958.75 from Delmarva to Ledford's Leddy Bear account.  The next day, Ledford wired $73,958.75 from DeVille to the Virginia Group.

178.    In total, Defendants obtained approximately $52.8 million from the Virginia Group, while paying back $22.2 million in the form of purported collection remittances using the Virginia Group's and other investors' money.  The Virginia Group's investments were procured through material misrepresentations and omissions and deceptive conduct.

**D.    The Scope of Defendants' Fraud**

179.    Individuals and entities have invested more than $345 million with Defendants based on the misrepresentations, omissions, and deceptive conduct alleged herein.  Approximately $197 million has been repaid to investors, in the form of remittances on purported collections, purported profits from flips, interest payments, or redemptions.  Thus, out of the $345 million initially invested, investors are still owed at least $148 million in principal.

180.    Approximately 30 entities affiliated with Defendants were involved in the fraud or received proceeds from the fraud.  Those entities controlled over 55 different bank accounts.

181.    Defendants' fraudulent scheme continued until the filing of the SEC's complaint and the arrest of Merrill, Ledford, and Jezierski by the criminal authorities.

## II.    DEFENDANTS VIOLATED THE SECURITIES LAWS

182.    The investment agreements, agreements concerning acquisition of portfolio, credit facilities and promissory notes, LLC interests, and other investments offered and sold by Merrill, Ledford, and Entity Defendants (the "Securities") were securities within the meaning of the Securities Act and Exchange Act.

183.    The investments were all in a common enterprise run by Defendants, with the expectation of profits to be derived solely from the efforts of Defendants.  Investors played no role in management or operations of the businesses described herein.

184.    Merrill, Ledford, and Entity Defendants sold the Securities as investments and the purchasers of these instruments invested with the expectation of profit.

185.    Merrill, Ledford, and Entity Defendants sold the Securities to hundreds of individual members of the general public, including those individuals who pooled their money specifically to purchase the Securities.

186.    The Securities are not subject to any other regulatory scheme that significantly reduced the risks inherent in their purchase.

187.    Defendants engaged in the conduct described herein, including the offer and sale of the Securities, by use of the means or instruments of transportation or communication in interstate commerce, the instrumentalities of interstate commerce, and/or by use of the mails.

188.    Merrill—and GCR, Delmarva, and Rhino, by and through Merrill—knowingly made material untrue statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

189.     Ledford—and DeVille and RW Financial, by and through Ledford—knowingly made material untrue statements and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

190.     A reasonable investor would consider the misrepresented facts and omitted information—among other items, misrepresentations and omissions regarding the use of investors' money, including, among other things, using investors' money to pay existing investors and finance Merrill's and Ledford's extravagant lifestyles; the fabricated nature of certain debt portfolios; the fabricated bank wire transfer and confirmation documents; the false collection activity reports; and the sales of the same or overlapping interests in the same debt portfolio—important in deciding whether to purchase the Securities.

191.     The untrue statements of material fact and material omissions described herein were made in the offer or sale and in connection with the purchase or sale of securities.

192.     In connection with the conduct described herein, Defendants acted knowingly or recklessly.  Merrill, Ledford, and Entity Defendants knew or were reckless in not knowing that they were making material misrepresentations and omitting to state material facts necessary to make certain statements not misleading under the circumstances.

193.     Defendants obtained money or property by means of untrue statements of material fact and omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.  Investors sent money directly to Entity Defendants.  Merrill and Ledford took money for themselves, and Jezierski was paid a portion of the money that Defendants obtained through Fake SCUSA and Fake NLEX by wiring money to his entity CRJ Holdings.

194.    Defendants used devices, schemes, and artifices to defraud investors, and engaged in acts, transactions, practices, or courses of business that operated as a fraud or deceit upon investors.  In addition to the numerous misrepresentations discussed herein, among other things, Defendants created and funneled money through a web of shell entities to disguise sham transactions; fabricated debt portfolios; created fake collections reports, fake wire transfer records, and other falsified due diligence materials; and created companies designed to deceive investors into thinking their investment transactions were being conducted with other legitimate companies.  Merrill and Ledford directed the payment of, and GCR, Delmarva, Rhino, DeVille, and RW Financial each made, Ponzi-like payments, using investor money, to pay existing investors as purported profits and returns of principal.  Jezierski created a parallel set of books to track and hide Defendants' fraudulent scheme.

195.    Non-party entities owned or controlled by Merrill, Ledford, or Jezierski, including K.B. Merrill, GCR CBL I, GCR CBL II, GCR CBL III, GCR CBL IV, GCR Mercer, GCR HCP, FRG, Halo, JBL Holdings, JBL PC, JFC, Leddy Bear, Ledford & Associates, LP, NLEX, RW Capital, RW Credit, RW Debt, RW Fixed, SCUSA, Vaquero, and Centurion, among others, received funds procured through Defendants' fraudulent conduct.

## III.    RELIEF DEFENDANTS BENEFITED FROM THE FRAUD

196.    Both Mrs. Merrill and Mrs. Ledford benefited from their husbands' fraudulent scheme.

197.    Merrill transferred to Mrs. Merrill at least $104,000 that came from investors who were told they were investing in consumer debt portfolios.  Mrs. Merrill did not provide anything of value in exchange for these funds.

198.    Mrs. Merrill is either the owner or co-owner with Merrill of at least three houses purchased using money Merrill obtained from defrauded investors.  These houses include (1) a

Naples, Florida house, titled in the names of Merrill and Mrs. Merrill, which was purchased for $10.5 million and carries a $5 million mortgage; (2) an Easton, Maryland house, titled in the names of Merrill and Mrs. Merrill, which was purchased for $1.3 million and carries no mortgage; and (3) a Towson, Maryland house, titled in Mrs. Merrill's name, which was purchased for $350,000 and carries no mortgage.  The money used to purchase these houses came from defrauded investors.  Mrs. Merrill did not provide anything of value in exchange for any ownership interest in these houses.

199.    Mrs. Merrill also is in possession of numerous luxury items purchased using money obtained from defrauded investors, including but not limited to jewelry, handbags, wine, artwork, comic books and other collectibles, and electronics.  Many of these items are located in the house where Mrs. Merrill is currently living and other properties owned by Merrill and/or Mrs. Merrill.  Mrs. Merrill did not provide anything of value in exchange for these items.

200.    Ledford transferred to Mrs. Ledford at least $300,000 obtained from defrauded investors.  Mrs. Ledford did not provide anything of value in exchange for these funds.

201.    Mrs. Ledford is in possession of numerous luxury items purchased using money from defrauded investors, including but not limited to jewelry, handbags, and artwork.  Mrs. Ledford did not provide anything of value in exchange for these items.

202.    Mrs. Merrill and Mrs. Ledford received the money and other assets described herein as a result of Merrill's and Ledford's material misrepresentations, omissions, and other deceptive acts in connection with their offer and sale of the securities described herein.

203.    Neither Mrs. Merrill nor Mrs. Ledford provided money, goods, services, or anything else of value in exchange for the money or other assets transferred to them by Merrill and/or Ledford.

204.     These transfers were part, and in furtherance of, the securities law violations alleged herein.  Therefore, Mrs. Merrill and Mrs. Ledford have been unjustly enriched.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 17(a) of the Securities Act**
**(Against All Defendants)**

205.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 204 inclusive, as if they were fully set forth herein.

206.     As a result of the conduct alleged herein, Defendants, in the offer or sale of securities, directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce, or the mails:

    a.     knowingly or recklessly employed devices, schemes, or artifices to defraud;

    b.     knowingly, recklessly, or negligently obtained money or property by means of any untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.     knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

207.     By engaging in the foregoing conduct, Defendants violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a).

**SECOND CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Thereunder**
**(Against All Defendants)**

208.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 204, inclusive, as if they were fully set forth herein.

209.     As a result of the conduct alleged herein, Defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentality of interstate commerce or of the mails, or a facility of a national securities exchange:

a.     employed devices, schemes, or artifices to defraud, and

b.     engaged in acts, practices or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

210.     By engaging in the foregoing conduct, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R. § 240.10b-5(a) and (c).

**THIRD CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Thereunder**
**(Against Defendants Merrill, Ledford, and the Entity Defendants)**

211.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 204, inclusive, as if they were fully set forth herein.

212.     As a result of the conduct alleged herein, Defendants Merrill and Ledford and the Entity Defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by use of the means or instrumentality of interstate commerce or of the mails, or a facility of a national securities exchange made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

213.     By engaging in the foregoing conduct, Defendants Merrill, Ledford, and Entity Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

## FOURTH CLAIM FOR RELIEF
### Equitable Disgorgement of Ill-Gotten Funds
### (Against Relief Defendants Amanda Merrill and Lalaine Ledford)

214.    The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 204, inclusive, as if they were fully set forth herein.

215.    Relief Defendant Mrs. Merrill obtained funds and property as a result of the violations of the securities laws by Defendants Merrill and Ledford.

216.    Relief Defendant Mrs. Ledford obtained funds and property as a result of the violations of the securities laws by Defendants Merrill and Ledford.

217.    Relief Defendant Mrs. Merrill obtained the gains described above as part, and in furtherance of, the securities law violations alleged above, under circumstances where it is not just, equitable, or conscionable for her to retain them.

218.    Relief Defendant Mrs. Ledford obtained the gains described above as part, and in furtherance of, the securities law violations alleged above, under circumstances where it is not just, equitable, or conscionable for her to retain them.

219.    Relief Defendant Mrs. Merrill should be required to disgorge all ill-gotten gains which inured to her benefit under the equitable doctrines of disgorgement, unjust enrichment, and/or constructive trust.

220.    Relief Defendant Mrs. Ledford should be required to disgorge all ill-gotten gains which inured to her benefit under the equitable doctrines of disgorgement, unjust enrichment, and/or constructive trust.

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

a.    Permanently restraining and enjoining Defendants from violating Section 17(a) of the Securities Act, 15 U.S.C § 77q(a).

b.    Permanently restraining and enjoining Defendants from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) thereunder, 17 C.F.R § 240.10b-5(a) and (c);

c.    Permanently restraining and enjoining Defendants Merrill, Ledford, and the Entity Defendants from violating Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R § 240.10b-5(b);

d.    Ordering Defendants to disgorge any and all ill-gotten gains derived from their unlawful conduct, together with prejudgment interest thereon;

e.    Ordering Defendants to pay a civil penalty pursuant to Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u-1, and Section 20(d) of the Securities Act, 15 U.S.C. § 77t;

f.    Ordering Relief Defendants Amanda Merrill and Lalaine Ledford to disgorge all ill-gotten gains to which they do not have legitimate claims that they received as a result of the conduct alleged in the Amended Complaint, together with prejudgment interest thereon;

g.    Retaining jurisdiction of this action for purposes of enforcing any final judgment and orders; and

h.    Granting such other and further relief as this Court may deem just and appropriate.

**JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Commission hereby

requests a trial by jury.

Dated:  November 6, 2018                              Respectfully submitted,

                                                     Jennifer Chun Barry
                                                     Mark R. Sylvester
                                                     Julia C. Green
                                                     Scott A. Thompson
                                                     Norman P. Ostrove
                                                     SECURITIES AND EXCHANGE COMMISSION
                                                     1617 JFK Blvd., Suite 520
                                                     Philadelphia, Pennsylvania  19103
                                                     (215) 597-3100 (telephone)
                                                     (215) 597-2740 (facsimile)
                                                     barryj@sec.gov
                                                     sylvesterm@sec.gov
                                                     greenju@sec.gov

                                                     *Attorneys for Plaintiff Securities and*
                                                     *Exchange Commission*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of November, 2018, I caused a true and correct copy
of the Amended Complaint with exhibit to be served upon the following parties in the manner set
forth below:

**Defendant Cameron R. Jezierski**
Joseph J. Aronica
Duane Morris LLP
505 9th Street, N.W. Suite 1000
Washington, D.C. 20004-2166
JJAronica@duanemorris.com
*Counsel for Defendant Cameron R. Jezierski*
**via ECF**

**Defendant Jay B. Ledford**
Jack Jamison
1509 Main St., #205
Dallas, TX 75201
jack@jackjamisonattorney.com
*Counsel for Defendant Jay B. Ledford*
**via ECF**

and

Joshua R. Treem
Brown Goldstein Levy LLP
120 E Baltimore St., Ste. 1700
Baltimore, MD 21202
jtreem@browngold.com
*Counsel for Defendant Jay B. Ledford*
**via ECF**

**Defendant Kevin B. Merrill**
Chesapeake Detention Facility, #1335278
401 East Madison Street
Baltimore, MD 21202
**via U.S. Mail**

**Defendant Delmarva Capital, LLC**
c/o Gregory S. Milligan, Receiver for Delmarva Capital, LLC

Brian Paul Waagner
Husch Blackwell LLP

750 17th St NW Ste 900
Washington, DC 20006
*Counsel for Receiver Gregory S. Milligan*
**via ECF**


and


Lynn H. Butler
Husch Blackwell LLP
111 Congress Ave., Ste. 1400
Austin, TX 78701
*Counsel for Receiver Gregory S. Milligan*
**via ECF**


**Defendant DeVille Asset Management LTD**
c/o Gregory S. Milligan, Receiver for DeVille Asset Management LTD


Brian Paul Waagner
Husch Blackwell LLP
750 17th St NW Ste 900
Washington, DC 20006
*Counsel for Receiver Gregory S. Milligan*
**via ECF**


and


Lynn H. Butler
Husch Blackwell LLP
111 Congress Ave., Ste. 1400
Austin, TX 78701
*Counsel for Receiver Gregory S. Milligan*
**via ECF**


**Defendant Global Credit Recovery, LLC**
c/o Gregory S. Milligan, Receiver for Global Credit Recovery, LLC


Brian Paul Waagner
Husch Blackwell LLP
750 17th St NW Ste 900
Washington, DC 20006
*Counsel for Receiver Gregory S. Milligan*
**via ECF**


and


Lynn H. Butler

Husch Blackwell LLP
111 Congress Ave., Ste. 1400
Austin, TX 78701
*Counsel for Receiver Gregory S. Milligan*
**via ECF**

### Defendant Riverwalk Financial Corporation

c/o Gregory S. Milligan, Receiver for Riverwalk Financial Corporation

Brian Paul Waagner
Husch Blackwell LLP
750 17th St NW Ste 900
Washington, DC 20006
*Counsel for Receiver Gregory S. Milligan*
**via ECF**

and

Lynn H. Butler
Husch Blackwell LLP
111 Congress Ave., Ste. 1400
Austin, TX 78701
*Counsel for Receiver Gregory S. Milligan*
**via ECF**

### Defendant Rhino Capital Group, LLC

c/o Gregory S. Milligan, Receiver for Riverwalk Financial Corporation

Brian Paul Waagner
Husch Blackwell LLP
750 17th St NW Ste 900
Washington, DC 20006
*Counsel for Receiver Gregory S. Milligan*
**via ECF**

and

Lynn H. Butler
Husch Blackwell LLP
111 Congress Ave., Ste. 1400
Austin, TX 78701
*Counsel for Receiver Gregory S. Milligan*
**via ECF**

### Defendant Rhino Capital Holdings, LLC

c/o Gregory S. Milligan, Receiver for Riverwalk Financial Corporation

Brian Paul Waagner
Husch Blackwell LLP
750 17th St NW Ste 900
Washington, DC 20006
*Counsel for Receiver Gregory S. Milligan*
**via ECF**

and

Lynn H. Butler
Husch Blackwell LLP
111 Congress Ave., Ste. 1400
Austin, TX 78701
*Counsel for Receiver Gregory S. Milligan*
**via ECF**

**Intervenor Plaintiff United States of America**
Joyce K. McDonald
Office of the United States Attorney
36 S Charles St., Fourth Floor
Baltimore, MD 21201
Joyce.McDonald@usdoj.gov
*Counsel for Intervenor Plaintiff United States of America*
**via ECF**

/s/ Mark R. Sylvester
Mark R. Sylvester