## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) |
| | ) |
| **Plaintiff,** | ) |
| | )   **Case No.: 1:18-cv-02844-RDB** |
| **v.** | ) |
| | ) |
| KEVIN B. MERRILL, et al., | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM IN SUPPORT OF RECEIVER GREGORY S. MILLIGAN'S MOTION TO DISQUALIFY ATTORNEY JACK JAMISON

Receiver Gregory S. Milligan (the "Receiver") submits this Memorandum in Support of the Receiver's Motion to Disqualify Attorney Jack Jamison (the "Motion to Disqualify"), and would respectfully show the Court as follows:

### I.      BACKGROUND

**A.      The SEC Action.**

1.      On September 13, 2018, the SEC filed this case (the "SEC Action") along with thousands of pages of evidence alleging that Defendants Kevin B. Merrill ("Merrill"), Jay B. Ledford ("Ledford"), and Cameron R. Jezierski ("Jezierski") (collectively, the "Defendants") engaged in a $345 million fraudulent Ponzi scheme involving as many as 230 investors. *See* Dkt. Nos. 1, 3.[1]   This Court found that it was both necessary and appropriate to appoint a

---

[1]  While the SEC Action is stayed pending resolution of the criminal prosecution of the Defendants, *see* Dkt. No. 42, the Receiver brings this Motion to Disqualify and requests the Court consider it during the pendency of the stay due to the potential for waiver of the conflict of interest over the passage of time. *See Buckley v. Airshield Corp.*, 908 F. Supp. 299, 307 (D. Md. 1995) ("Courts have held that a party's failure to timely raise a motion to disqualify may result in a waiver."). Additionally, Jamison's continued filings after entry of the stay indicate his intention to be actively involved in the SEC Action notwithstanding the stay.

receiver and thereby assumed exclusive in rem jurisdiction over all assets and records of the Defendants and certain entities affiliated with Defendants.  *See* Dkt. Nos. 11, 62.

2.      On September 13, 2018, this Court entered the Receivership Order (Dkt. No. 11) and on November 27, 2018, the First Amended Receivership Order (Dkt. No. 62) (collectively, the "Receivership Order").

3.      Pursuant to the Receivership Order, the Court appointed the Receiver and granted him authority to take possession of all assets for the estates of the Receivership Parties, which includes, but is not limited to, the following Defendants and affiliated entities: Merrill; Ledford; Jezierski; Global Credit Recovery, LLC; Delmarva Capital, LLC; Rhino Capital Holdings, LLC; Rhino Capital Group, LLC; DeVille Asset Management LTD ("DeVille"); Riverwalk Financial Corporation; K.B. Merrill Associates; Financial Reclamation Group LLC; Halo Credit Solutions LLC; JBL Holdings LLC; Jay B. Ledford, P.C.; the Joseph Finance Company; Leddy Bear LTD; Ledford & Associates, PLLC; King Fischer LTD d/b/a LP Investments LTD; NLEX, Inc.; Receivables Portfolio Interchange, Inc.; Riverwalk Capital Investments, Inc.; Riverwalk Credit Solutions, Inc.; Riverwalk Debt Solutions, Inc.; Riverwalk Fixed Asset Group LLC; SCUSA Financial, Inc.; Vaquero Asset Management, Inc.; CRJ Holdings LLC; Centurion Capital Corporation ("Centurion"); GCR CBL CP I, LLC; GCR CBL CP II, LLC; GCR CBL CP III, LLC; GCR CBL CP IV, LLC; GCR HCP Holdings 1, LLC; GCR Mercer Holdings, LLC, J Trust, and the Kevin B. Merrill Revocable Trust (collectively, the "Receivership Parties").  *See* Amended Receivership Order, Dkt. 62 at ¶ 1.

4.      These assets are defined broadly to include all assets:

    a.      owned, controlled, or held, in whole or in part, by or for the benefit of any of the Receivership Parties;

    b.      in the actual or constructive possession of any of the Receivership Parties, or other individual or entity acting in concert with any of the Receivership Parties;

c.   held by an agent of any of the Receivership Parties, including as a retainer for the agent's provision of services; or

d.   owned, controlled, or held, in whole or in part, by, or in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, trust, or other entity directly or indirectly owned, controlled, or held, in whole or in part, by any of the Receivership Parties, including assets that have been transferred to other persons or entities but as to which assets such persons or entities do not have a legitimate claim.

Amended Receivership Order, Dkt. No. 62 at ¶ 3.

5.      Pursuant to the Receivership Order, "[t]he trustees, directors, officers, managers, investment advisors, accountants, attorneys, and other agents of the non-individual Receivership Parties [were] dismissed and the powers of any partners, directors, and/or managers [were] suspended." Amended Receivership Order, Dkt. No. 62 at ¶ 5.

6.      The Receivership Order further provides that the "Receiver maintains and controls the attorney-client privilege for all non-individual Receivership Parties," which includes DeVille and Centurion. Amended Receivership Order, Dkt. No. 62 at ¶ 16.

7.      On October 24, 2018, attorney Jack Jamison ("Jamison") filed a Motion for Admission *Pro Hac Vice* to represent Ledford individually in this SEC Action. *See* Dkt. No. 41.

8.      On October 26, 2018, the Court granted Jamison's Motion for Admission *Pro Hac Vice*. *See* Dkt. No. 48.

**B.     Jack Jamison's Representation of Deville and Centurion.**

9.      On or about December 7, 2018, counsel for the Receiver was contacted by counsel for the Boulder Group[2] regarding Jamison's involvement in certain facts and circumstances giving rise to this SEC Action.[3]

---

[2] The "Boulder Group" is a group of defrauded individuals, investment funds, and entities based in Boulder, Colorado that invested approximately $116 million with the Defendants over the course of several years. *See* First Amended Complaint, Dkt. No. 50 at ¶¶ 100-120.

[3] On December 11, 2018, counsel for the Boulder Group sent a letter to Jamison and the Receiver providing notice of claims and a demand for document preservation. A redacted copy

10.     Specifically, counsel for the Boulder Group notified counsel for the Receiver that Jamison had actively represented DeVille and Centurion in negotiating the Boulder Group's redemption of certain investments immediately prior to the filing of this action.

11.     The Receiver thereafter investigated Jamison's relationship with DeVille and Centurion and has determined that Jamison did in fact represent DeVille and Centurion from, at the latest, August 24, 2018 up to the filing of the SEC Action.[4]

12.     Specifically, Jamison (i) negotiated the terms of the redemption with counsel for the Boulder Group, (ii) drafted the transaction documents related to the redemption of the Boulder Group's investments, and (iii) advised DeVille and Centurion with regard to structuring the redemption.  The redemption of existing investors was an integral part of the Defendants' fraudulent scheme, as it assisted in the portrayal of a legitimate investment.  *See* Amended Complaint, Dkt. No. 50 at ¶ 120.

13.     Of the $116 million invested by the Boulder Group, approximately $92.8 million has been repaid "in the form of purported profits or redemptions that almost entirely consisted of Ponzi-like payments of monies invested by the Boulder Group or other investors."  Amended Complaint, Dkt. No. 50 at ¶ 120.

14.     Jamison failed to notify the Court of his prior representation of DeVille and Centurion in his Motion for Admission *Pro Hac Vice*.  *See* Dkt. No. 41.

---

of the Letter from counsel for the Boulder Group is attached as **Exhibit A** to remove the names of the individual investors in the Boulder Group.

[4] The Receiver has located numerous emails between Jamison, counsel for the Boulder Group, and Receivership Parties that illustrate the subject matter and significant level of involvement that Jamison played in negotiating the Boulder Group's redemption.  Attached as **Exhibit B** is an email string between Jamison and counsel for the Boulder Group, redacted to remove the names of the individual investors in the Boulder Group.  The Receiver can also provide copies of relevant attorney-client privileged emails for the Court to perform an *in camera* review, but the Receiver is not attaching the privileged emails to this Motion to Disqualify out of an abundance of caution to ensure preservation of the attorney-client privilege held by DeVille and Centurion.

15.     On December 14, 2018, counsel for the Receiver spoke to Jamison by telephone and notified him of the conflict of interest in his current representation of Ledford individually in this SEC Action.[5]   Counsel for the Receiver further notified Jamison that the Receiver, as the holder of DeVille and Centurion's attorney-client privileges, would not waive the conflict of interest to the extent it is a waivable conflict.

16.     Jamison notified counsel for the Receiver that he was not seeking DeVille or Centurion's consent in his representation of Ledford and that he does not believe there is a conflict of interest.

## II.     ARGUMENT & AUTHORITY

17.     "The Maryland Rules of Professional Conduct ("MRPC"), which have been adopted by the Court of Appeals of Maryland, apply to disputes involving attorney conduct." *Fenzel v. Group2 Software, LLC*, No. 13-cv-0379, 2014 WL 7404575, at *3 (D. Md. Dec. 29, 2014) (citing Local Rule 704).

18.     The Maryland Rules of Professional Conduct apply to this Motion to Disqualify because it is brought in relation to Jamison's conduct in connection with a matter pending before a tribunal in the State of Maryland.   *See* MRPC 19-308.5(b)(1) (Choice of Law).

19.     "One of the Court's duties and responsibilities is to ensure that attorneys who appear before it preserve the public's confidence in the judicial system."   *Buckley*, 908 F. Supp. at 303-04.

---

[5] As set forth in the Certificate of Conference attached to the Motion to Disqualify, counsel for the Receiver had previously left a voicemail for Jamison on December 12, 2018, regarding his conflict of interest in representing Ledford individually in this SEC Action.  Counsel for the Receiver called Jamison again the morning of December 14, 2018, at which time the subject matter of this Motion to Disqualify was discussed and Jamison refused to withdraw.  Later that morning, Jamison responded to an inquiry from the Court's Law Clerk and notified the Court that Ledford would be objecting to the Receiver and its counsel's unrelated fee applications. Ledford's forthcoming objection is unrelated to this Motion to Disqualify and the bases for Jamison's disqualification.

20.     "A motion to disqualify counsel is a serious matter, which must be decided on a case-by-case basis.   This is so because two significant interests are implicated by a disqualification motion: the client's free choice of counsel and the maintenance of the highest ethical and professional standards in the legal community.   Nevertheless, the guiding principle in considering a motion to disqualify counsel is safeguarding the integrity of the court proceedings. Thus, this Court must not weigh the competing issues with hair-splitting nicety but, in the proper exercise of its supervisory power over the members of the bar and with a view of preventing the appearance of impropriety, [the] Court is to resolve all doubts in favor of disqualification." *Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 750 (D. Md. 1997), *aff'd*, 141 F.3d 1162 (4th Cir. 1998) (citations and quotations omitted).

21.     In addition, an attorney seeking admission *pro hac vice* has a duty to disclose a potential conflict of interest in a motion for admission *pro hac vice*. *See Manning v. Vellardita*, No. CIV.A. 6812-VCG, 2012 WL 1072233, at *3 (Del. Ch. Mar. 28, 2012) ("A duty of candor dictates that, where a colorable claim of conflict under DLRPC Rule 1.9 exists, at a minimum facts sufficient to put the Court and opposing counsel on notice should be disclosed in the [*pro hac vice*] application.   This potential conflict, in other words, should not have been left to disclosure by chance or accident."); *D.H. Overmyer Co. v. Robson*, 750 F.2d 31, 34 (6th Cir. 1984) (applying bankruptcy rule requiring disclosure of a potential conflict of interest).

22.     Pursuant to Local Rule 101-1(b), "the Court **may** permit any attorney who is an active member in good standing of the bar of any other United States court or of the highest court of any state to appear and participate as counsel in a particular civil case."   Local Rule 101-1(b) (emphasis added).

23.     The Court "is vested with the discretion to determine if *pro hac vice* status should be granted, or, as in this case, revoked."   *Robson*, 750 F.2d at 34 (affirming trial court's

revocation of *pro hac vice* admission where attorney failed to disclose a conflict of interest); *see also Obert v. Republic W. Ins. Co.*, 190 F. Supp. 2d 279, 299 (D. R.I. 2002) ("A court may disqualify *pro hac vice* counsel, without a hearing, upon knowledge of counsel's conflict of interest or during trial in order to maintain order.").

**A.      Jamison Has a Conflict of Interest With Former Clients, DeVille and Centurion.**

24.      The Receivership Order dismissed Jamison, thereby effectively terminating his attorney-client relationship with DeVille and Centurion.   Consequently, Jamison should be disqualified due to a conflict of interest with former clients.

25.      MPRC 19-301.9 ("Rule 1.9") states, in relevant part, that "[a]n attorney who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."  MRPC 19-301.9(a).

26.      Comment 3 to Rule 1.9 states, in relevant part, that:

> Matters are "substantially related" for purposes of this Rule if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter. . . . In the case of an organizational client, general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation.

MPRC 19-301.9, cmt. 3.

27.      "'Substantially related' has been interpreted to mean 'identical' or 'essentially the same,' or 'factually related.'"  *Nichols Agency, Inc. v. Enchanted Child Care, Inc.*, 537 F. Supp. 2d 774, 779 (D. Md. 2008) (citing *Tessier v. Plastic Surgery Specialists, Inc.*, 731 F. Supp. 724, 730 (E.D. Va. 1990) (quoting *Gov't of India v. Cook Indus.*, 569 F.2d 737, 739-40 (2d Cir.

DocID: 4811-8479-3988.2

1978)); *Blumenthal Power Co. v. Browning-Ferris, Inc.*, 903 F. Supp. 901, 902 (D. Md. 1995) (quoting *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980)).

28.     The term "'substantially related' embraces consideration of circumstances where the same issue is litigated, albeit for a different client, if there is a substantial risk that confidential communications between the attorney and his or her former client may be disclosed or utilized in a material manner prejudicial to the former client." *Gatewood v. State*, 880 A.2d 322, 332-33 (Md. 2005)

29.     "[I]t is well settled that once an attorney-client relationship has been established, an irrebuttable presumption arises that confidential information was conveyed to the attorney in the prior matter." *Buckley*, 908 F. Supp. at 306 (quoting *Tessier*, 731 F. Supp. 2d at 724).

30.     A similar rule prohibits using confidential information of a former client to the former client's disadvantage unless that information has become generally known. *See* MRPC 19-301.9(c)(1).

31.     Further, "[a]n attorney shall not reveal information relating to the representation of a client unless the client gives informed consent." MRPC 19-301.6(a); *see also* MRPC 19-301.6 cmt. 15 (noting the fiduciary relationship between an attorney and the client).

32.     Here, at the time that this SEC Action was filed and the Receivership Order was entered, Jamison was actively negotiating the redemption with the Boulder Group on behalf of DeVille and Centurion. *See* Exhibit B. Jamison readily admits his active representation of DeVille and Centurion in the month leading up to the time the SEC Action was filed.

33.     Jamison's representation of DeVille and Centurion was substantially related to the actions complained of in the SEC's First Amended Complaint and the facts giving rise to entry of the Receivership Order. *See* Amended Complaint, Dkt. No. 50 at ¶ 120.

34.     Specifically, Jamison negotiated and prepared the transactional documents whereby DeVille and Centurion had contemplated redemption of the Boulder Group's investments using funds obtained from other investors in the Ponzi scheme.

35.     Jamison received significant confidential factual information during his representation of DeVille and Centurion related to the Boulder Group redemption.   Even if Jamison denies having received any confidential information, an irrebuttable presumption exists that confidential information was conveyed to Jamison during his representation in the Boulder Group redemption.   *See Buckley*, 908 F. Supp. at 306.   This confidential information would materially advance Ledford's position in this SEC Action to the detriment of DeVille and Centurion.

36.     Jamison's receipt of the confidential information would be detrimental to DeVille and Centurion because each entity is the holder of claims against Ledford related to his improper use of DeVille and Centurion as vehicles to perpetuate his fraud on investors.   Ledford's actions were in direct adversity to the best interest of the non-individual Receivership Parties, including DeVille and Centurion.

37.     As explained in the *Stanford* receivership litigation, "a federal equity receiver has standing to assert only the claims of the entities in receivership, and not the claims of the entities' investor-creditors, but the knowledge and effects of the fraud of the principal of a Ponzi scheme in making fraudulent conveyances of the funds of the corporations under his evil coercion are not imputed to his captive corporations.   Thus, once freed of his coercion by the court's appointment of a receiver, the corporations in receivership, through the receiver, may recover assets or funds that the principal fraudulently diverted to third parties without receiving reasonably equivalent value."   *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 190 (5th Cir. 2013).

38.     In other words, "[t]he entities in receivership were injured when [the principal] used them to commit fraud and waste." *Wing v. Hammons*, No. 2:08-CV-00620, 2009 WL 1362389, at *3 (D. Utah May 14, 2009).

39.     Here, as detailed at length in the SEC's Amended Complaint, Ledford utilized DeVille, Centurion, and other Receivership Parties as vehicles to perpetuate the fraud on investors, including the Boulder Group.  Ledford also misappropriated at least $40 million of investors' funds to maintain his own lavish lifestyle, which included transferring $17 million to personal bank accounts and purchasing several high value cars and pieces of jewelry.  *See* Amended Complaint, Dkt. No. 50 at 2, ¶ 4.

40.     Ledford's use of DeVille and Centurion as vehicles to perpetuate the fraud on investors caused profound injuries to DeVille and Centurion, which creates a distinct adversity of interests between Ledford and DeVille/Centurion.  Indeed, the Boulder Group has already put Jamison and the Receiver on notice of claims it intends to assert against Ledford and Centurion. *See* Exhibit A.

41.     Although Jamison's known representation of DeVille and Centurion is not believed to be in relation to the solicitation of investments from the Boulder Group, Jamison's representation expressly involved the redemption of the Boulder Group's investments utilizing funds that could only have come from other investors in the Ponzi scheme given the size of the Boulder Group redemption.

42.     While DeVille and Centurion have not directly asserted claims against Ledford at this time, the Receiver anticipates it may be necessary, in order to maximize the value of the Receivership Estate, for the Receiver to bring claims adverse to and directly against Ledford in relation to his use of DeVille and Centurion to perpetuate fraudulent transfers of investors'

funds.  Moreover, DeVille and Centurion will be adverse to Ledford in their defense of potential claims brought by investors, including the Boulder Group.  *See* Exhibit A.

43.    Finally, Jamison has not sought, and has indicated he will not seek, DeVille or Centurion's consent of his representation of Ledford in this SEC Action, and the Receiver is unwilling to give such consent on behalf of DeVille or Centurion.

44.    Accordingly, Jamison should be disqualified from representing Ledford in this SEC Action due to a conflict of interest with former clients that has not been waived by DeVille or Centurion.

**B.    Jamison Has a Conflict of Interest in this SEC Action Due to Personal Interests.**

45.    Although the Receiver is still investigating the extent to which Jamison was involved in related businesses of the Defendants and the Receivership Parties, enough evidence has been discovered at this time to establish a conflict of interest based on Jamison's personal interest in the outcome of this SEC Action.

46.    Jamison, in addition to being counsel to Deville and Centurion, was, along with his wife Jennifer M. Jamison, an employee of Open Spice, LLC ("Open Spice"), a start-up company[6] formed in December 2017 and owned 100% by Receivership Party J Trust, with Ledford's daughter (Sarah Ledford) and her boyfriend serving as managing members of Open Spice.  *See* Open Spice Entity Classification Election, a copy of which is attached as **Exhibit C**.

47.    Specifically, on or about January 3, 2018, Jamison signed an employment agreement to become an employee of Open Spice with an annual salary of $175,000.00, reimbursement of rent at Jamison's law office in the amount of $13,572.00 annually, plus

---

[6] The Receiver understands that Open Spice was created to explore insurance business opportunities in those jurisdictions that allow cannabis cultivation.  However, the Receiver is unaware at this time of any business activities that Open Spice undertook prior to the installation of the Receiver.

payment of all premiums under group health, dental, vision, disability, and life insurance policies. *See* Jamison Employment Agreement, a copy of which is attached as **Exhibit D**.

48.     Jamison's wife, Jennifer M. Jamison, signed a similar employment agreement with Open Spice with an annual salary of $75,000.00, plus payment of all premiums under group health, dental, vision, disability, and life insurance policies. *See* Jennifer M. Jamison Employment Agreement, a copy of which is attached as **Exhibit E**.

49.     Prior to Jamison's execution of the Open Spice employment agreement, Jamison drafted a memorandum for Sarah Ledford entitled "Preliminary organizational action plan for insurance business venture" (the "Memorandum"). A copy of the Memorandum is attached as **Exhibit F**. In the Memorandum and its attached infographic Figures, Jamison details the proposed business venture's corporate structure and the forms of contribution and compensation for the various parties. *See* Exhibit F. Of interest, the business venture originally contemplated that Jamison and his wife would be employees of DeVille and would receive ownership interests in the newco through "sweat equity." *See* Exhibit F.

50.     Thereafter, Jamison sent an email to Sarah Ledford regarding proposed changes to the organization of the business venture, with "the revisions reflecting that Open Spice, LLC will be the employer instead of DeVille Asset Management Limited." Proposed Insurance Business Venture Email from Jamison, a copy of which is attached as **Exhibit G**.

51.     During this time period, J Trust received millions of dollars in transfers from other Receivership Parties at times when J Trust's only known assets were two residential homes located in Dallas, Texas and Las Vegas, Nevada. It is unknown at this point whether Jamison received any portion of the transfers identified above as part of his compensation from Open Spice. However, Jamison and his wife were listed as employees of Open Spice at the same

compensation levels in the payroll records of Paylocity, the payroll service utilized by some of the Receivership Parties.

52.     Rule 1.7 states, in relevant part, that "an attorney shall not represent a client if the representation involves a conflict of interest.   A conflict of interest exists if . . . there is a significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the attorney."  MRPC 19-301.7(a)(2).

53.     As noted by Judge Quarles in a criminal context, "[t]he Sixth Amendment right to effective assistance of counsel 'encompasses the attorney's duty of loyalty to the client and, concomitantly, the duty to avoid conflicts of interest.'  'Counsel whose interests diverge from that of the defendant-client cannot render competent legal services or give the client undivided loyalty.'"  *United States v. Bundy*, No. 08-cr-0226, 2008 WL 4133857, at *3 (D. Md. Sept. 2, 2008) (on motion of the government, the Court found a conflict of interest where the defense attorney asserted a claim to client's funds that were subject to forfeiture) (quoting *United States v. Magini*, 973 F.2d 261, 263 (4th Cir. 1992) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)); *Reckmeyer v. United States*, 709 F. Supp. 680, 687 (E.D. Va. 1989)).

54.     "The critical question is 'whether a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or forecloses courses of action that reasonably should be pursued on behalf of the client.'"  *Bundy*, 2008 WL 4133857, at *3 (quoting MPRC 19-301.7, cmt. 8).

55.     "A situation in which the attorney's own interests diverge from those of the client presents the same core problem presented in the multiple representation cases: the attorney's fealty to the client is compromised.   Therefore, courts have held that the presumption of

prejudice set forth in *Cuyler*[7] applies as well to situations where the personal interests of the attorney and the interests of the client are in actual conflict." *United States v. Fulton*, 5 F.3d 605, 609 (2d Cir. 1993)

56.     Jamison's role as an employee and recipient of compensation from Open Spice, which is owned 100% by Receivership Party J Trust, creates a conflict of interest for Jamison due to a personal interest in the outcome of the SEC Action and related litigation.

57.     The compensation paid to Jamison as an employee of Open Spice is a potential fraudulent transfer for which the Receiver may assert a claim against Jamison after additional investigation and approval by this Court.

58.     Moreover, Jamison's active participation in the decision to be employed by Open Spice, as opposed to DeVille as originally contemplated, and the development of a business venture with Jay and Sarah Ledford show he has a personal interest in the outcome of the SEC Action and the ultimate disposition of assets and claims held by the Receivership Parties.

59.     By way of further example, on December 13, 2018, Jamison filed on behalf of Ledford a Motion to Dismiss, or, Alternatively, to Transfer Venue, and Motion to Reconsider and Vacate First Amended Order Appointing Temporary Receiver (Dkt. No. 68) (the "Motion to Dismiss").

60.     In the Motion to Dismiss, Ledford, through Jamison as counsel, goes to great lengths in an attempt to distance himself from J Trust for the purpose of challenging J Trust's inclusion within the definition of "Receivership Parties." *See* Memorandum in Support of Motion to Dismiss, Dkt. No. 68-1 at 28-29; *see also* Exhibit 1 to Memorandum in Support of Motion to Dismiss, Dkt. No. 68-2 (Unsworn Declaration of Jay B. Ledford).

---

[7] *Cuyler v. Sullivan*, 446 U.S. 335, 350 (1980) ("a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief").

61.     Ledford, through Jamison as counsel, alleges J Trust is an irrevocable spendthrift trust in which "Ledford neither reserved nor retained any interest in the trust or trust property nor the power to revoke, modify, or terminate the trust in whole or in part, or the power to control the administration of the trust in whole or in part." Memorandum in Support of Motion to Dismiss, Dkt. No. 68-1 at 15, n.13; *see also* Declaration of Jay B. Ledford, Dkt. No. 68-2 at 5, ¶ 10.

62.     Despite claiming no interest in J Trust, no control over J Trust, and no other rights with respect to J Trust, Ledford felt compelled to move for J Trust's removal from the definition of Receivership Parties, and Jamison effectuated Ledford's unfounded position by filing the Motion to Dismiss without disclosing he is and/or was an employee of an entity owned 100% by J Trust.

63.     Based on the allegations in Ledford's Declaration, Ledford has no standing to challenge the inclusion of J Trust within the definition of Receivership Parties, and Jamison's willingness to pursue the Motion to Dismiss with respect to J Trust may be indicative of his personal interest in the outcome of this SEC Action.

64.     Additional bases for disqualification may exist or arise as the Receiver's investigation is ongoing and continues to develop additional facts related to Jamison's relationship to the Receivership Parties.

65.     Accordingly, Jamison should be disqualified in this SEC Action due to a conflict of interest based on Jamison's personal interest in the outcome of this SEC Action.

**C.     Jamison is also a Material Fact Witness and Cannot Represent a Party in This SEC Action.**

66.     MPRC 19-303.7 (Rule 3.7) states:

(a)     An attorney shall not act as advocate at a trial in which the attorney is likely to be a necessary witness unless:

     (1)     the testimony relates to an uncontested issue;

(2)     the testimony relates to the nature and value of legal services rendered in the case; or

(3)     disqualification of the attorney would work substantial hardship on the client.

MPRC 19-303.7(a).

67.     Here, Jamison will likely be a necessary witness in this SEC Action based on his representation of DeVille and Centurion in the redemption transaction involving the Boulder Group.

68.     The legitimacy of the redemption of the Boulder Group and the source(s) of DeVille and Centurion's funds is anticipated to be a contested issue.  Furthermore, based on the Receiver's review of correspondence between Jamison and Deville and Centurion, Jamison is likely to be a necessary witness regarding additional contested matters of importance in the SEC Action.

69.     Jamison's testimony will be unrelated to the nature or value of legal services in this SEC Action.

70.     Finally, Jamison's disqualification will not work substantial hardship on Ledford, because the civil SEC Action is stayed pending resolution of the criminal proceedings against Ledford.  *See* Order Staying SEC Action, Dkt. No. 42.  Moreover, Ledford has other counsel of record, Joshua Treem, who has appeared and can continue to represent him in this SEC Action. *See* Entry of Appearance of Joshua Treem, Dkt. No. 43.

71.     Accordingly, Jamison should be disqualified from representing Ledford in this SEC Action due to the likelihood he will be a necessary witness in this SEC Action.

### III. CONCLUSION

Accordingly, the Receiver respectfully requests that the Court enter an order disqualifying Jack Jamison from appearing in this action on behalf of Jay Ledford, and for such other and further relief the Court deems just.

Respectfully Submitted,

*/s/ Lynn H. Butler*
Lynn H. Butler, *pro hac vice*
HUSCH BLACKWELL LLP
111 Congress Ave., Suite 1400
Austin, TX 78701
Tel: (512) 472-5456
Fax: (512) 479-1101
lynn.butler@huschblackwell.com

Brian P. Waagner, Fed. Bar No. 14954
HUSCH BLACKWELL LLP
750 17th Street, NW, Suite 900
Washington, D.C. 20006
Tel: (202) 378-2300
Fax: (202) 378-2318
brian.waagner@huschblackwell.com

Buffey E. Klein, *pro hac vice*
HUSCH BLACKWELL LLP
2001 Ross Avenue, Suite 2000
Dallas, Texas 75201
Tel: (214) 999-6100
Fax: (214) 999-6170
buffey.klein@huschblackwell.com

*Counsel for Receiver Gregory S. Milligan*

## <u>CERTIFICATE OF SERVICE</u>

On December 24, 2018, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court for the District of Maryland, using the electronic case filing system of the court.  I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).


*/s/ Lynn H. Butler*
Lynn H. Butler