**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | |
| **Plaintiff,** | Case No. 1:18-cv-02844-RDB |
| **v.** | |
| **KEVIN B. MERRILL, et al.,** | |
| **Defendants** | |

<u>**RECEIVER GREGORY S. MILLIGAN'S FIRST QUARTERLY STATUS REPORT FOR THE PERIOD BETWEEN SEPTEMBER 13, 2018 AND DECEMBER 31, 2018**</u>

Lynn H. Butler, *pro hac vice*
HUSCH BLACKWELL LLP
111 Congress Avenue, Suite 1400
Austin, Texas 78701
Telephone: (512) 472-5456
Facsimile:  (512) 479-1101

Buffey E. Klein, *pro hac vice*
HUSCH BLACKWELL LLP
2001 Ross Avenue, Suite 2000
Dallas, Texas  75201
Telephone: (214) 999-6100
Facsimile:  (214) 999-6170

Brian P. Waagner, Fed. Bar No. 14954
HUSCH BLACKWELL LLP
750 17th Street, NW, Suite 900
Washington, D.C. 20006
Telephone:  (202) 378-2300
Facsimile:  (202) 378-2318

*Attorneys for Receiver Gregory S. Milligan*

DocID: 4838-5623-9238.1
DocID: 4838-5623-9238.2
DocID: 4832-0195-8278.1

# TABLE OF CONTENTS

**Page**

I.     **INTRODUCTION**..........................................................................................**1**

II.    **SUMMARY** ...................................................................................................**3**

III.   **OVERVIEW OF THE RECEIVER'S ACTIVITIES**....................................**5**

    A.   **Summary of Assets** .................................................................................**5**

        1.   **Business Operations**.............................................................**5**

        2.   **Holding Institutions** ............................................................**5**

        3.   **Real Property** ......................................................................**6**

        4.   **Other Property** ....................................................................**6**

    B.   **Administration and Management** ..........................................................**7**

        1.   **Coordination and Conference with Other Parties**..............**8**

        2.   **Businesses Operated in Texas** .............................................**8**

        3.   **Real Property** ....................................................................**17**

        4.   **Vehicles** ..............................................................................**21**

        5.   **Other Personal Property** ...................................................**24**

        6.   **Insurance** ...........................................................................**25**

IV.   **ESTATE ADMINISTRATION** .................................................................**25**

V.    **UNRESOLVED CLAIMS AGAINST RECEIVERSHIP PROPERTY** ...................**26**

VI.   **ACCRUED ADMINISTRATIVE EXPENSES** ..........................................**27**

VII.  **RECEIVER'S ONGOING INVESTIGATION** ...........................................**27**

VIII. **CLAIMS DETERMINATION AND DISTRIBUTION PROCESS** ..........................**27**

IX.   **CONCLUSION** .........................................................................................**28**

i

DocID: 4838-5623-9238.1
DocID: 4838-5623-9238.2
DocID: 4832-0195-8278.1

Gregory S. Milligan (the "<u>Receiver</u>"), the Court-appointed Receiver for the assets of Defendants and affiliated entities, including but not limited to: Kevin B. Merrill ("<u>Merrill</u>"), Jay B. Ledford ("<u>Ledford</u>"); Cameron R. Jezierski ("<u>Jezierski</u>"); Global Credit Recovery, LLC; Delmarva Capital, LLC; Rhino Capital Holdings, LLC; Rhino Capital Group, LLC; DeVille Asset Management LTD; Riverwalk Financial Corporation; K.B. Merrill Associates; Financial Reclamation Group LLC; Halo Credit Solutions LLC; JBL Holdings LLC; Jay B. Ledford, P.C.; the Joseph Finance Company; Leddy Bear LTD; Ledford & Associates, PLLC; King Fischer LTD d/b/a LP Investments LTD; NLEX, Inc.; Receivables Portfolio Interchange, Inc.; Riverwalk Capital Investments, Inc.; Riverwalk Credit Solutions, Inc.; Riverwalk Debt Solutions, Inc.; Riverwalk Fixed Asset Group LLC; SCUSA Financial, Inc.; Vaquero Asset Management, Inc.; CRJ Holdings LLC; Centurion Capital Corporation; GCR CBL CP I, LLC; GCR CBL CP II, LLC; GCR CBL CP III, LLC; GCR CBL CP IV, LLC; GCR HCP Holdings 1, LLC; GCR Mercer Holdings, LLC; the J Trust; and Kevin B. Merrill Revocable Trust (collectively, the "<u>Receivership Parties</u>") and certain assets held by Relief Defendants Amanda Merrill and Lalaine Ledford (the "<u>Relief Defendants</u>") files this First Quarterly Status Report for the Period Between September 13, 2018 and December 31, 2018 (the "<u>Report</u>") in accordance with the First Amended Order Appointing Temporary Receiver dated November 27, 2018 (Dkt. No. 62) (the "<u>First Amended Receivership Order</u>"), and would respectfully show the Court as follows:

## I.    INTRODUCTION

On September 13, 2018, the Securities and Exchange Commission ("<u>SEC</u>") filed a Complaint that initiated this action against Defendants Merrill, Ledford, Jezierski, Global Credit Recovery, LLC, Delmarva Capital, LLC, Rhino Capital Holdings, LLC, Rhino Capital Group, LLC, DeVille Asset Management LTD, and Riverwalk Financial Corporation (collectively, the "<u>Defendants</u>") alleging various securities violations arising from the Defendants' operation of a

1

Ponzi scheme.  The Complaint also includes K.B. Merrill Associates, Financial Reclamation Group LLC, Halo Credit Solutions LLC, JBL Holdings LLC, Jay B. Ledford, P.C., the Joseph Finance Company, Leddy Bear LTD, Ledford & Associates, PLLC, King Fischer LTD d/b/a LP Investments LTD, NLEX, Inc., Receivables Portfolio Interchange, Inc., Riverwalk Capital Investments, Inc., Riverwalk Credit Solutions, Inc., Riverwalk Debt Solutions, Inc., Riverwalk Fixed Asset Group LLC, SCUSA Financial, Inc., Vaquero Asset Management, Inc., CRJ Holdings LLC, Centurion Capital Corporation, GCR CBL CP I, LLC, GCR CBL CP II, LLC, GCR CBL CP III, LLC, GCR CBL CP IV, LLC, GCR HCP Holdings 1, LLC, and GCR Mercer Holdings, LLC as affiliated entities of Defendants that are in possession of funds fraudulently obtained from investors.

On November 6, 2018, the SEC filed an Amended Complaint adding Amanda Merrill and Lalaine Ledford as Relief Defendants in this action.  Amanda Merrill is married to Defendant Kevin B. Merrill, and Lalaine Ledford is married to Defendant Jay B. Ledford.  The SEC alleges the Relief Defendants benefited from their husbands' scheme through transfers of funds fraudulently obtained from investors and assets purchased with such funds.

On September 13, 2018, the Court issued a Temporary Restraining Order Freezing Assets and Granting Other Emergency Relief that, *inter alia*, froze the assets of the Defendants and affiliated entities of Defendants, and enjoined further violations of securities laws by Defendants.

On September 13, 2018, this Court also entered the Order Appointing Temporary Receiver (Dkt. No. 11) (the "Initial Receivership Order") pursuant to which the Court took exclusive jurisdiction and possession of all assets of the Receivership Parties including, but not limited to, all assets that are "(a) owned, controlled, or held, in whole or in part, by or for the benefit of any of the Receivership Parties; (b) in the actual or constructive possession of any of

2

the Receivership Parties, or other individual or entity acting in concert with any of the Receivership Parties; (c) held by an agent of any of the Receivership Parties, including as a retainer for the agent's provision of services; or (d) owned, controlled, or held, in whole or in part, by, or in the actual or constructive possession of, or otherwise held for the benefit of, any corporation, partnership, trust, or other entity directly or indirectly owned, controlled, or held, in whole or in part, by any of the Receivership Parties, including assets that have been transferred to other persons or entities but as to which assets such persons or entities do not have a legitimate claim" (the "Receivership Assets").  The Court appointed Gregory S. Milligan as Receiver for the Receivership Assets and related records (the "Receivership Estate"), with the goal and purpose of marshaling and preserving the Receivership Assets to maximize the recovery to defrauded investors, as alleged in the Complaint.  The Receivership Order also stayed all civil actions or other proceedings involving the Receivership Assets, other than the Receivership proceedings and any additional charges in the actions brought by the SEC.  On November 27, 2018, the Court entered the First Amended Receivership Order clarifying and modifying the Receivership Parties and the Receiver's authority.

Pursuant to the First Amended Receivership Order, this Report provides information regarding the assets and liabilities of the Receivership Estate, a summary of the Receiver's activities for the period between September 13, 2018 and December 31, 2018 (the "Applicable Period"), and information regarding claims held by and against the Receivership Estate. A schedule of all of the Receiver's receipts and disbursements for the Applicable Period is attached hereto and incorporated herein as **Exhibit A**.

## II.    SUMMARY

This is a complex case involving four operating businesses on the date of filing, nine residential properties located in Maryland, Florida, Texas and Nevada, two commercial office

buildings in Texas owned by the Receivership Parties and two additional commercial office spaces in Texas leased by the Receivership Parties, an extensive list of more than 30 luxury and exotic vehicles, more than $800,000 in deposits to purchase additional exotic cars, a 2018 Formula 350 Crossover Bowrider Port Cruiser, an interest in pre-paid hours on a Gulfstream G200 twin-engine business jet, litigation financing wherein one of the Receivership Parties is the lender, an account receivable for the sale of a Porsche to be paid over a series of installment payments, a membership in a Naples, Florida country club with a $100,000 initiation fee, a whole life insurance policy with a surrender value of approximately $700,000, an equity investment of $1.5 million in an alternative investment management company, retainers and other deposits with professional service firms, and a substantial accumulation of luxury personal property. The case involves more than 20 banks and other parties upon which demand has been made for the turnover of cash or cash equivalents to the Receiver, with initial asset searches for more than 50 individuals and entities in an attempt to identify and preserve assets of the Receivership Estate.

While the Receiver is not directly involved in the companion criminal case pending before this Court, the administration of this Receivership Estate has required ongoing coordination with the U.S. Attorney's Office Asset Forfeiture Unit and Federal Bureau of Investigation ("FBI") on several matters. For example, the Receiver has coordinated with the FBI regarding the return of computer servers for three of the four operating businesses that were seized, care and maintenance of certain real property seized by the FBI and ongoing communication regarding additional assets discovered by the Receiver during the Applicable Period. Further, the Receiver has coordinated the overlapping jurisdiction of the civil and criminal cases as to certain assets to most-efficiently secure the same in a manner that preserves

4

both evidentiary and monetary value, subject to further administration of those assets as subsequently directed by this Court.

## III.   OVERVIEW OF THE RECEIVER'S ACTIVITIES

During the Applicable Period, the Receiver, in coordination with the federal authorities has assumed control, or taken steps to assume control, of the Receivership Assets with the objective of preserving the Receivership Assets to maximize the recovery for the Receivership Estate.

### A.   Summary of Assets

Immediately after his appointment, the Receiver initiated the process of assuming control and management of all property of the Receivership Estate.

#### 1.   Business Operations

On the date the Receivership Order was unsealed, the Receivership Estate included four business operations in Texas: (i) DeVille Asset Management Ltd. ("DeVille"); (ii) Riverwalk Credit Solutions, Inc. ("Riverwalk Credit"); (iii) Riverwalk Debt Solutions, Inc. ("Riverwalk Debt"); and (iv) Ledford & Associates, PLLC.  The Receiver continues to investigate the first three businesses and the proper means to monetize their value for the benefit of the Receivership Estate.  During the Applicable Period, the Receiver has worked with senior staff of DeVille, Riverwalk Credit, and Riverwalk Debt to gain further understanding of their business operations to properly assess the businesses' valuations.  Ledford & Associates, PLLC has remained shuttered since the Complaint and Receivership Order were unsealed on September 18, 2018 and has no going-concern value to the Receivership Estate.

#### 2.   Holding Institutions

Through telephone calls and written correspondence, the Receiver, by and through counsel of record, notified institutions holding the Receivership Parties' bank, brokerage, and

DocID: 4832-0195-8278.1

business accounts ("Holding Institutions") of his appointment as Receiver and of the Court's exclusive control, by and through the Receiver, of the accounts, assets, documents and information in control of the Holding Institutions pertaining to one or more of the Receivership Parties.   The Receiver also informed the Holding Institutions that the Receivership Parties' accounts were frozen pursuant to Court Order and requested that the Holding Institutions turn over all related accounts, assets, documents, and information in control of the Holding Institutions.   The Holding Institutions have turned over the funds in the Receivership Parties' known accounts, and the Receiver is continuing to follow up with all Holding Institutions who have not yet turned over documents to the Receiver.[1] As of December 31, 2018, the Receivership Estate had approximately $8.2 million of cash on hand in Receivership Estate bank accounts under the sole control of the Receiver.

### 3.     Real Property

The Receivership Estate also contains a number of residential and commercial real properties that have been secured by the Receiver, as discussed in greater detail below.

### 4.     Other Property

Additionally, there were several personal property items that the Receiver has recovered or identified to date, including:

- Vehicles. The Receivership Estate consists of many high-end vehicles and watercraft. The seized vehicles belonging to the Receivership Estate remain in the possession of the FBI or the U.S. Marshals Service.

- Other Property.  The Receivership Estate includes several investments made by the Defendants including, but not limited to: (i) prepaid hours on a Gulfstream Aircraft G200; (ii) an art collection; (iii) a watch collection; (iv) a comic book collection; (v) jewelry; (vi) a litigation financing arrangement; (vii) an equity investment in an alternative investment management company and (viii) a whole life insurance policy. Some of the foregoing investments are of unknown value, and the Receiver is in the

---

[1] The Receiver intends to recover funds from accounts nominally held in the name of the Relief Defendants containing funds that are traceable to the alleged fraud.

DocID: 4832-0195-8278.1

process of determining the value of each investment and the best means to monetize the investments value for the benefit of the Receivership Estate.

- <u>Clawbacks</u>.  The Receivership may hold claims ("<u>Clawbacks</u>") against individuals and entities, in addition to the Relief Defendants, that received gifts, donations, or fraudulent transfers from the Receivership Parties.  These individuals and entities may have received funds from the Receivership Parties derived from Ponzi scheme funds fraudulently obtained from investors.  If and when the Court authorizes the Receiver to pursue such actions, the Receiver will investigate these claims and, where appropriate, make demand for full repayment of the gift, donation, or fraudulent transfer and file suit against the recipients of such transfers, if necessary.

- <u>Clawbacks – Investors who are "Net Winners."</u>  The Receiver may hold claims against investors who withdrew fictitious profits from the Receivership Parties.  An investor's withdrawn profits may be fictitious, for example, if that party received payments in excess of investments.

- <u>Claims against Other Persons or Entities</u>.  The Receiver will investigate, analyze, and collect evidence regarding potential causes of action against other third parties.  Given the more immediate need to secure the tangible Receivership Assets, the Receiver's investigation into this category of assets has been limited to date.

Based upon current available information, which is preliminary and subject to further due diligence, the Receiver team estimates total recoveries from Receivership Assets could range between $40 million and $65 million.[2]  Future quarterly reports will have the benefit of actual recoveries, market data regarding assets yet to be monetized, and more due diligence leading to an increasingly accurate estimate of total Receivership Estate recoveries.

**B.  Administration and Management**

The Receiver's Initial Preservation Plan (the "<u>Preservation Plan</u>") was filed on November 13, 2018.  This Report is filed pursuant to paragraphs 59 and 60 of the First Amended Receivership Order.  The Receiver and his team continue to manage and marshal the Receivership Assets with the goal of maximizing the recovery to the Receivership Estate.

---

[2] These preliminary estimates do not include any potential clawback or fraudulent transfer claims that have not yet been authorized by the Court.

The Receivership Estate includes tangible and intangible property, all of which the Receiver has had to investigate, secure, and/or maintain since the unsealing of the Receivership Order on September 18, 2018.   To fulfill his obligations to the Court, the Receiver has undertaken the following tasks during the Applicable Period with respect to the various forms of property in the Receivership Estate.

### 1.      Coordination and Conference with Other Parties

Since being appointed in this case, the Receiver has coordinated extensively with the SEC, U.S. Attorney's Office Asset Forfeiture Unit, and FBI regarding the identification and safeguarding of Receivership Assets.  In an effort to minimize disputes and reach consensus on the maintenance and disposition of Receivership Assets, where possible, the Receiver has corresponded and/or met with criminal counsel for Merrill, criminal counsel for Ledford, civil counsel for Ledford, and criminal and forfeiture counsel for Amanda Merrill, including meetings in Baltimore, Maryland on November 1, 2018 where all counsel engaged as of that date were invited to meet with the Receiver, his counsel, and representatives from the SEC and the U.S. Attorney's Asset Forfeiture Unit.

### 2.      Businesses Operated in Texas

#### (a)      DeVille Asset Management Ltd.

##### (i)      Overview

Prior to the filing and unsealing of the Complaint, DeVille's operations included the collection of defaulted account receivable portfolios acquired from consumer credit originators, such as credit card issuers, auto loan finance companies, student loan providers, retailers, and other consumer lenders.   DeVille has an in-house debt collection center and a network of collection agencies and attorneys who perform collections on DeVille's behalf.

8

DeVille's computer servers were seized by the FBI on September 18, 2018 and not returned to the Receiver and reinstalled for operational purposes until October 18, 2018. All of DeVille's major systems, including its Debtmaster® debt management platform and telephone and email systems were stored and operated on these servers. As a result, in-house collection activity was dormant and non-operational for the initial 30 days following the unsealing of the Initial Receivership Order and resumed on October 23, 2018.

Despite those challenges, the Receiver re-established key aspects of the operation before the return of the servers, and completed critical actions to preserve the value in the business and the portfolios including:

- Established daily meetings and action plans with DeVille's management team, including General Counsel, Director of Operations, Director of Collections, Director of Compliance, Controller, and Information Technology Managers;

- Consolidated operations from three sites in Euless, Colleyville, and North Richland Hills, Texas into one site in North Richland Hills, Texas;

- Vacated underutilized leased property in Euless, Texas;

- Re-established operating bank accounts for purposes of receiving previously scheduled collection payments from debtors and from third party agencies, and for making payroll and other disbursements;

- Organized and conducted a meeting with all 100+ employees from DeVille, Riverwalk Debt, and Riverwalk Credit to introduce the Receiver and his team, explain the anticipated process moving forward, and answer any questions they had in an effort to maintain the ability to retain sufficient employees to continue operations;

- Made all regular payroll payments (base pay only) and tax/benefits deductions for employees;

- Executed pre-planned, in-process conversions to a new payroll service provider and a new health care insurance provider;

- Provided periodic electronic updates to employees during the time operations were suspended;

- Enacted a strategic headcount reduction eliminating 14 out of 48 collection positions;

- Contacted third party collection firms to ensure ongoing collection efforts;

- Accessed QuickBooks financial data from the cloud and used it to forecast 90-day liquidity and determine the profitability of different operating models;

- Opened up alternate communication channels for DeVille's outside collection agencies and other key stakeholders; and

- Responded to debtors who inquired regarding the indictments and how that affected their debt owed to DeVille, the status of their payment obligations, etc.

After internal investigation and discussion with employees, the Receiver understands the following with respect to DeVille's prior business operations. DeVille's collection business included its in-house collection center and a network of collection agencies. When a new portfolio was acquired by DeVille, the in-house employees would onboard the portfolio into Debtmaster® and perform initial diligence on the portfolio. DeVille in-house collectors typically collected the portfolio for the initial 60 days the loans are owned by DeVille. During this time the DeVille team typically performed data analysis of the portfolio, reported to the debtors the acquisition, and reported to the credit agencies for all "in stat" debt (debt within the statute of limitations to report the debt).

DeVille historically contracted with approximately twelve third-party collection agencies. After the initial collection period by in-house collectors, DeVille management would outsource segments of the acquired portfolios to the appropriate collection agencies based upon established criteria. The fees paid to the contract relationships were a percentage of actual collections and were typically netted from the proceeds paid to DeVille by the agency.

These agencies were grouped into five categories, and DeVille sourced debt to these agencies based upon the agency's expertise and the characteristics of the debt. DeVille's third party collection agencies were actively engaged in the collection process. Unlike DeVille's internal collection center, which was suspended for approximately 30 days following the seizure

10

of DeVille's servers, the agencies did not rely on the DeVille Debtmaster® and have been actively collecting the portfolios throughout the Applicable Period.

A core group of DeVille's remaining senior staff has assisted the Receiver in understanding mission-critical processes and operating relationships.  This core group located key operational data from sources not seized by the FBI, which the Receiver used to better understand the portfolios and business operations.   These proactive efforts mitigated the unavoidable disruption created by the seizure of records and allowed DeVille to restart operations quickly when it reinstalled the servers on October 18, 2018, with almost all collectors back in place by October 24, 2018.

Since September 18, 2018, the Receiver team has included one person onsite for day-to-day supervision of ongoing business activities of the three operating businesses, management of all treasury functions for each such business, and the production of other reporting and analyses to the Receiver regarding these operating entities.  This person also manages the Receivership Estate bank accounts, pays all expenses of the Receivership Estate incurred in the ordinary course of business, pays all insurance and maintenance costs for the real properties, transferred or established new utility service for each real property, prepares other required financial reporting, as well as other activities to help administer the Receivership Estate.

During the Applicable Period, the Receiver team, Receiver's counsel, company staff and company in-house counsel have responded to numerous threats and actual termination of key operating relationships, despite language in paragraph 35 of the First Amended Receivership Order providing that, "[a]ll counterparties to agreements and contracts entered into with the Receivership parties are enjoined from unilaterally terminating such agreements or contracts without order of this Court."   Such parties have included banks, credit card processors, bonding

DocID: 4832-0195-8278.1

companies, and other service providers.  To date, the Receiver and his counsel have been able to amicably resolve each situation without the need and expense of seeking Court intervention, but these outcomes may vary during the next reporting period.  The attempted cancellations of bonding and other key operating services are currently identified as the largest risks to the going-concern businesses.

The Receiver and his counsel have also investigated potential adverse claims to a small subset of DeVille's total debt portfolio and issued a demand letter to such adverse party.  As of the date this Report is filed, the Receiver and the adverse party are evaluating settlement options.  Absent a consensual resolution in the best interest of the Receivership Estate, the Receiver will seek enforcement of the prior orders of this Court and the Receivership Estate's rights to the subject consumer debt accounts.

Since the Receiver assumed control of the operations of DeVille, Riverwalk Debt, and Riverwalk Credit, and in consultation with senior staff at each company, combined headcount has been reduced by approximately 45% with no degradation in the operations of the businesses, resulting in a substantial and recurring savings to the Receivership Estate each pay period.

The Receiver's review of DeVille's Debtmaster® collection platform indicates the following in the aggregate (both in-house and out-sourced):

- DeVille owns a number of consumer debt portfolios;
- These portfolios were acquired from consumer credit originators largely consisting of auto loan finance companies, credit card issuers, student loan providers, and retailers;
- The aggregate face amount of the portfolios exceeds $5 billion; and
- Each of these portfolios has distinct characteristics in terms of charge off dates, past collection activity, and quality/performance.  The Receiver is working on segmenting these portfolios based on these characteristics in order to analyze and value them and prepare for the due diligence and sale process (as further described below).

During the Applicable Period, the Receiver team has compared available QuickBooks financial records against 2.5 million debtor accounts in the Debtmaster® collection database,

consisting of approximately 1.1 million individual transactions.   The Receiver team reviewed approximately 320,000 transactions, with varying levels of diligence, in 35 QuickBooks company files to both validate the Debtmaster® collection database activity and to review for anomalous transactions.   The Receiver will continue the analysis of the portfolio data in Debtmaster® to learn more.

<p style="text-align:center;">(ii)   <strong>Recommended Disposition</strong></p>

During the Applicable Period, the Receiver team assembled data regarding the debt portfolios, executed Non-Disclosure Agreements, and engaged in due diligence discussions with several potential advisors to represent the Receivership Estate in the sale of such portfolios.   The Receiver team also conferred with and considered proposals from potential master servicers which could monetize the current portfolio by holding and collecting the accounts over an extended period of time, if that is ultimately determined to be the path to maximize the value to the Receivership Estate.

To assist the Receiver in making a determination as to which path would maximize the value of the portfolios and operating platform for the Receivership Estate (a sale of the portfolios versus holding and collection over time, the Receiver team conducted research and identified an advisor for such purpose.[3] After completion of this valuation process, the Receiver will make a recommendation to the Court to either engage an advisor/broker to sell the current debt portfolios and debt buying business platform, or engage a master servicer to collect out the current debt portfolios over an extended period of time.

---

[3] Although outside the Applicable Period for this Report, the Receiver anticipates filing his Application for Order Authorizing Retention and Employment of Velocity Portfolio Group, Inc.

<p style="text-align:center;">13</p>

**(b)** **Riverwalk Debt Solutions, Inc. and Riverwalk Credit Solutions, Inc.**

**(i)** **Overview**

Riverwalk Debt purports to provide a fee-based service to assist borrowers by providing financial solutions for student loans, with a focus on federal student loan consolidation and federal student loan forgiveness programs.   Riverwalk Credit purports to provide a fee-based credit repair organization that reviews and analyzes its clients' credit profiles and then disputes/repairs inaccurate items.

While Riverwalk Debt and Riverwalk Credit are considered separate entities and have their own taxpayer identification numbers, they function as one company.  In their most recent iterations, Riverwalk Debt and Riverwalk Credit have been operating since approximately 2014. During this period, it appears both Riverwalk entities have been regularly operating at a loss, at least in part because Riverwalk Debt changed its business strategy multiple times and Riverwalk Credit has not been operating at full capacity.   Since 2017, Riverwalk Debt has operated closer to a break-even level while Riverwalk Credit is still showing a loss.   During 2018 Riverwalk Credit completed all its state licensing requirements, which has increased overall revenue levels. However, both companies are essentially operating at a startup level.

Throughout the Applicable Period, the Receiver has worked closely with the Director of Operations and other members of the Riverwalk management team to determine cost-savings measures.  These measures have included strategic headcount reduction of approximately 15 employees, as well as the elimination of various other operating costs.

**(ii)** **Recommended Disposition**

The Receiver has been contacted by multiple groups and individuals that have expressed an interest in purchasing Riverwalk Debt and Riverwalk Credit.  Further, the Receiver has received one written expression of interest from an individual who wants to serve as a stalking-

horse bidder in any court-approved sale process.  This individual has significant experience in debt consolidation and student loan consolidation industries, as well as the credit repair industry. The individual and other interested parties understand there is value in the current platform despite its startup posture and weak financial performance.

The Receiver team has facilitated due diligence for the identified potential buyer and anticipates seeking Court approval for a sale of these operations during the first quarter of 2019. Any amount received would provide some recovery to the Receivership Estate, maintain the jobs of the employees, and avoid further costs of administration and liquidation.  Any sale would be subject to Court approval with notice of hearing and opportunity for parties-in-interest to be heard.

### (c)      Ledford & Associates, PLLC

#### (i)      Overview

According to its website, Ledford & Associates, PLLC provided public accounting, financial planning, and other financial services to individual consumers and business entities and a broad array of industries, including individuals, businesses, financial services, healthcare, professionals, retail, wholesale, non-profits, estates, and trusts.  Accounting services included bookkeeping, financial statement preparation, payroll preparation, payroll reports, sales tax filings, financial reports, and bill pay.  Tax services included federal and state tax return preparation for individuals, partnerships, S-Corporations, corporations, trusts, and non-profit entities, as well as matters involving Texas franchise tax reporting, tax planning, and gifting.

When the civil and criminal cases were unsealed on September 18, 2018, the FBI searched the firm's office location at 2801 Paramount Boulevard, Amarillo, Texas 79109. During that search certain records related to the criminal investigation were seized, including the primary server and other computer media.  The revelation of the alleged criminal activity and the

15

inability to operate the business led to the resignation of the key CPAs on staff required to operate the business.  As a result, the business has been shuttered since September 18, 2018.

During the Applicable Period, and after contacting the Texas State Board of Accounting for guidance, the Receiver has worked with a former CPA on staff to facilitate the return of client files to those who have reached out to the Receiver either though the sign posted on the firm's front door or word of mouth in the local community.  To date, approximately 200 client files (personal and business) have been returned.

Upon information and belief, the preponderance of the remaining files on hand are for clients who require once-a-year tax filings, as compared to weekly payroll process or monthly sales tax reporting clients, which have already retrieved their files.  To facilitate the return of these remaining client files, the Receiver is contracting with a former administrative (non-CPA) staff member to open the office all day, each day for a week during January 2019 for former clients to retrieve their physical files.[4]  Arrangements have also been made with former clients who live outside of the area to have their files mailed to them.

### (ii)      Recommended Disposition

The Receiver will take additional steps to arrange for long-term storage of the remaining business records after the client files are returned and while the building is marketed for sale. The physical and electronic records of Ledford & Associates are anticipated to have significant ongoing value to the Receiver team as they examine the Receivership Parties and Receivership Assets and related financial records maintained by Ledford & Associates.

---

[4] The Receiver mailed a letter to each client with remaining physical files at the firm's Amarillo office location advising that the office will be staffed from 9:00a to 6:00p from January 28 through February 1, 2019 for former clients to retrieve their files.  Any electronic files requested by clients will be returned once those files are available to Receiver.

DocID: 4832-0195-8278.1

### 3.     Real Property

#### (a)     Overview

During the pendency of this case, the Receiver has undertaken the review and analysis of various real estate holdings, including both residential and commercial properties located in Maryland, Florida, Texas, and Nevada.  These real properties include:

1. 1848 Circle Road, Towson, MD 21204 – Owned by Kevin Merrill;
2. 1055 Spyglass Lane, Naples, FL 34102 – Owned by Kevin and Amanda Merrill;
3. 27776 Sharp Road, Easton, MD 21601 – Owned by Kevin and Amanda Merrill;
4. 531 Hampton Lane, Towson, MD 21286 – Owned by Amanda Merrill;
5. 3018 Susanne Court, Owings Mills, MD 21117 – Owned by Kevin Merrill;
6. 1718 Greenspring Valley Road, Stevenson, MD 21153 – Owned by Kevin Merrill as Trustee of the Kevin B. Merrill Revocable Trust;
7. 9017 Grove Crest Lane, Las Vegas, NV 89134 – Owned by Hillary R. Badrow as Trustee of the J Trust;
8. 1650 Cedar Hill, Dallas, TX 75208 – Owned by J Trust;
9. 2801 Paramount Boulevard, Amarillo, Texas 79109 – Owned by Jay Ledford.
10. 2308 Cedar Elm Terrace, Westlake 76262 – Owned by Jay Ledford; and
11. 1132 Glade Road, Colleyville, TX 76034 – Owned by King Fisher Ltd.;

Based upon initial information developed by the Receiver with the preliminary assistance of Sotheby's International Realty, ("SIR" or "Sotheby's"), and subject to further investigation and adjustment, the aggregate market value of these properties likely exceeds $20 million.

Currently, the Receiver has identified approximately $6.4 million in mortgage debt and approximately $1 million in Mechanic's and Materialman's ("M&M") liens on properties 1 through 9.  Property 10 is subject to a first priority purchase money lien in an amount exceeding $760,000, as well as judgment liens exceeding $7.0 million.  Property 11 is likewise burdened by judgment liens exceeding $7.0 million.  To prevent any attempted or unauthorized sale or mortgaging of any estate real property, counsel for the Receiver has submitted a *lis pendens* for

recording in each of the appropriate jurisdictions to give notice of the receivership proceeding so that no adverse action is taken absent the knowledge of the Receiver and this Court.

Given the estimated value of the properties, the "luxury" nature of some, and the geographically diverse locations, the Receiver believes it would be best to utilize a national broker to assist the Receiver in monetizing the real estate assets.  Utilizing a single, national broker with one point of contact for these purposes reduces the Receiver's administrative overhead and leverages the broker's local networks to maintain, preserve, and market the assets to achieve the highest and best price.

Soon after appointment, the Receiver approached Sotheby's, a national broker with global advertising reach that is experienced in marketing and selling properties of this caliber, to assist with investigating and maintaining the properties until they can be monetized.  To date Sotheby's has provided the Receiver, free of charge and prior to any engagement:

- Brokers Opinion of Price, ("BOP"), for each of the residential properties.  These assessments were made based on (i) an examination of the exterior of the properties and (ii) comparable sales in the area.  The BOPs were subsequently revised and converted to proposed listing prices after interior inspections were completed.

- Preliminary Title Reports.  Prepared by an independent title company, the reports delineate: (i) ownership; (ii) legal description of property, including easements, etc.; (iii) mortgage amounts and mortgagees; and (iv) clouds on the title, e.g. M&M liens and judgements.

- Report on Liens and claims.  Prepared by an independent title company, the report provides additional details with respect to the claims against the property, contract amount, parties, payments, and terms.

The Receiver and his counsel will continue their examination of issues related to mortgage liens, vendor liens, judgment liens, and other encumbrances, as well as the validity and enforceability of same.  Similarly, multiple properties are currently under renovation and the

DocID: 4832-0195-8278.1

Receiver will make a determination, after consultation with the local Sotheby's agent, about whether to complete any further renovations or sell the property "as is."

Concurrently with these efforts, the Receiver has been gathering information with respect to each of the properties, including but not limited to the following:

- Legal description of the property;
- Owner of record;
- Property characteristics, e.g. improvement square footage, number of bedrooms and bathrooms, size of parcel, original date of construction, construction material, date of acquisition, etc.;
- Photos and/or videos taken by the Receiver or acquired from other sources.
- Payment status of 2017 property taxes;
- Amounts, payees and due dates for 2018 taxes by jurisdiction;
- Appraised values of the properties as listed in the tax records of the relevant jurisdictions;
- Information regarding known mortgage liens, the holder of such liens and the related account number with the mortgage company, information regarding known vendor liens and judgment liens;
- Information regarding the insured status of each property, the name of the carrier and broker, current expiration date and renewal premium amount;
- Estimates of market value from sources other than Sotheby's BOP; and
- Status of on-going renovations, if any.

The Receiver also obtained information from the applicable Defendants' representatives and other third-party sources regarding the identification and transfer of utilities for each property. As of the filing date of this Report, all utility accounts have either been transferred to the Receiver or the Receiver has established new service at the subject properties in the name of the Receivership Estate. Additionally, Sotheby's agents, at no charge to the Receivership Estate, have provided essential assistance to the Receiver given the geographic dispersion of the properties to maintain the properties—i.e., cutting the grass, servicing pools and related equipment, effecting minor repairs, winterizing, etc.—on a reimbursement basis.

In addition to ordinary course investigation, maintenance and supervision, the Receiver, with the assistance of counsel as necessary, has:

19

- Made insurance premium payments to maintain existing coverages on all applicable policies.

- Determined that the first lien filed of record on the Paramount Road property in Amarillo has been paid in full, and requested the lienholder to file a release of lien in the Randall County deed records.  The Receiver has received a copy of the transmittal of the release mailed to Randall County.

- Determined that, in the opinion of the Receiver and his counsel, the second lien filed of record on the Paramount Road property in not valid as the grantor of the lien was not the owner of the property.

- As a result of both determinations above, the Paramount Road property has equity and can be liquidated for the benefit of the Receivership Estate.

- The Paramount Road property also incurred interior water damage due to a faulty roof structure. The Receiver has filed a claim with the insurance carrier, organized access with the adjustor and is awaiting a final determination by the carrier regarding repair or replacement.

- Negotiated an agreement to sell the Cedar Elm Terrace property, subject to total liens exceeding $7.7 million, for $100,000.  Absent this sale to a co-judgment debtor on more than $7.0 million of secured debt, the Receiver would abandon this property as burdensome and of no economic benefit to the Receivership Estate.

- Negotiated an agreement to sell the Receivership Estate's 50% interest in the Receivership Party that owns the Glade Road property, subject to total liens exceeding $7.0 million, for $100,000.  Absent this sale to a co-judgment debtor on more than $7.0 million of secured debt, the Receiver would abandon this property as burdensome and of no economic benefit to the Receivership Estate.

- Obtained possession of the Circle Road property following seizure of the property by the FBI.   The Receiver further secured the property through entry of an Order Granting Receiver's Motion to Enforce Receivership Order and Secure Receivership Assets entered on December 14, 2018 (Dkt. No. 77)[5].

- Conferred with the Sotheby's broker, the general contractor and the general contractor's counsel regarding the potential completion of limited additional renovations at the Grove Crest Lane property in order to maximize the return to the Receivership Estate.  This property was nearing the end of a renovation project with a cost that exceeded the initial purchase price for the property.

---

[5] Relief Defendant, Amanda Merrill, who was residing at the Circle Road property when the Complaint was filed, was subsequently arrested and charged with conspiracy to violate and violation of statutes related to the removal of property to prevent seizure, corruptly obstructing, influencing or impeding any official  proceeding or attempting to do so, and disobedience or resistance to lawful court orders.

DocID: 4832-0195-8278.1

- Reviewed the purported M&M Liens on the Grove Crest Lane property to determine they were each filed after the entry of the stay in this case prohibiting such adverse actions against Receivership Assets, and conferred with counsel for the general contractor regarding the same.

### (b)   Recommended Disposition

The Receiver intends to file a motion to engage Sotheby's to list, market, and sell each of the real properties, save and except Cedar Elm Terrace and Glade Road, as well as other real property that might subsequently become property of the Receivership Estate within the next fourteen days.  The Receiver will then enter into a contract to sell each residential real property, subject to the sale procedures authorized by the Court which will provide all parties-in-interest with an opportunity to be heard as to each proposed sale.

### 4.   Vehicles

### (a)   Overview

Based upon information from pleadings filed by the federal authorities and/or other third-party sources, current information indicates a substantial automobile and boat fleet with year models ranging from 2008 to 2018 and initial estimated values ranging from approximately $11K (Ford Explorer) to approximately $1.4MM (Pagani Huayra).  This fleet of vehicles[6], specifically identified in pleadings of governmental authorities, is itemized as follows:

- 2014 Lamborghini Aventador Roadster, VIN No. ZHWUR1ZD4ELA02398;
- 2014 Mercedes-Benz S63, VIN No. WDDUG7JB1EA061984;
- 2016 Ferrari 488 Coupe, VIN No. ZFF79ALAXG0214388;
- 2017 Audi R8 5.2 Plus Coupe, VIN No. WUAKBAFX1H7902028;
- 2017 Lamborghini Huracan Convertible, VIN No. ZHWUR2ZF1HLA07683;
- 2017 Land Rover Range Rover, VIN No. SALGS5FE7HA341466;

---

[6] This is a fluid list as the FBI seized a number of vehicles on the day the civil and criminal proceedings were unsealed and have continued to seize additional vehicles during the pendency of this case.  Further, it is the Receiver's information that not all of the vehicles reflected in the Complaint were still owned by or in the possession of the Receivership Parties on September 13, 2018.  The Receiver has not participated in these seizures and does not have a current reconciliation of all seized vehicles.  As of the date of this Report, the Receiver is not in possession of any vehicles.

DocID: 4832-0195-8278.1

- 2017 Land Rover Range Rover Sport, VIN No. SALWz2FE6HA145282;
- 2017 Porsche 911 Turbo S, VIN No. WP0AD2A96HS167075;
- 2017 Rolls Royce Dawn Convertible, VIN No. SCA666D57HU107107;
- 2017 Rolls Royce Wraith Coupe, VIN No. SCA665C58HUX86607;
- 2018 McLaren 720S Coupe, VIN No. SBM14DCA9JW001142;
- 2008 Bugatti Veyron, VIN No. VF9SA25C78M795164;
- 2013 Ferrari California Convertible, VIN No. ZFF65TJA7D0195090;
- 2015 BMW M6 Gran Coupe, VIN No. WBS6C9C51EDV73690;
- 2014 Ferrari F12 Berlinetta, VIN No. ZFF674UFA2E0199037;
- 2014 Pagani Huayra, VIN No. ZA9H11RAYYSF76034;
- 2015 Mercedes Benz S63, VIN No. WDDXJ7JB8FA000972;
- 2015 Mercedes Benz S63, VIN No. WDDXJ7JB6FA001781;
- 2017 Cadillac Escalade ESV, VIN No. 1GYS4JKJ7HR194939;
- 2017 Lamborghini Aventador, VIN No. ZHWUT3ZDXHLA05923;
- 2018 Ferrari 488 Spider, VIN No. ZFF80AMA4J0228310;
- 2018 Lamborghini Huracan, VIN No. ZHWUS4ZF6JLA10746;
- 2015 BMW S1000R Motorcycle, VIN No. WB10D210XFZ352440;
- 2015 Harley-Davidson VRSCDX Night Rod, VIN No. 1HD1HHH18FC805081;
- 2018 Formula 350 Crossover Bowrider Port Cruiser, Hull No. TNRD1491C818;
- 2014 Ford F-150, VIN No. 1FTFW1R69EFA85544;
- 2016 Ducati Superbike Motorcycle, VIN No. ZDM14B1W1GB001832;
- 2016 Continental, VIN No. 5NHUVH010GN080677;
- 2015 Polaris Sportsman, VIN No. 4XASEA574FA235601;
- 2015 Bentley Flying Spur, VIN No. SCBET9ZA7FC042592;
- 2018 Chevrolet Silverado, VIN No. 3GCPCREC5JG128390;
- 2012 Nissan Rogue, VIN No. JN8AS5MT1CW285782;
- 2016 Ferrari 488, VIN No. ZFF79ALA3G0217973; and
- 2016 Tesla Model S, VIN No. 5YJSA1E49GF155262.

To preserve and maximize the value of the performance vehicles, the Receiver believes it is imperative they be stored and maintained by knowledgeable individuals. To that end, the Receiver has considered several potential brokers and selected Prestige Motor Car Imports, LLC ("Prestige") to collect, maintain, and manage the liquidation of the vehicles. The Receiver intends to seek authority to engage Prestige, upon separate motion and opportunity for parties-in-interest to be heard, with such engagement terms to include:

- Shipping the vehicles to a single location;
- Showing the cars;
- Storing the cars at no cost;

- Promoting and exposing the vehicles on all proper advertising channels;
- Maintenance and repairs (replacing dead batteries, reprogramming keys, etc.); and
- Delivering to eventual buyers.

All costs associated with the cars will be deducted from the ultimate sale price, which will also be subject to an anticipated commission of five percent (5%) or less.

The Receiver has identified and requested refunds from Prestige of two $25,000 deposits (for a total of $50,000) related to two additional Lamborghini vehicles.  Additionally, Receiver and Prestige have worked together to obtain the return of a $703,000 deposit placed on a Pagani Huayra.

### (b)    Recommended Disposition

The Receiver anticipates filing his Motion to Approve Procedures for Sale of Automobiles and for Order Authorizing Retention and Employment of Prestige to list, market, and sell all cars that are, or subsequently become, property of the Receivership Estate.  Such motion will recommend to the Court a notice-based procedure for the sale of each vehicle (as opposed to a separate motion for each vehicle) that seeks to balance the administrative burden on the Court and Receivership Estate against the desire to provide adequate notice of such sales to all parties-in-interest.

With respect to the 2018 Formula 350 Crossover Bowrider Port Cruiser, the Receiver has negotiated a consignment agreement with a suitable boat broker in Florida to sell the subject vessel.  Within fourteen (14) days of the filing of this Report, the Receiver intends to file a motion to engage the identified broker with sale procedures to be approved by the Court to include an opportunity for parties-in-interest to be heard when an acceptable offer is received and presented to the Court.  The Receiver has also confirmed current insurance coverage on the

DocID: 4832-0195-8278.1

vessel and investigated the applicability of such coverage while being transported to, and on consignment with, the broker.

### 5. Other Property

The Receiver, independently and through collaboration with the SEC, FBI, and U.S. Attorney's Office Asset Forfeiture Unit has identified other personal property, including but not limited to: art, collectibles, jewelry, rare wine, watches, luggage, and similar luxury items. To maximize recovery to the Receivership Estate, the Receiver has researched and identified various consignment and/or auction outlets for monetizing the different classes of personal property. For the highest-end personal property, the Receiver has identified a specific auction house which is in the process of inspecting and appraising the subject personal property, including property under the custody and control of the FBI. The Receiver is in the process of finalizing a retention agreement with the auction house and an anticipated motion for approval of the same to be filed with the Court within the next thirty days. The Receiver team has also identified outlets and sale strategies for the lower-end, yet still luxury goods, which will also be the subject of a retention and sale procedures motion to be filed with the Court within the next thirty days.

The Receivership Assets also include the rights as lender in a litigation finance agreement whereby a Receivership Party loaned $750,000 to a plaintiff in a pending lawsuit. Upon discovery of this asset, Receiver considered a number of alternatives avenues to sell the Receivership Estate's interest in the subject loan and security agreement. To prevent a default of the obligations of the Receivership Party under the litigation finance agreement, the Receiver funded the final $130,000 due to the plaintiff. The terms of the loan and security agreement call for the repayment of the principal amount, interest accrued thereon, and 10% of any recoveries related to the litigation. On December 12, 2018, the plaintiff received a jury verdict in the

DocID: 4832-0195-8278.1

amount of $20 million.  As of the date of this Report, there are post-verdict motions pending with the trial court and the applicable appeal period is stayed pending rulings on those motions. The Receiver team and his counsel are regularly monitoring this matter with plaintiff's counsel.

During the Applicable Period, the Receiver identified a whole life insurance policy as a Receivership Asset with a surrender value of $694,083.04 and, prior to the filing of this Report, filed his Motion for Authority to Surrender Whole Life Insurance Policy to Guardian Life Insurance Company of America (Dkt. No. 95).

     **6.**    **Insurance**

The Receiver has been working to obtain information from the applicable Defendants' representatives and other third-party sources regarding the identification of all applicable insurance policies for all property of the Receivership Estate.  Through forwarded mail and other independent means, the Receiver was able to discover a partial list of insurance carriers and brokers.  As of the filing of this Report, for each of the real properties owned by the Receivership Estate, the Receiver has either confirmed the existence of continuing insurance coverage or acquired new coverage.  Additional insurance needs continue to be evaluated.

## IV.    ESTATE ADMINISTRATION

Pursuant to the First Amended Receivership Order the Receiver is authorized by the Court to use Receivership Assets and proceeds thereof to pay debts and expenses of the Receivership Parties that (i) have accrued prior to or during the receivership and (ii) in the sole discretion of the receiver are essential or necessary to the operations of the non-individual Receivership Parties.To facilitate the administration of the Receivership Estate, the Receiver has established a single Receivership Bank Account into which all bank account turnover payments and other Receivership Asset liquidation proceeds have been deposited.  Further, as provided for in the First Amended Receivership Order at paragraph 8(d), the Receiver has used such funds in

the Receivership Bank Account for "making payments and disbursements and incurring expenses as may be necessary or advisable in the ordinary course of business for discharging his duties as Receiver."  Additionally, the Receiver has maintained and opened new bank accounts specifically for DeVille, Riverwalk Credit, and Riverwalk Debt as necessary to protect or improve the operations of each entity.  The financial report at Exhibit A delineates activity between the operating entities and the balance of the Receivership Estate providing a clearer picture of the separate components of the Receivership Estate.

The Receiver has also registered the domain www.Merrill-Ledford.com for his use to communicate with investors and other stakeholders in this case.  The website will contain the Initial Preservation Report, each Quarterly Report, and other matters describing the process and progress of the case.  The Receiver will also include an "Asset Sales" section where notice of all significant asset sales will be provided.  It is anticipated the website will eventually contain information about the approved claims process for investors and other creditors of the Receivership Parties.

## V.    UNRESOLVED CLAIMS AGAINST RECEIVERSHIP PROPERTY

During the Applicable Period, the Receiver has received some claims against Receivership Assets.  At this time, the Receiver continues to investigate those allegations and review any and all evidence provided by such claimants in support of their allegations of ownership of the Receivership Assets.  It is anticipated that Parties asserting claims against Receivership Assets will receive notice and an opportunity to object during any potential sale process that is approved by the Court.

Additionally, the Receiver has received numerous contacts from potential investor victims requesting information.  The Receiver has provided general status updates and directed

DocID: 4832-0195-8278.1

such parties to pleadings filed of record in the case, including the Receiver's Initial Preservation Report.  After the above-referenced website is operational, inquiries will also be directed there. During the Applicable Period, the Receiver also directed investors to both the SEC and the FBI.

## VI.     ACCRUED ADMINISTRATIVE EXPENSES

During the Applicable Period, the Receivership Estate accrued administrative expenses comprised of professional fees for the services of the Receiver's team and counsel, both of which remained unpaid during the Applicable Period.   The Receiver and counsel each filed fee applications for the period of September 18, 2018 through October 31, 2018 on December 13, 2018 (Dkt. 70 and Dkt 71).   Receiver and counsel will be filing fee applications requesting additional approval of fees accrued during the period of November 1, 2018 through December 31, 2018 pursuant to the timing provided in the Receiver Order and the SEC requirements.  At this time, the total amount of accrued and unpaid administrative expenses[7] as of December 31, 2018 is $661,231.92 for the Receiver and his team, and $447,108.62 for the Receiver's counsel, Husch Blackwell.    The Receiver anticipates the Receivership Estate will continue to accrue such administrative expenses going forward with the actual amounts fluctuating commensurate with the activities required to properly administer the Receivership Estate.

## VII.     RECEIVER'S ONGOING INVESTIGATION

The Receiver continues his investigation with the assistance of his counsel, Husch Blackwell LLP.  The Receiver will file supplemental reports to the Court for the duration of the Receivership, as required by the Receivership Order.

## VIII.   CLAIMS DETERMINATION AND DISTRIBUTION PROCESS

The Receivership Order states that "without further order of this Court, the Receiver's duties shall not include a forensic investigation to identify claimant on or creditors of

---

[7] These balances include the accrued fees for which fee applications have not yet been finalized and filed.

Receivership Assets or any determination of amounts owed to such parties."  Receivership Order at ¶ 41.  The Receiver believes that the Receivership Estate is the proper venue and mechanism to resolve investor claims and affect distribution pursuant to further Order of this Court. However, the Receiver intends to focus current time and resources on activities that will generate proceeds for the Receivership Estate.   Claims determination and distributions to allowed claimants will not occur until later in the case and there is ample time to address these issues at a later date.   Additionally, the Receiver would need access to additional investor information before a proposed claim and distribution process can be recommended to the Court.

## IX.    CONCLUSION

Accordingly, the Receiver, Gregory S. Milligan, respectfully submits this First Quarterly Status Report for the Court's consideration.

<div style="margin-left: 40%;">

Respectfully submitted,

*/s/ Lynn H. Butler*
Lynn H. Butler, *pro hac vice*
HUSCH BLACKWELL LLP
111 Congress Ave., Suite 1400
Austin, TX 78701
Tel: (512) 472-5456
Fax: (512) 479-1101
lynn.butler@huschblackwell.com

Brian P. Waagner, Fed. Bar No. 14954
HUSCH BLACKWELL LLP
750 17th Street, NW, Suite 900
Washington, D.C. 20006
Tel:  (202) 378-2300
Fax:  (202) 378-2318
brian.waagner@huschblackwell.com

Buffey E. Klein, *pro hac vice*
HUSCH BLACKWELL LLP
2001 Ross Avenue, Suite 2000
Dallas, Texas  75201
Tel: (214) 999-6100
Fax:  (214) 999-6170

</div>

28

buffey.klein@huschblackwell.com

*Counsel for Receiver Gregory S. Milligan*

DocID: 4832-0195-8278.1

## CERTIFICATE OF SERVICE

On January __, 2019, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court for the District of Maryland, using the electronic case filing system of the court.  I hereby certify that I have served all counsel and/or pro se parties of record electronically through the Court's CM/ECF filing system for all parties who have registered to receive electronic service.  Additionally, the foregoing document was served on the following parties not registered for Court's CM/ECF filing system as indicated below:

**Defendant Kevin B. Merrill (via U.S. Mail):**

Kevin B. Merrill
Harford County Detention Center, #1335278
1030 Rock Spring Rd.
Bel Air, MD 21014

**Criminal Counsel for Defendant Kevin B. Merrill (via E-Mail and U.S. Mail):**

Elizabeth Genevieve Oyer
Office of the Federal Public Defender
100 S Charles St Ste 900 Tower II
Baltimore, MD 21201
liz_oyer@fd.org

Maggie Grace
Office of the Federal Public Defender
100 S Charles St, Tower II, 9th Floor
Baltimore, MD 21201
maggie_grace@fd.org

**Criminal Counsel for Defendant Jay B. Ledford (via E-Mail and U.S. Mail):**

Harry J Trainor , Jr
Trainor Billman Bennett and Milko LLP
116 Cathedral St Ste E
Annapolis, MD 21401
htrain@prodigy.net

**Criminal Counsel for Defendant Cameron R. Jezierski (via E-Mail and U.S. Mail):**

Joseph J Aronica
Duane Morris LLP
505 9th St NW Ste 1000
Washington, DC 20004
jjaronica@duanemorris.com

DocID: 4832-0195-8278.1

**Criminal Counsel for Relief Defendant Amanda Merrill (via E-Mail and U.S. Mail):**

David Z Seide
5301 Burling Terrace
Bethesda, MD 20814
seide.david@gmail.com

**Relief Defendant Lalaine Ledford (via U.S. Mail):**

Lalaine Ledford
10512 Courtney Cove Ave.
Las Vegas, NV 89144

<div align="right">

*/s/ Lynn H. Butler*
Lynn H. Butler

</div>

DocID: 4832-0195-8278.1