**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: 1:18-cv-0284 4-RDB |
| KEVIN B. MERRILL, et al., | ) ) ) | |
| Defendants. | ) | |

---

## RECEIVER GREGORY S. MILLIGAN'S MOTION FOR ORDER APPROVING DISTRIBUTION PLAN AND INTERIM DISTRIBUTION

Receiver Gregory S. Milligan (the "Receiver"), in consultation with the Securities and Exchange Commission (the "SEC"), respectfully files this Motion for Order Approving Distribution Plan and Interim Distribution (the "Motion"). In support of this Motion, the Receiver states as follows:

### I.      INTRODUCTION

**A.      The SEC Action and the Receiver's Liquidation Efforts.**

1.      The SEC initiated this action (the "SEC Action") on September 13, 2018 when it filed suit against Defendants Kevin B. Merrill ("Merrill"), Jay B. Ledford ("Ledford"), Cameron R. Jezierski ("Jezierski"), Global Credit Recovery, LLC, Delmarva Capital, LLC, Rhino Capital Holdings, LLC, Rhino Capital Group, LLC, DeVille Asset Management LTD, and Riverwalk Financial Corporation (collectively, the "Defendants") asserting claims against the Defendants for violating the Securities Act of 1933 and the Securities Exchange Act of 1934 based on their operation of a Ponzi scheme that raised more than $345 million from more than 230 individual investors or investor groups to purportedly purchase consumer debt portfolios. *See* Dkt. No. 1. Merrill, Ledford, and Jezierski each consented to entry of partial judgments against them in the SEC Action. *See* Dkt.

No. 181 (Judgment as to Jezierksi), Dkt. No. 196 (Judgment as to Ledford), and Dkt. No. 211 (Judgment as to Merrill).

2.      On September 13, 2018, the Court appointed the Receiver to marshal and preserve the assets of the Defendants and their affiliate entities, which collectively are referred to as the Receivership Parties.[1]  *See* Dkt. No. 11 at 1.  On November 27, 2018, the Court entered a First Amended Order Appointing Temporary Receiver that further confirmed the Receiver's rights, duties, and obligations.  *See* Dkt. No. 62.  On September 14, 2021, the Court entered a Second Amended Order Appointing Temporary Receiver (the "Receivership Order") that further confirmed the Receiver's rights, duties, and obligations.  *See* Dkt. No. 484.

3.      Since the Receiver was appointed, he has undertaken significant efforts to identify the assets of the Receivership Parties, including monies, funds, securities, investments, cash, accounts, vehicles, equipment, real estate, art, collectibles, jewelry, casino accounts, bonds, and any other assets of value.  In his initial preservation plan, the Receiver detailed the various assets of the Receivership Parties that he had identified within the first sixty days of his appointment, which included eleven real estate assets, thirty-four vehicles, an interest in an aircraft, fine art, watches, and other jewelry, along with their recommended disposition.  *See* Dkt. No. 54.

---

[1] The Receivership Parties are: Merrill, Ledford; Jezierski; Global Credit Recovery, LLC; Delmarva Capital, LLC; Rhino Capital Holdings, LLC; Rhino Capital Group, LLC; DeVille Asset Management LTD; Riverwalk Financial Corporation; K.B. Merrill Associates; Financial Reclamation Group LLC; Halo Credit Solutions LLC; JBL Holdings LLC; Jay B. Ledford, P.C.; the Joseph Finance Company; Leddy Bear LTD; Ledford & Associates, PLLC; King Fischer LTD d/b/a LP Investments LTD; NLEX, Inc.; Receivables Portfolio Interchange, Inc.; Riverwalk Capital Investments, Inc.; Riverwalk Credit Solutions, Inc.; Riverwalk Debt Solutions, Inc.; Riverwalk Fixed Asset Group LLC; SCUSA Financial, Inc.; Vaquero Asset Management, Inc.; CRJ Holdings LLC; Centurion Capital Corporation; GCR CBL CP I, LLC; GCR CBL CP II, LLC; GCR CBL CP III, LLC; GCR CBL CP IV, LLC; GCR HCP Holdings 1, LLC; GCR Mercer Holdings, LLC; the J Trust; and the Kevin B. Merrill Revocable Trust.  *See* Receivership Order, Dkt. No. 484 at 2-3.

4.      Throughout the course of the SEC Action and pursuant to approval from this Court, the Receiver has diligently worked to market and sell the assets of the Receivership Parties with the goal of maximizing the cash available for distribution to those who have claims against the Receivership Parties.

5.      The Receiver also operated DeVille Asset Management, Ltd ("DeVille"), Riverwalk Credit Solutions, Inc., and Riverwalk Debt Solutions, Inc. until the entities' assets were sold.  The Receiver's operation of these entities generated cash for the Receivership Estate.

6.      The Receiver has liquidated most of the physical assets of the Receivership Parties. However, the Receiver still intends to liquidate certain additional assets, including real property in Texas, art, collectibles, jewelry, watches, and other luxury items.  The Receiver also intends to investigate and pursue claims and litigation against third parties, which could increase the assets available for distribution.  *See* Dkt. No. 484.

7.      As of September 30, 2021, the Receivership Estate had $59,339,909.87 in cash.  *See* Dkt. No. 497.

**B.      The Fraud.**

8.      Merrill, Ledford, and Jezierski each pled guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 in the related criminal action styled *United States of America v. Kevin B. Merrill, et al.*, Case No. 18-cr-00465-RDB, filed in the United States District Court for the District of Maryland (the "Criminal Action").[2]  *See* Plea Agreements in Criminal Action, Case No. 1:18-cr-00465-RDB, Dkt. Nos. 76, 81, and 87.  In addition, Ledford pled guilty to committing

---

[2] On December 11, 2018, a criminal complaint was also filed against Relief Defendant Amanda Merrill ("Amanda Merrill") for conspiracy to: (i) obstruct, influence, or impede the Criminal Action; and (ii) disobey or resist lawful Orders of the Court in the Criminal Action.  *See* Criminal Complaint, Case No. 1:18-cr-00465-RDB, Dkt. No. 5.  Amanda Merrill is Defendant Kevin Merrill's spouse.

aggravated identity theft and a money-laundering transaction in excess of $10,000.00.  *See id.*, Dkt. No. 87 at 1.  Merrill pled guilty to committing wire fraud.  *See id.*, Dkt. No. 81 at 1.

9.     In connection with their pleas, Merrill and Ledford agreed, among other things, that "there was a scheme and artifice to defraud and to obtain money and property from investors by materially false and fraudulent pretenses, representations, and promises using interstate wire communications as alleged in the Indictment."  *Id.*, Dkt. No. 87 at 1; *see also id.*, Dkt. No. 81 at 1.

10.    Ledford and Merrill further agreed that from 2013-2018, their scheme to "defraud took in over $394 million" from investors.  *Id.*, Dkt. No. 81-1 at 15; Dkt. No. 87-1 at 12.  Ledford and Merrill "used investor funds to pay out promised returns to other investors and to misrepresent those payouts as funds from the sales of portfolios."  *Id.*, Dkt. No. 87-1 at 9; Dkt. No. 81-1 at 7.  They also "diverted investors' funds and collections for their own personal benefit."  *Id.*, Dkt. No. 87-1 at 11; Dkt. No. 81-1 at 14.  They returned $248 million to the investors they defrauded during the course of the Ponzi scheme.  *Id.*, Dkt. No. 81-1 at 15.

## C.     The Claims Process.

11.    In February 2021, the Receiver filed a Motion for Order Setting Claims Bar Date, Establishing Claims Procedure, and Approving Notification Process to provide a process through which claims could be asserted against the Receivership Estate (the "<u>Claims Procedure Motion</u>").  *See* Dkt. 394.  The Court granted the Claims Procedure Motion on February 10, 2021, and entered its Order Setting Claims Bar Date, Establishing Claims Procedure, and Approving Notification Process (the "<u>Claims Procedure</u>").  *See* Dkt. No. 396.  Pursuant to the Claims Procedure, any Known Investors,[3] Relief Defendants, Other Creditors, Unknown Creditors, and Unknown Investor

---

[3] Capitalized terms herein shall have the same meaning as those defined in the Claims Procedure unless otherwise noted.

Creditors were directed to submit any claims they had against any of the Receivership Parties by May 20, 2021 (the "Claims Bar Date"). *See id.* The Claims Procedure provided procedures through which the Receiver could contest any claim and allowed the Claimant to subsequently supplement the claim. The Claims Procedure similarly provided a procedure through which the Court could resolve any disputed claims. *See id.*

12. The Claims Bar Date has now passed, and the Receiver has been working diligently to resolve disputed claims. A total of 274 claims were submitted, which included 219 claims submitted by Known Investors, 1 claim submitted by a Relief Defendant, and 54 claims submitted by Other Creditors, individuals within Investment Entities, and/or Unknown Investors (collectively, the "Claimants"). The Receiver objected to and/or requested that 83 Claimants supplement or withdraw their claims. Following resolution of this process, there are 238 undisputed and allowed claims totaling $166,022,249.69, and there are 36 disputed claims that are the subject of the Receiver's Omnibus Objection to Claims (Dkt. No. 503) (the "Claims Objections"). The disputed claims include 8 Known Investor claims for a total amount of $8,672,556.83 and 28 Other Creditor claims for a total amount of $2,811,799.26.

## II. REQUESTED RELIEF

13. The Receiver has liquidated the majority of the assets of the Receivership Parties, and the amount of the claims to be asserted against the Receivership Parties is substantially certain. The Receiver believes it is ripe to move the Court to enter an Order approving a distribution plan and an interim distribution to certain Claimants. As detailed below, the Receiver's proposed distribution plan contains or provides for the following: (1) five classes of Claimants based on their relationship to the Receivership Estate and the subordination of insider (Class 5) claims; (2) netting of investments and recoveries from third parties; (3) a rising tide distribution methodology

for Class 4 Claimants; and (4) the pooling of all assets of the Receivership Parties for distribution. After reserving sufficient funds to pay Claimants in Classes 1-3 and claims of Relief Defendants to assets in dispute, the Receivership Estate holds approximately $50 million.  By this Motion, the Receiver seeks to make an interim distribution of this net amount to Class 4 Claimants. Distribution payments to Claimants whose Class 4 Claims remain in dispute will be escrowed pending Court resolution, and then paid to the disputing Claimant or included in subsequent distributions to allowed Claimants, as appropriate.

### A.      Legal Standard.

14.     A "district court has broad powers and wide discretion to determine the appropriate relief in an equity receivership." *S.E.C. v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986) (internal quotations omitted).  Its selection of a distribution plan is reviewed for an abuse of discretion, and appellate scrutiny is narrow given the district court's broad equitable powers. *S.E.C. v. Quan*, 870 F.3d 754, 761 (8th Cir. 2017).  "The primary job of the district court is to ensure that the proposed plan of distribution is fair and reasonable." *Id.* (internal quotations omitted); *see also S.E.C. v. Torchia*, 922 F.3d 1307, 1311 (11th Cir. 2019) ("The goal of such receiverships is to grant fair relief to as many investors as possible."); *see also S.E.C. v. Parish*, No. 2:07-cv-00919, 2010 WL 5394736, at *5 (D.S.C. Feb. 10, 2010) ("The court has power to approve any plan so long as it is fair and reasonable.") (internal quotations omitted).

### B.      Classes of Claimants and Subordination of Insider Claims.

15.     The Receiver proposes dividing Claimants into five different classes.  The proposed classes are:

Class 1:      Administrative Professional Fees and Claims: to be paid in full up to the allowed amount of the claims.

Class 2:      Priority Claims: to be paid in full up to the allowed amount of the claims.

Class 3:      Secured Claims: to be paid in full to the extent of the value of the collateral, with any deficiency to be paid as a Class 4b general unsecured claim.

Class 4a:     Investor Claims: to be paid along with Class 4b pursuant to the rising tide methodology after Classes 1, 2, and 3 are paid in full or after sufficient assets are reserved for payment in full of Class 1, 2, and 3 Claimants.

Class 4b:     General Unsecured Claims: to be paid along with Class 4a pursuant to the rising tide methodology after Classes 1, 2, and 3 are paid in full or after sufficient assets are reserved for payment in full of Class 1, 2, and 3 Claimants.[4]

Class 5:      Insider Claims: to be paid *pro rata* after Classes 1, 2, 3, and 4 are paid in full.[5]

16.    The Receiver proposes that allowed Class 1 Claimants recover the full amount of their claims upon approval of interim and final fee applications by the Court, as applicable. Among the professionals who fall into Class 1 are: (1) the Receiver and the company that employs him; (2) the Receiver's attorneys; and (3) professionals the Receiver has employed pursuant to the terms of the Receivership Order and other Orders entered by the Court, including Sotheby's International Realty, Inc., Heritage Auctioneers & Galleries, Inc., Prestige Motor Car Imports, LLC, BDO USA, LLC, Velocity Investments, LLC, FLS Auction, Inc., Garnet Capital Advisors, LLC, and BK Management Solutions d/b/a Stretto. Upon motion by the Receiver, input from the SEC, and Order of the Court, Class 1 Claimants have been paid periodically throughout the course of the SEC Action from either the proceeds of the sale of the Receivership Asset(s) from which they were retained to sell or from the cash on hand with the Receiver. Class 1 Claimants will continue to

---

[4] Class 4a and Class 4b are collectively referred to as Class 4.

[5] Class 5 Claimants will not receive a distribution pursuant to this Motion, and the Receiver does not, at this time, believe there will be sufficient funds collected to make any payments to Class 5 Claimants. If sufficient funds are collected to pay Class 5 Claimants, the Receiver will, at that time, make a recommendation to the Court as to the most equitable *pro rata* methodology to be used with respect to those Claimants.

seek payment by this process and be paid upon Court Order; the Receiver is not proposing any change to the procedure for the payment of Class 1 Claimants.

17.     The Receiver proposes that allowed Class 2 Claimants shall be paid in full.  Class 2 Claimants shall include tax liabilities of the Receivership Estate at the federal level and state taxes necessary to the sale of assets of the Receivership Estate, if any, which are discussed in greater detail below.

18.     The Receiver proposes that allowed Class 3 Claimants shall similarly be paid in full up to the value of their respective collateral.  Class 3 Claimants shall include mortgagees and other secured creditors, including any homeowners' association and local taxing entities for real property taxes.  The Receiver proposes that Class 3 Claimants be paid in full out of sale proceeds of their respective collateral before any Claimants in Class 4 receive proceeds from the sale of any property secured by a valid lien of a Class 3 Claimant.  To the extent Class 3 Claimants are not paid in full out of the sale of their respective collateral, any deficiency claim shall be deemed a Class 4b claim.

19.     The Receiver proposes that Class 4a Claimants shall include Known Investors and Unknown Investors.  As discussed in more detail below, the Receiver proposes that allowed Class 4a Claimants, along with allowed Class 4b Claimants, be paid pursuant to the rising tide methodology.  At this time, the Receiver does not believe that allowed Class 4a Claimants will be paid the full amount of their claim.

20.     The Receiver proposes that Class 4b Claimants shall include general unsecured creditors that are not Known Investors or Unknown Investors.  The general unsecured creditors in Class 4b shall include individuals or entities who have claims against a Receivership Party that have been reduced to a judgment or are the subject of pending litigation, amounts owed pursuant

to a contract, or other debts owed by a Receivership Party.  As discussed in more detail below, the Receiver proposes that allowed Class 4b Claimants be paid along with allowed Class 4a Claimants pursuant to the rising tide methodology.  At this time, the Receiver does not believe that allowed Class 4b Claimants will be paid the full amount of their claim.

21.     The Receiver finally proposes that a final Class 5 be created that includes insiders of the Receivership Parties who have submitted claims against the Receivership Estate, provided, however, that with the exception of Amanda Merrill, no Defendant in this SEC Action or the Criminal Action will qualify as a Class 5 insider Claimant or otherwise be eligible to receive a distribution in this SEC Action.  Insiders shall include family members, employees, officers, directors, shareholders, members, or owners of any Receivership Party along with the spouses, children, or relatives of any such person, or any individual or their spouse who received a commission, finders fees, or other compensation from a Receivership Party for their role in the fraud. The Receiver proposes that any individual or entity falling within this category who has submitted a claim that is allowed by the Receiver be paid *pro rata* only after Class 1, 2, 3, and 4 Claimants have been paid in full.  At this time, the Receiver does not anticipate having sufficient funds to make payments to Class 5 Claimants.

22.     The Receiver believes subordination of Class 5 Claimants is fair and reasonable.  In equitable receiverships, Courts have subordinated the claims of insiders or outright denied their right to a distribution on the grounds they are not similarly situated to other investors or victims.  As equity is equity, it is inequitable to allow employees or others who participated in the Ponzi scheme or should have been aware of the fraudulent conduct at issue to recover a distribution.  *See S.E.C. v. Byers*, 637 F.Supp.2d 166, 173, 184 (S.D.N.Y. 2009) (collecting cases).

23.     Of the individuals who submitted claims by the Bar Date, the Receiver has identified 7 Claimants who should be treated as insiders.  These are: (1) I-0117, (2) I-0181, (3) I-0239, (4) I-0268, (5) I-0125, (6) I-0104, and (7) I-0189.[6]

  a.  I-0117 is an insider because I-0117 was an owner and employee of Ledford & Associates, PLLC, served on the Board of Directors for Riverwalk Financial Corp, and was an owner and employee of VIP Capital, the trustee of J Trust.

  b.  I-0181 is an insider because I-0181 received commissions, finder's fees, or other compensation from Merrill, Ledford, and/or other Receivership Parties as part of securing other individuals or entities to invest with Receivership Parties.

  c.  I-0239 is an insider because I-0239 received commissions, finder's fees, or other compensation from Merrill, Ledford, and/or other Receivership Parties as part of securing other individuals or entities to invest with Receivership Parties.

  d.  I-0268 is an insider because I-0268 received commissions, finder's fees, or other compensation from Merrill, Ledford, and/or other Receivership Parties as part of securing other individuals or entities to invest with Receivership Parties.

---

[6] Amanda Merrill is Defendant Kevin Merrill's spouse and submitted a claim prior to the Bar Date. *See* Amanda Merrill Claim Form, Dkt. No. 445-1.  The Receiver interprets Amanda Merrill's "claim" as an assertion of ownership over the property identified in her claim form.  To the extent Amanda Merrill is successful in her claims and defenses in this SEC Action, her separate property is not property of the Receivership Estate available to satisfy claims of Claimants.  However, to the extent the property identified in Amanda Merrill's claim is property of the Receivership Estate available for distribution to Claimants, the Receiver proposes to classify her claim as a Class 5 claim because she is married to Defendant Kevin Merrill. Because Amanda was not charged with the underlying fraud in either the SEC action or the Criminal Action, the Receiver does not believe her exclusion from Class 5 would be appropriate.

    e.   I-0125 is an insider because I-0125 received commissions, finder's fees, or other compensation from Merrill, Ledford, and/or other Receivership Parties as part of securing other individuals or entities to invest with Receivership Parties.

    f.   I-0104 is an insider because I-0104 is an in-law of Defendant Kevin Merrill.

    g.   I-0189 is an insider because I-0189 is the spouse of an individual who received commissions, finder's fees, or other compensation or fees from a Receivership Party.

**C.      The Settlements and Other Compensation at Issue.**

24.      The Receiver further proposes that that any payments or funds that Class 4 Claimants received to compensate them for losses sustained as a part of the Class 4 Claimant's investment or business dealings with Receivership Parties be factored in when determining the Claimant's claim amount.  "[I]t is appropriate for the Receiver to consider amounts received by investors in settlement of their claims with third parties in determining those investors' claim amounts for purposes of making distributions . . ." *Parish*, 2010 WL 5394736, at *9; *see also S.E.C. v. McGinn, Smith & Co, Inc.*, No. 1:10-cv-457, 2016 WL 6459795, at *3 (N.D.N.Y. Oct. 31, 2016) ("In attempting to equalize recovery among investors, the [settlement] reduction ensures that no one investor recovers a disproportionate percentage of their allowed claim after considering all sources of recovery.  As equality is equity.") (internal quotations omitted).  If the Receiver did not do so, "investors who obtained third-party recoveries would stand to receive distributions in this case that were not proportional to their actual losses."  *Parish*, 2010 WL 5394736, at *9 (citing *S.E.C. v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005)).

25.      The Claims Procedure required Claimants to disclose any compensation they received based on their losses in this Ponzi scheme.  A total of 38 Claimants received a combined

$2,882,787.66 in recoveries that compensated them for their losses in the Defendants' Ponzi scheme. As discussed below in the context of the rising tide methodology, the Receiver proposes treating these recoveries as pre-Receivership withdrawals rather than a dollar-for-dollar reduction from their claim amount as it appropriately balances the desire to equalize recovery among Claimants.

26.     There are at least three different ways outside of this SEC Action in which Class 4 Claimants received payments to compensate them for the losses they sustained as a result of the Ponzi scheme.  Some Class 4 Claimants settled a lawsuit in which they sued a non-Receivership Party for fraudulent misrepresentations the non-Receivership Party made to induce them to invest with the Receivership Parties.  These Class 4 Claimants received settlement payments that are directly related to the losses that comprise their claim amounts in this SEC Action.  Other Class 4 Claimants received payments from an unregistered broker who charged certain Claimants a percentage of their account balances each time they took a distribution from their investment with the Receivership Parties.  Later, by agreement, the broker returned those payments to the Class 4 Claimants, thereby partially compensating those Class 4 Claimants for the losses they sustained as a result of the Ponzi scheme.  Finally, other Class 4 Claimants received insurance proceeds to compensate them for the losses they sustained as a result of the Ponzi scheme.  Treating settlements and other similar recoveries as pre-Receivership withdrawals ensures all Class 4 Claimants are treated equally with respect to the total recovery of their principal investments.

**D.     Netting of Investments is Appropriate.**

27.     The Receiver's recommended distribution plan also requests the Court allow the Receiver to net investments where a person invested with a Receivership Party in multiple capacities. For example, there are some individuals who invested directly with a Receivership Party and also through a pooled fund who invested with a Receivership Party.  A person may have incurred a loss

on their investment individually but received a profit based on their investment in the pooled fund. In such instances, like settlements and other recoveries, the Receiver proposes that the individual's net winnings in the pooled fund be treated as a pre-Receivership withdrawal from their direct investment to ensure that Class 4 Claimants are treated identically with respect to the total recovery of their principal investments.

28.     In addition, there are individuals who received a profit on their direct investment with a Receivership Party but incurred a loss based on their investment in a pooled fund.  In such instances, the Receiver proposes that the individual's net winnings be treated as a pre-Receivership withdrawal by the pooled fund, with an adjustment made by the pooled fund to ensure the individual does not participate in any distribution unless and until the rising tide reaches their loss after factoring in the net winnings from their direct investment.  Treating net winnings in direct investments as pre-Receivership withdrawals for pooled funds ensures all Class 4 Claimants are treated identically with respect to the total recovery of their principal investments.

**E.     A $50 Million Interim Distribution to Class 4 Claimants is Appropriate.**

29.     As of September 30, 2021, the Receiver has available cash on hand totaling $59.3 million.  *See* Dkt. No. 497.  The Receiver requests authority to make an interim distribution of $50 million to allowed Class 4 Claimants at this time.  Specifically, the Receiver requests authority to pay or reserve funds as follows:

a.     Class 1 Claimants: The Receiver has paid and will continue to pay allowed Class 1 Claimants as their fees become due and payable as authorized by Orders of the Court. The Receiver has reserved funds for this purpose.

b.     Class 2 Claimants: The Receiver has paid and will continue to pay the allowed Class 2 Claimants in full when due.  The Receiver does not intend to make an interim

distribution to Class 2 Claimants pursuant to this Motion but has reserved funds for any potential liabilities.

c.      Class 3 Claimants: Allowed Class 3 Claimants will be paid from the sales of the real properties that secure their claim.

d.      Class 4 Claimants: The Receiver will pay each allowed Class 4 Claimant based on the rising tide methodology described in greater detail below.  The Receiver proposes a total interim distribution of $50 million to allowed Class 4 Claimants, which, for the avoidance of doubt, includes both Class 4a and Class 4b Claimants.

e.      Class 5 Claimants: These Claimants are not entitled to a distribution until allowed Class 4 Claimants are paid in full.  Allowed Class 4 Claimants will not be paid in full by the proposed interim distribution, and, therefore, there will be no distribution to any Class 5 Claimants.

30.     The Receiver believes an interim distribution of $50,000,000 to allowed Class 4 Claimants in accordance with the plan set forth above is fair and reasonable, and appropriate at this time.  After making a $50,000,000 interim distribution, the Receiver will still have $9,339,909.87 of cash on hand as reserves for Class 1-3 Claimants, assets disputed by Relief Defendants, and future distributions, which will be supplemented by additional collections, through sales of the remaining assets, and third-party (including claw-back) recoveries and litigation.  Distribution payments to Claimants whose Class 4 Claim remains in dispute will be escrowed pending Court resolution, and then paid to the disputing Claimant or included in subsequent distributions, as appropriate.  *See* Claims Objections.

31.     The remaining cash on hand is sufficient to pay any claim on disputed assets, including Amanda Merrill's claim in full in the event the Court determines she is entitled to 100%

of the net sale proceeds of the two real properties identified in her claim that have been sold by the Receiver: (i) $5,486,183.33 for 1055 Spyglass Lane, Naples, FL 34102; and (ii) $808,364.53 for 27776 Sharp Road, Easton, MD 21601.  *See* Amanda Merrill Claim Form, Dkt. No. 445-1 at 19. The remaining property claimed by the Relief Defendants has not been liquidated and, therefore, could be turned over to satisfy their claims.

32.    The Receiver does not believe, after consultation with BDO, there is any tax liability to the Receivership Parties or the Receivership Estate for the $59.3 million in available cash on hand as of September 30, 2021.  Thus, the Receiver is not reserving any funds to satisfy potential tax liabilities of the Receivership Parties or the Receivership Estate to Class 2 Claimants.

33.    Accordingly, the Receiver believes an interim distribution of $50 million is appropriate and requests authority to make an interim distribution of $50 million to Class 4 Claimants.  If and when the Receiver collects additional funds through sales of the remaining assets and claw-back litigation, the Receiver will propose to the Court another interim, or a final, distribution.

**F.    The Court should Adopt a Rising Tide Distribution for Class 4 Claimants.**

*i.    Distribution methods.*

34.    There are three distribution methods that are often considered in equitable receiverships.  These are: (i) rising tide; (ii) net investment or net loss; and (iii) last statement method. The rising tide method is the "most commonly used (and juridically approved) for apportioning receivership assets."  *S.E.C. v. Huber*, 702 F.3d 903, 906 (7th Cir. 2012).  The Receiver has concluded, as more fully detailed below, that the rising tide method is the most equitable in this case as it equalizes the lowest percentage return victims of the Ponzi scheme recover on their investment

and it provides the greatest recoveries for the largest number of Claimants.  The Receiver therefore requests the Court approve its use here.

35.    The rising tide method uses the distribution process to equalize the percentage return each allowed Claimant receives on their loss with the Receivership Parties.   Under the rising tide method, an investor's pre-receivership withdrawals are considered a part of the overall distributions received by an investor.  As such, the investor's pre-receivership withdrawals for Class 4a Claimants are credited dollar-for-dollar from the principal amount they invested with the Receivership Parties. *Huber*, 702 F.3d at 903.  For non-investor claims (*i.e.*, Class 4b general unsecured claims), and assuming there has been no recovery, the claim is treated as a 100% loss so that general unsecured claims are paid *pro rata* with investor Claimants who lost 100% of their principal investment.  This methodology ensures each allowed Claimant receives the same minimum recovery before any allowed Claimant who received pre-receivership withdrawals receives a distribution.  As the rising tide recovery percentage reaches allowed Claimants who received pre-receivership withdrawals, those allowed Claimants begin sharing in *pro rata* distributions until the next allowed Claimant in the rising tide is reached and is added to the *pro rata* distributions.  This methodology results in those investors who received the largest pre-receivership withdrawals (on a percentage basis) potentially not receiving any distribution.

36.    Under the net loss or net investment method, recoveries are considered as an offset to the claim amount, as opposed to a pre-receivership recovery, and investors receive a *pro rata* distribution based on their claim amount compared to the total amount of all allowed claims in the case. *U.S. Commodity Futures Trading Comm'n v. Lake Shore Asset Mgmt. Ltd.*, 2010 WL 960362, at *9 (N.D. Ill. Mar. 15, 2010)  In other words, a pre-receivership withdrawal would only reduce an investor's claim amount, not their eligibility to receive a distribution as is the case under the rising

tide methodology.  This methodology would pay all Class 4 Claimants on a *pro rata* basis based on the dollar amount of their claim compared to the total dollar amount of all Claimants.

37.     Under the last statement method, an investor's claim amount is determined by taking the value of their investment as of the last investor statement.  *In re Bernard L. Madoff Invs. Secs. LLC*, No. 15-CV-01151, 2016 WL 183492, at *1 (S.D.N.Y. 2016).  Courts have rejected the use of the last statement method when statements are based on fictitious profits as this method has "the absurd effect of treating fictitious and arbitrarily assigned paper profits as real and would give legal effect to [the Ponzi scheme's] machinations."  *In re Bernard L. Madoff Invs. Secs., LLC*, 779 F.3d 74, 78 (2d Cir. 2015).  Here, the last statement method should be rejected as a distribution method because its use would similarly have the "absurd effect" of giving legal effect to the Defendants' fraud as many of the investments were based on fake consumer debt portfolios, or investments that never existed in the first place.  **Exhibit A**, Declaration of Greg Milligan ¶ 8.  Further, the Defendants did not consistently provide account statements, so it would be entirely inequitable to adopt a distribution plan based on inconsistent statements.  Ex. A, Decl. of G. Milligan ¶ 8.

   *ii.     Rising tide versus net loss.*

38.     The Seventh Circuit in *SEC v. Huber* provided two useful charts copied below to illustrate the differences between the net loss (or net investment) and rising tide methodologies.  In the Seventh Circuit's example, the Court assumed that investors A, B, and C each invested $150,000 in the Ponzi scheme.  Investor A withdrew $60,000 before the scheme collapsed, Investor B withdrew $30,000 before the scheme collapsed, and Investor C withdrew nothing.  Thus, Investor A lost $90,000, Investor B lost $120,000, and Investor C lost $150,000.  The Seventh Circuit then assumed that the Receiver had $60,000 to distribute.  Applying the net loss method, Investors A, B, and C would each receive 1/6 of their loss as there was a total of $60,000 in assets and $360,000 in

losses, *i.e.* $60,000/ ($90,000 + $120,000 + $150,000).  In other words, Investor A would receive $15,000, Investor B would receive $20,000, and Investor C would receive $25,000.  Despite each investor investing the same amount in the Ponzi scheme, Investor A will have only lost $75,000, Investor B will have lost $100,000, and Investor C would have lost $125,000.



*See SEC v. Huber*, 702 F.3d at 904-06.

39.     Under the rising tide methodology, however, pre-receivership withdrawals are considered in determining whether an investor is entitled to a distribution, and if so, in what amount. Using the example in *Huber*, the Receiver has $60,000 in assets to distribute.  Because Investor A has already received $60,000 pre-receivership, it would not recover anything.  The $60,000 would be distributed between Investors B and C to bring their distributions as close as possible to the amount Investor A received pre-receivership.  Because Investor C had not received anything on its investment, it would first be entitled to $30,000 so that Investors B and C will have both received $30,000.  The remaining $30,000 would be shared equally between Investors B and C.  Thus, Investor B would receive a $15,000 distribution and Investor C would receive an additional $15,000 for a total distribution of $45,000.  The following chart from *SEC v. Huber* illustrates the effect of

the same $60,000 distribution under the rising tide methodology. These charts show that the rising

tide methodology has the ability to neutralize the worst losses amongst the victims of the defrauded

investors; whereas the net loss methodology can favor investors who made pre-Receivership

withdrawals.



*See SEC v. Huber*, 702 F.3d at 904-06.

40.     Another way to compare the amount investors receive under the net loss methodology

vs. the rising tide methodology is to consider the percentage of each investor's loss. Using the same

*SEC v. Huber* example above, Investor A lost 60% of its investment pre-receivership, Investor B

lost 80%, and Investor C lost 100%. All three investors will receive distributions under the net loss

methodology, with Investor A going from a 60% loss pre-receivership to a 50% loss, Investor B

going from an 80% loss to a 67% loss, and Investor C going from a 100% loss a 83% loss. Under

the rising tide methodology, Investor B will not receive a distribution until Investor C's loss

percentage reaches 80%, and Investor A will not receive a distribution until Investor B's and

Investor's C's loss percentage reaches 60%. Because Investor B and Investor C's loss percentage

reached only 70%, Investor A in the example above will not receive a distribution under the rising

tide methodology.  Once again, the rising tide methodology seeks to treat all similarly situated investors the same by using the distribution process to equalize the losses suffered by the victims throughout the entire Ponzi scheme by not favoring those who received larger pre-receivership withdrawals earlier in the Ponzi scheme.  The rising tide methodology favors investors who lost the highest percentage of their principal investment and ensures the most-harmed investors receive distributions before those who lost a lower percentage of their principal investment.

> ### iii.   Pooling of Assets is Appropriate and the Rising Tide Distribution Methodology Results in a More Equitable Result for Class 4 Claimants.

41.    Some Courts have held that to apply a rising tide or pro rata methodology, the Court must find that "a pooling and pro rata distribution, as opposed to the tracing of assets, [is] appropriate." *S.E.C. v. Capital Consultants, LLC*, 397 F.3d 733, 747 (9th Cir. 2005).  Tracing of assets has been rejected when determining how to distribute assets to similarly situated innocent investors in a fraud scheme as tracing promotes unequal and inequitable treatment of investors who are otherwise similarly situated.  *U.S. v. Real Property located at 13328 and 13324 State Highway 75 N.*, 89 F.3d 551, 553-54 (9th Cir. 1996) (collecting cases).  Here, for the same reasons the last statement methodology should not be used, the Court should find that a pooling and pro rata distribution is appropriate as the Receivership Parties commingled investors' funds and as there is no equitable reason to allow certain investors to recover more than others simply based on fictitious returns.  Ex. A, Decl. of G. Milligan ¶ 8.

42.    The Receiver believes the rising tide is the most equitable distribution methodology for the Class 4 Claimants in this SEC Action.  With respect to investors, after factoring in settlements and other recoveries, 201 investors incurred a loss on their investment with the Receivership Parties.[7]

---

[7] The following analysis is based on the assumption that the Court overrules all remaining objections to claims that have been filed by the Receiver, except for claims of individuals who are

Ex. A, Decl. of G. Milligan ¶ 9.  The majority of the investors—160—lost 50% or more of their

principal investment with 73 investors losing 100% of their investment.  *Id.* ¶ 9.  In addition, 16

allowed Class 4b general unsecured creditors will be deemed to have lost 100% of their claim.[8]  *Id.*

¶ 9.  The following bar graph illustrates the distribution of allowed Class 4's losses.



43.    If the Court adopts a rising tide methodology and assuming a $50,000,000

distribution to Class 4, 176 allowed Claimants would receive a distribution increasing the lowest

recovery from 0.0 % to 48.86%.  41 allowed Claimants would not receive a distribution as they

already recovered at least 48.86% of their principal investment.  *Id.* ¶ 10.  Attached as **Exhibit B** is

the distribution schedule for what each allowed Class 4 Claimant would receive under the rising tide

---

purely duplicative of the pooled group they invested through, which are not included in the
distribution calculations contained in this Motion.  It is not anticipated that the resolution of these
objections would have a material effect on whether to adopt the rising tide or net loss method.

[8] As noted above, the Class 4b Claimants have no recoveries and, accordingly, they are treated as
Claimants who lost 100% of their Claim.

methodology compared to the net loss methodology with the proposed $50,000,000 interim distribution.[9]

44.     If the Court were to adopt the net loss method, all allowed Claimants would receive a distribution; however, it would be at the cost of the allowed Claimants who sustained a 100% loss. Instead of these Claimants recovering 48.86% of their principal under rising tide methodology, the lowest recovery would drop to 28.17% under the net loss methodology.  *Id.* ¶ 11; *see also* Ex. B. Accordingly, the allowed Claimants who lost everything would suffer at the expense of the investors who received distributions pre-Receivership.

45.     The rising tide is also a more equitable distribution methodology to apply here as 147 allowed Claimants would recover more under a rising tide methodology than net loss, assuming a $50,000,000 distribution.  *Id.* ¶ 12.  Only 70 allowed Claimants would receive a higher recovery under the net loss methodology.  *Id.* ¶ 12.

46.     Accordingly, the Receiver recommends the Court adopt a rising tide methodology as (1) it equalizes the lowest percentage return victims of the Ponzi scheme recover on their investment, (2) more allowed Claimants will receive a greater distribution using rising tide methodology, and (3) it raises the lowest percentage of recovery from 28.17% to 48.86% with a $50,000,000 distribution when compared against the net loss methodology.

**G.     Other Relief.**

47.     To be eligible for a distribution payment, the Receiver requests the Court enter an Order that the allowed Claimant be required to provide the Receiver with a completed and signed W-9 on the most recent form, which will be mailed and/or emailed to each allowed Claimant and is

---

[9] To preserve anonymity, investors will be referred to by their investor number that was provided by Stretto to each Claimant.  Other Creditors have also been assigned a number beginning with "O."

also available at https://www.irs.gov/pub/irs-pdf/fw9.pdf.  The Receiver will cause a check to be issued to the allowed Claimant by the 15th day of the month following 30 days after the Receiver's receipt of the properly completed W-9, and the Court's entry of an Order authorizing a $50,000,000.00 distribution.

48.     The Receiver further proposes that the allowed Claimant have 90 days from the date the check is issued to negotiate the payment.  To the extent the distribution is not negotiated within 90 days from the date of the check, then such check and distribution shall be canceled, and the underlying funds will remain in the Receivership Estate for distribution to other allowed Claimants in this SEC Action pursuant to the priority established by the Plan or as otherwise ordered by this Court.

49.     The Receiver further requests the Court find that the Receivership Estate, comprised of funds held and/or recovered by the Receiver, is a qualified settlement fund as required by the Receivership Order.  *See* Dkt. No. 484 at 22, ¶ 45.  Specifically, 26 C.F.R. § 1.468B-1 states that a fund, account, or trust is a qualified settlement fund if:

(1)     It is established pursuant to an order of, or is approved by, the United States, any state (including the District of Columbia), territory, possession, or political subdivision thereof, or any agency or instrumentality (including a court of law) of any of the foregoing and is subject to the continuing jurisdiction of that governmental authority;

(2)     It is established to resolve or satisfy one or more contested or uncontested claims that have resulted or may result from an event (or related series of events) that has occurred and that has given rise to at least one claim asserting liability—

(i)      Under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (hereinafter referred to as CERCLA), as amended, 42 U.S.C. 9601 et seq.; or

(ii)     Arising out of a tort, breach of contract, or violation of law; or

(iii)    Designated by the Commissioner in a revenue ruling or revenue procedure; and

> (3)     The fund, account, or trust is a trust under applicable state law, or its assets are otherwise segregated from other assets of the transferor (and related persons).

26 C.F.R. § 1.468B-1(c).

50.     Here, the Receiver was appointed and the Receivership Estate created pursuant to an Order of this Court, and the Receiver was ordered to "take all necessary steps to enable the Receivership Funds to obtain and maintain the status of a taxable 'Settlement Fund,' within the meaning of Section 468B of the Internal Revenue Code and of the regulations, when applicable." Dkt. No. 484 at 22, ¶ 45.  The Receivership Estate was established to resolve and/or satisfy the contested and uncontested claims of defrauded investors and creditors of the Receivership Parties arising out of the violations of law, as further set forth in this SEC Action and the Criminal Action. The Receiver maintains the assets of the Receivership Estate; they are no longer under the control of the Defendants or their related persons.  Accordingly, the Receiver requests that the Court enter an Order that all distributions made pursuant to the proposed distribution plan will be treated as distributions from a qualified settlement fund.

### III.     CONCLUSION

The Receiver, Gregory S. Milligan, respectfully requests that the Court grant this Motion and enter an Order approving the distribution plan as outlined above, authorizing a $50 million interim distribution to allowed Class 4 Claimants, granting the additional relief requested in this Motion, and for any other further relief which the Court deems proper and just.

Respectfully Submitted,

/s/ Lynn H. Butler
Lynn H. Butler, *pro hac vice*
Jameson J. Watts, *pro hac vice*
HUSCH BLACKWELL LLP
111 Congress Ave., Suite 1400
Austin, TX 78701
Tel: (512) 472-5456
Fax: (512) 479-1101
lynn.butler@huschblackwell.com
jameson.watts@huschblackwell.com

Buffey E. Klein, *pro hac vice*
HUSCH BLACKWELL LLP
1900 N. Pearl Street, Suite 1800
Dallas, Texas 75201
Tel: (214) 999-6100
Fax: (214) 999-6170
buffey.klein@huschblackwell.com

Brian P. Waagner, Fed. Bar No. 14954
HUSCH BLACKWELL LLP
750 17th Street, NW, Suite 900
Washington, D.C. 20006
Tel: (202) 378-2300
Fax: (202) 378-2318
brian.waagner@huschblackwell.com

**COUNSEL FOR RECEIVER**
**GREGORY S. MILLIGAN**

## CERTIFICATE OF SERVICE

On November 17, 2021, I electronically submitted the foregoing document with the clerk of the court of the U.S. District Court for the District of Maryland, using the electronic case filing system of the court.  I hereby certify that I have served all counsel and/or pro se parties of record electronically through the Court's CM/ECF filing system for all parties who have registered to receive electronic service.  Additionally, the foregoing document was served on the following parties not registered for Court's CM/ECF filing system as indicated below:

**Defendant Kevin B. Merrill (via U.S. Mail):**

Kevin B. Merrill, #64274-037
FCI Allenwood Low
Federal Correctional Institution
P.O. Box 1000
White Deer, PA 17887

**Defendant Jay B. Ledford (via U.S. Mail):**

Jay B. Ledford, #55055-048
FCI Safford
Federal Correctional Institution
P.O. Box 9000
Safford, AZ 85548

**Criminal Counsel for Defendant Kevin B. Merrill (via E-Mail and U.S. Mail):**

Elizabeth Genevieve Oyer
Office of the Federal Public Defender
100 S Charles St Ste 900 Tower II
Baltimore, MD 21201
liz_oyer@fd.org

Maggie Grace
Office of the Federal Public Defender
100 S Charles St, Tower II, 9th Floor
Baltimore, MD 21201
maggie_grace@fd.org

**Criminal Counsel for Defendant Jay B. Ledford (via E-Mail and U.S. Mail):**

Harry J Trainor , Jr
Trainor Billman Bennett and Milko LLP
116 Cathedral St Ste E
Annapolis, MD 21401
htrain@prodigy.net

**Criminal Counsel for Defendant Cameron R. Jezierski (via E-Mail and U.S. Mail):**

Joseph J Aronica
Duane Morris LLP
505 9th St NW Ste 1000
Washington, DC 20004
jjaronica@duanemorris.com

**Criminal Counsel for Relief Defendant Amanda Merrill (via E-Mail and U.S. Mail):**

Addy R. Schmitt
Ian Herbert
Miller & Chevalier Chartered
900 16th St NW
Washington, DC 20006
aschmitt@milchev.com
iherbert@milchev.com

**Baltimore County Office of Law (via E-Mail and U.S. Mail):**

Susan B. Dubin
Baltimore County Office of Law
400 Washington Avenue
Towson, Maryland 21204
sdubin@baltimorecountymd.gov

**Dundalk United Methodist Church (U.S. Mail):**

Dundalk United Methodist Church
c/o Edward F. Mathus
6903 Mornington Road
Baltimore, Maryland 21222

**Lienholders, Tax Assessors, and Other Interested Parties (U.S. Mail):**

Florida Community Bank, N.A.
2325 Vanderbilt Beach Road
Naples, Florida 34109

Mortgage Electronic Registration Systems, Inc.
PO Box 2026
Flint, Michigan 48501-2026

Collier County, Florida Tax Assessor
3291 Tamiami Trail East
Naples, Florida 34112

Maryland Department of Assessments & Taxation
301 W. Preston Street
Baltimore, Maryland 21201-2395

Branch Banking and Trust Company,
A North Carolina Banking Corporation
PO Box 1290
Whiteville, North Carolina 28472

Talbot County, Maryland Finance Office
Talbot County Courthouse
11 North Washington Street, Suite 9
Easton, Maryland 21601

HSBC Bank USA, National Association, as trustee of
J.P. Morgan Alternative Loan Trust 2006-A5
c/o Howard n. Bierman, Trustee
c/o Select Portfolio Servicing, Inc.
3815 Southwest Temple
Salt Lake City, Utah 84115

Clark County, Nevada Tax Assessor
500 S. Grand Central Parkway
Las Vegas, Nevada 89155

First Financial Bank, N.A. Southlake
3205 E. Hwy. 114
PO Box 92840
Southlake, Texas 76092

Hunter Kelsey of Texas, LLC
4131 Spicewood Springs Road, Bldg. J-1A
Austin, Texas 78759

Frost Bank, f/k/a The Frost National Bank
c/o Michael J. Quilling
Quilling, Selander Lownds, Winslett & Moser, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201

The City of Colleyville, Texas
c/o Victoria W. Thomas
Nichols, Jackson, Dilard, Hager & Smith, L.L.P.
1800 Lincoln Plaza
500 North Akard
Dallas, Texas 75201

HB: 4824-3798-5531.11

Tarrant County, Texas Tax Assessor
100 E. Weatherford
Fort Worth, Texas 76196

J Trust
c/o Hillary RE. Badrow, Trustee
2801 Paramount Boulevard
Amarillo, Texas 79109

Dallas Central Appraisal District
2949 N. Stemmons Freeway
Dallas, Texas 75247-6195

Bozeman West
PO Box 1970
15632 West Main Street
Bozeman, Montana 59771-1970

Neil A. Patel
5308 Burgandy Court
Colleyville, Texas 76034

TIB – The Independent BankersBank
350 Phelps Court, Suite 200
PO Box 560528i
Dallas, Texas 75356-0528

Wachovia Mortgage, FSB
PO Box 659548
San Antonio, Texas 78265-9548

Denton County Tax Assessor
1505 E. McKinney Street
Denton, Texas 76209-4525

Potter County, Texas Tax Assessor
900 South Polk, Suite 106
Amarillo, Texas 79101

Wells Fargo Home Mortgage
P.O. Box 10335
Des Moines, IA 50306

Albertelli Law
Attn: Coury M. Jacocks
2201 W. Royal Lane, Suite 155
Irving, TX 75063

Samual I. White, P.C.
5040 Corporate Woods Drive, Suite 120
Virginia Beach, VA 23462

Stephen D. Graeff
Dunlap Bennett & Ludwig
8300 Boone Boulevard, #550
Vienna, VA  22182

Kenneth C. Grace
Lash Wilcox & Grace PL
2202 West Shore Blvd.; Suite 200
Tampa, FL 33607

**All Known Investors and known Other Creditors (via U.S. Mail)**

*/s/ Lynn H. Butler*
Lynn H. Butler