UNITED STATES DISTRICT COURT
DISTRICT OF MARYLAND

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>v.<br><br>KEVIN B. MERRILL et al.,<br><br>    Defendants. | Case No. 1-18-cv-02844-RDB |

**OBJECTION OF THE *CONNAUGHTON* OBJECTORS TO THE RECEIVER'S MOTION FOR ORDER APPROVING DISTRIBUTION PLAN AND INTERIM DISTRIBUTION**

Claimants Jeffrey J. Connaughton, Tony Davis, Barbara Louderback, Rochelle Katz, Scott D. Oser, Ojas Patel, Pulin Patel, Dhaval Shukla and Nishant Shukla ("Objectors," the "Named Objectors" or the "*Connaughton* Objectors") through undersigned counsel, respectfully submit this objection to the Receiver's Motion for Order Approving Distribution Plan and Interim Distribution (Dkt. No. 504) ("the Motion"). For the reasons stated below, the Motion should be denied to the extent it imposes an offset, or at least a dollar-for-dollar offset, of recoveries obtained by investors from collateral sources outside of the Receivership.

**I.  Introduction**

This objection concerns the Receiver's proposed treatment of the prior receipt by claimants of recoveries from third parties. Just to be clear, we use the term "third parties" to refer to persons who are *not* "Receivership Parties." For example, the *Connaughton* Objectors, along with certain other investors (collectively, "the *Connaughton* Plaintiffs") were plaintiffs in a civil action (the *Connaughton* Action) brought against one of the "feeder funds" (the persons identified in the Receiver's complaint as the "Bethesda Group") who solicited and procured

investors who would invest in the Receivership Parties.  The *Connaughton* Action settled for an amount of money that is confidential, although the amounts of funds distributed to the *Connaughton* Plaintiffs was provided (under cover of the operative confidentiality agreement in this action) to the Receiver.

In his moving papers, the Receiver indicates that there are a total of 38 claimants (presumably including the 15 *Connaughton* Plaintiffs) who have received distributions from litigation against third parties, and that these distributions total $2,882,787.66.  Motion, ¶ 25.  We refer to this cohort of 38 claimants as the "Collateral Recovery Cohort."

We do not know the specific details about the other twenty-three (23) members of this group.  We asked the Receiver for their identities and information about their claims.  The Receiver refused our request.  But we assume, since the Receiver describes their recoveries as having been from against third parties, that they were from persons who are not affiliated with Defendants Merrill, Ledford or Jezierski, or otherwise defined as Receivership Parties.

In his moving papers, the Receiver indicates that he has "factored" in the receipt of said distributions in determining the amount he intends to distribute to claimants.  Motion, ¶ 25.

This is an understatement.  The Receiver has done more than merely "factor" in these prior distributions.  Rather, he proposes, in effect to confiscate them in their entirety.

The Receiver has treated distributions from third party settlements the same as he has treated distributions from the underlying Ponzi scheme.  This has a particularly harsh effect under the "rising tide" calculation method proposed by the Receiver.  Under this method, the Receiver proposes to bring each investor claimant up to the point of having *received back* 48.86% of total aggregate investments, rather than calculating distributions based on "net loss," which would result in claimants receiving approximately 28.1% of their net loss (regardless of

the amounts of back-and-forth cash flows).

The Receiver's proposed treatment of third party recoveries the same as Ponzi Scheme distributions, will result, for all intents and purposes, in a dollar-for-dollar reduction in what the claimant will receive. If a claimant, for example, had already received $100,000 in a third party settlement, the amount of the claimant's distribution will be effectively reduced by $100,000. Nine (9) of the fifteen (15) *Connaughton* Plaintiffs will receive *nothing* under the Receiver's proposed distribution, and the remaining six (6) will receive a total of approximately $6,500. The *Connaughton* Plaintiffs collectively had a net loss (prior to third party settlement distributions) of approximately $1.25 million. *See* Exhibit A (depicting the Receiver's proposed distribution, highlighted in yellow in Column A, as well as other possible outcomes that are explored below).

While the Receiver does not intend to literally confiscate the full amount of payments received by claimants from third party settlements (*e.g.,* to attach their bank accounts), his proposal to implement a 100% offset (we refer to an offset to factor in third party recoveries as a "Collateral Recovery Offset") has precisely the same effect. This completely eliminates any incentive for any claimant to pursue third parties, ever, much less to reward them for their efforts.

We recognize, as noted by the Receiver, that hard choices have to be made when limited resources need to be allocated among persons who are all faultless victims of a criminal scheme, and that concepts of "fairness" and "equity" should inform this process.

The central questions presented is whether persons who took the initiative to recover from sources outside the Receivership should be rewarded for their initiative, and whether defrauded investors be incented to improve their plight in difficult circumstances. Or, should

they be punished, and the fruits of their labor and initiative confiscated in full. The answer is clear – there must be a sufficient reward to pursue third party recoveries, and such recoveries should not be confiscated. There should not be any Collateral Recovery Offset, or, alternatively, if there is one, it must be sufficiently modest so as not to punish the Collateral Recovery Cohort, and to provide sufficient incentive to defrauded investors to take the proper initiatives in the future.

## II.      Argument

### A. The Receiver Should Not Consider Third Party Recoveries at All

Obviously, in the vast majority of litigation contexts, there simply is no such offset implemented when distributing limited assets to classes of persons who have been harmed by specific defendants.

The guiding background black letter rule is the collateral source rule, applicable both under federal and Maryland law, pursuant to which, a litigant's recovery against Defendant B is not reduced merely because the litigant previously effected a recovery against Defendant (or, say Insurer) A. *Sloas v. CSX Transp. Inc.,* 616 F.3d 380, 389 (4th Cir.2010) (quoting *United States v. Price,* 288 F.2d 448, 449–50 (4th Cir.1961)). (The "collateral source rule holds that 'compensation from a collateral source should be disregarded in assessing tort damages'"). *Accord, e.g., Norfolk Southern Ry. Corp. v. Tiller*, 179 Md. App. 318, 327 (2008) (noting recognition of the doctrine since at least 1899); *Debbas v. Nelson*, 389 Md. 364, 378 n.3 (2003) (In Maryland, the collateral source rule "permits an injured person to recover the full amount of his or her provable damages, regardless of the amount of compensation which the person has received for his injuries from sources unrelated to the tortfeasor").

This principle guides distributions in the vast majority of litigation contexts.

In the federal securities class action context, for example, it is axiomatic that class

members filing claim forms are not asked whether they also obtained recoveries (say, against an investment bank or broker they dealt with, but who were not named as defendants in the class proceeding) from outside of the class action settlement.[1]

In the bankruptcy context, too, courts regularly hold that creditors' claims are "not affected by third-party payments" so long as those payments do not create a double recovery. *In re Del Biaggio*, 496 B.R. 600, 603 (Bankr. N.D. Cal. 2012) (citing *Invanhoe Bldg. & Loan v. Orr*, 295 U.S. 243 (1935)). Any rights of unsecured creditors "to payment from third parties … entitle them to a disproportionate recovery compared to other creditors of the same class (up to a full recovery)." *In re Journal Register Co.*, 407 B.R. 520, 533 (Bankr. S.D.N.Y. 2009). The objective of that policy is to "value *equality of treatment* by the debtor's estate *above equality of overall outcomes* among creditors having different rights against third parties." *Del Biaggio*, 496 B.R. at 604. Honoring that equitable principle properly incentivizes claimants to increase their overall outcome by actively seeking recovery from sources beyond the receivership estate.

Receiverships do not require a different set of rules.

Notably, in *Securities & Exchange Commission v. Credit Bancorp, Ltd.,* 290 F. Supp. 2d 418 (S.D.N.Y. 2003), an SEC receivership, the court rejected the argument, asserted by certain objectors, that a Collateral Recovery Offset was needed:

> As to the objection that some customers are "double-dipping" because they may be compensated from the Receivership estate as well as from insurance policies or collateral lawsuits, the Receiver has argued that he []
>> did not want to eliminate the incentive for any customer to obtain compensation from sources other than the Receivership. To deduct from a customer's distribution under the Plan any amounts received from collateral sources *would have eliminated any incentive for customers to seek compensation from such sources*. Benefits for all customers taken as a whole are maximized if customers are encouraged to seek compensation from other sources.

---

[1] The undersigned have a combined 60 years' experience in securities class actions, including settlement administration.

> Letter from Receiver to Court, dated October 29, 2003. The Receiver further notes that neither the Greers nor Interbanc will be "worse off if other customers do not have their distributions reduced due to recoveries from other sources." *Id.* Accordingly, no modification in the Plan is needed to account for collateral recoveries.

290 F. Supp. 2d at 424 (emphasis added). In that proceeding, the receiver, and the court, properly rejected an offset because it would wrongfully remove incentives from injured investors to pursue third party recoveries.

If the Court were to reject any Collateral Recovery Offset, as in *Credit Bancorp*, and to treat, the fifteen (15) *Connaughton* Plaintiffs on the same terms as other claimants, they would collectively receive distributions *slightly in excess of $400,000*, as compared with the proposed *$6,500* distribution the Receiver proposes. *See* Column G (shaded purple) in Exhibit A, depicting the zero offset outcome, using a rising tide distribution.

The Receiver suggests that we should discard the collateral loss rule because we are in the Never-Neverland land of equity, and equity is just different. "Equality is equity," the Receiver proclaims, Motion, ¶ 24 (quoting *S.E.C. v. McGinn, Smith & Co, Inc.*, 2016 WL 6459795, at *3 (N.D.N.Y. Oct. 31, 2016)) (*"McGinn Smith"*), as he strives for "equality."

To be clear, the Receiver is certainly not talking about equality *within* the Receivership. In fact, he is unapologetically planning on acting in an *unequal* matter within the receivership (through the vastly different treatment of classes of claimants with substantially the same investment losses) to achieve some measure of equality of outcome in the world *outside* the receivership. But is it really the proper function of a receiver to make people more equal in the outside world? If so, then why not also have claimants submit their tax returns and provide for "needs testing?" Or perhaps submit questionnaires relating to their ethnicity, national origin and gender identity so that the Receiver can help traditionally disadvantaged constituencies? While the Receiver's idea of promoting *equality of result* may be well-intentioned, it is contrary to his

mission, and his responsibility to treat creditors equally and fairly within the scope of his receivership. The Receiver's job is to manage assets and distribute them to creditors, not to make the world a better place.

The Receiver cites cases in which courts have approved Collateral Recovery Offsets. Motion, at ¶ 24. But the devil is in the details, and these cases do *not*, for the reasons discussed in more detail below, support the draconian 100% offset proposed here, as the details, and facts, tell a much more nuanced story.

In summary, any Collateral Recovery Offset, is inequitable, unequal, and should be rejected. It requires that the Collateral Recovery Cohort to donate to the receivership estate the fruits of their labor in partially recovering their losses. Rather than place all of their eggs in one basket by relying solely on the Receiver's diligence in recovering funds, investors in the Collateral Recovery Cohort were responsibly proactive and spent their own time, effort, and legal costs to further mitigate their damages. Penalizing them by forcing them to share their success with the those who provided no assistance would create a perverse incentive for future fraud victims to get a free ride on the coattails of their more ambitious fellow victims.

> **B. Alternatively, the Receiver Should Modify the Distribution So as to Reasonably "Factor" Third Party Recoveries Without Confiscating Them Completely and Voiding Any Incentive for Investors to Pursue Third Parties**

Alternatively, if the Court is inclined to approve a Collateral Recovery Offset, it should be considerably less severe than the 100% version presently proposed.

With respect to the range of possible outcomes for the *Connaughton* Plaintiffs,[2] there is a broad range of possibilities between the (approximately) $6,500 distribution proposed by the Receiver, and an (approximately) $400,000 distribution that would occur if the Collateral

---

[2] Presumably, the same could be said for the other members of the Collateral Recovery Cohort.

Recovery Cohort were treated the same as other claimants (in a "rising tide" distribution with no Collateral Recovery Offset). The undersigned have attempted to explore these possibilities with the Receiver, who, thus far, appears not to be interested.

The cases cited by the Receiver provide guidance as to other possible outcomes.

### *1. Capital Consultants*

We start with *SEC v. Capital Consultants, LLC*, 397 F.3d 733 (9th Cir. 2005), a leading case on this issue, and the only appellate decision cited by the Receiver. While the receiver in *Capital Consultants* did propose, and the district court and circuit court both approved, a Collateral Recovery Offset, the one that was approved barely resembles the one proposed in this receivership.

Notably, the receiver in *Capital Consultants*, like the Receiver here, initially proposed a 100% Collateral Recovery Offset. After objections were filed by capable and well-financed counsel, on behalf of two union pension funds, the receiver made rather substantial modifications to the proposed offset:

1. The offset was only at 50% of the amount of the collateral recoveries, not 100%

2. The collateral recoveries (or, more precisely, 50% of the amount of the collateral recoveries) would be deducted from the total aggregate amount invested (treated as money that "never went in"), rather than treated as money invested and received back – an important distinction, particularly if a "rising tide" methodology is used.

3. *Capital Consultants* involved a "net loss"[3] (rather than "rising tide") distribution calculation, which is generally more favorable for those who have received collateral recoveries if there is a substantial Collateral Recovery Offset.

---

[3] While we are *not* arguing for a "net loss" distribution for the entire pool of investor claimants, the Court undoubtedly could, in order to mitigate the harshness of the Collateral Recovery Offset, direct that the Collateral Recovery Cohort receive, as an alternative minimum, what they would have received under a "net loss" distribution.

The relevant provision of the final distribution plan in *Capital Consultants* provided, in pertinent part, that "to the extent the client obtains or has obtained any Third Party Recoveries, 50% of those amounts shall also be treated as Money-out and *deducted from the total Money-in*" (emphasis added).  *See* Order Approving Second Amended Distribution Plan, *SEC v. Capital Consultants, LLC*., Civ. No. 3:00-cv-01290-KI (D. Ore. Feb. 28, 2003) (attached hereto as Exhibit B), at 7.  *See also Capital Consultants*, 397 F.3d at 737 n.5 (reciting the foregoing provision from the distribution plan).

While the Ninth Circuit approved the implementation of the foregoing offset, it did so only after concluding that "clients still have an incentive to pursue third-party claims, and are still rewarded for their efforts, or their decision to purchase insurance, since only half of any third-party recovery is deducted from the client's net loss claim."  397 F.3d at 740.

If the Court generally followed *Capital Consultants*– *i.e.,* to the extent of implementing a 50% offset and treating collateral recoveries as "deducted from the total Money-in," the *Connaughton* Plaintiffs would receive a distribution of approximately $268,000.  *See* Exh. A Column D (shaded green).[4]  This is a very substantial discount from $400,000, but not so draconian an offset so as to deter future third-party claims in analogous circumstances, or to punish claimants who took the initiative to pursue other sources of recovery.

   2. **Parish**

In *S.E.C. v. Parish*, 2010 WL 5394736 (D.S.C. Feb. 10, 2010), the Receiver initially proposed a Collateral Recovery Offset substantially identical to the one proposed in this action – a 100% offset effected by treating collateral recoveries as money in and money out (as opposed

---

[4] In fact, if the Court followed *Capital Consultants* to the letter (50% offset, deduction from money-in, *and* affording the Collateral Recovery Cohort an alternative minimum distribution based on "net loss"), the *Connaughton* Plaintiffs would receive a distribution of approximately $392,000.  *See* Exh. A Column F (shaded gray).

to "no money in") in a "rising tide" receivership distribution. Certain objectors filed objections to the offset (as well as objections related to other issues).

The receiver subsequently modified the plan of distribution, so as to treat collateral recoveries as "no money in." The following discussion recounts the proceedings:

> At the hearing on the Motion to Approve Claim Schedules, *the Receiver's counsel advised the Court that the Receiver agrees with the objecting investors that it will be more equitable to treat third-party recoveries as reductions from investors' Allowed Actual Investments instead of as Allowed Amounts Previously Received*. On the basis of this recommendation, objecting investor Steven L. Smith withdrew his objection to the Receiver's motion. The other objecting investors did not present oral arguments at the hearing; however, the court believes that the concerns raised in their objections are appropriately addressed by the Receiver's new recommendation.

2010 WL 5394736, at *10. As noted by the court, this tweak in the distribution plan seems to have been enough to placate the objectors in *Parish*, one of whom withdrew his objections, and the others of whom simply disappeared and failed to show up at the hearing.

The *Parish* court, in the face of the relatively feeble resistance offered by the objectors, did not closely analyze whether the minor modification made by the receiver would actually be sufficient so as not to be confiscatory, and so as not to remove incentives to pursue third party recoveries. These concerns were nowhere on the court's radar screen. To the contrary, the *Parish* opinion reflects an outright hostility toward litigious fraud victims:

> Indeed, an investor who recovered *all* of his losses from a third-party would stand to collect a double recovery by also receiving a distribution payment in this case, ... *thereby creating an incentive for the type of detrimental "race to the courthouse"* …(emphasis added)

2010 WL 5394736, at *9. First, the threat of a "double recovery" is almost invariably a bogeyman, as it would be in this proceeding, and there simply is no such threat here, and it is not particularly likely that there was such a threat in *Parish* either. Second, and most importantly, the court's characterization of third party litigation as "detrimental" speaks volumes about the

punitive and confiscatory intentions of the court and the receiver. Finally, the notion that investors who pursue *third parties* are "racing" the receiver to the courthouse is, by definition, simply wrong. Investors who pursue third parties are going to *an entirely different courthouse*, suing entirely different defendants, and are not competing with the receiver for the same assets. If anything, they are broadening the pool of recoverable assets available.

Although we would hardly recommend that the Court follow the outcome in *Parish*, it would be a somewhat less draconian result than the offset presently proposed by the Receiver. If the Court were to follow *Parish* (100% offset, but counted as "no money in," in a rising tide distribution), the *Connaughton* Plaintiffs would collectively receive approximately $138,000, or approximately one third of the recovery they would receive if treated as other claimants. *See* Exh. A, Column B (shaded pink). Some, however, would still receive nothing at all.

This type of result is simply not sufficient to preserve an adequate incentive to pursue third party recoveries. Litigation is stressful enough as it is, and the rewards questionable enough. Cases almost invariably settle for substantially less than 100% of damages. Then typical litigants can expect to pay one third (or more) of their aggregate recovery to their lawyers, and have even more deducted as expenses. If, after all of that, two-thirds of their *net* recovery is essentially confiscated in a collateral proceeding, what exactly is the point of taking the initiative to be a litigant?

### 3. McGinn Smith

Finally, we briefly discuss *McGinn Smith*, *supra*, a 2016 decision from the Northern District of New York. In *McGinn Smith*, the court did ultimately approve a 100% Collateral Recovery Offset. As in *Parish*, the court appears to express no concern about the impact of such an offset on the incentive to pursue third party claims. But, notably, in *McGinn Smith*, the Court employed the "net loss" distribution calculation method. 2016 WL 6459795, at *2 ("The

Receiver calculated the amount of each investor's claim according to the net investment method"). *See also* Motion, at ¶ 36 (discussing the "net loss" or "net investment method"). As discussed above, if a substantial Collateral Recovery Offset is implemented, the "net loss" method will typically result in a much less draconian impact on the Collateral Recovery Cohort. If the *Connaughton* Plaintiffs were permitted to recover, as an alternative minimum recovery, what they would recover under the "net loss" or "net investment" calculation, as in *McGinn Smith*, they would collectively recover approximately $200,000. *See* Exh. A, Column C (shaded blue). This would be approximately 50% of what they would recover with *no* Collateral Recovery Offset using the "rising tide" method.

### III.   Conclusion

For the reasons stated above, the *Connaughton* Objectors respectfully pray that the Court deny the Receiver's motion to the extent it provides for a Collateral Recovery Offset, or, alternatively, to the extent that it provides for a Collateral Recovery Offset that is confiscatory and that eliminates meaningful incentives to pursue third party recoveries.

| | |
|---|---|
| Dated: January 3, 2022 | **CUNEO GILBERT & LADUCA, LLP** |
| | /s/ *Monica Miller* <br> JONATHAN W. CUNEO <br> MONICA MILLER, Bar No. 19220 <br> 4725 Wisconsin Ave NW, Suite 200 <br> Washington, D.C. 20002 <br> Telephone: (202) 789-3960 <br> E-mail: jonc@cuneolaw.com <br>         monica@cuneolaw.com |
| | *Counsel for the Connaughton Objectors* |

## **CERTIFICATE OF SERVICE**

I hereby certify that counsel for all parties were served through the Court's Electronic Case Filing System on January 3, 2022.

/s/ *Monica Miller*
Monica Miller